11 CIV 6934

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
Taiwo Olorode,                                                 :     __ Civ. ____
                                                               :
                           Plaintiff,                          :
                                                               :     **COMPLAINT**
          -against-                                            :     **WITH JURY DEMAND**
                                                               :
Streamingedge, Inc., and Tradition (North America) Inc.,       :
                                                               :
                           Defendants.                         :
-------------------------------------------------------------- X

OCT - 3 2011
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff Taiwo Olorode ("Plaintiff" or "Olorode"), by his attorneys, Liddle & Robinson, L.L.P., alleges as follows:

### THE NATURE OF THE ACTION

1)   This is a civil action for damages and remedies for discrimination against Olorode based on his national origin, retaliation for complaining about that discrimination, Streamingedge's failure to provide Olorode overtime compensation, and breach of contract, brought under: (1) the New York State Human Rights Law; (2) the New York City Human Rights Law; (3) 29 U.S.C. §§ 201 *et seq*, the Fair Labor Standards Act ("FLSA"); (4) New York Labor Law §§ 650 et seq.; and (5) breach of contract.

### THE PARTIES

2)   Olorode is a 38 year old male who was born in Nigeria. He resides at 151 Norfolk Street, Apt. 3, New York, NY, 10002. Olorode is a naturalized United States citizen.

3)   Defendant Streamingedge, inc. ("Streamingedge") is a company that "specializes in the research and development of technologies with expertise in the delivery of Real time trading

1

systems and Straight Through processing applications to support Tradition group of Companies in its core business"[1] and is a citizen of New Jersey with its principal place of business in New York City.

4) Defendant Tradition (North America) Inc. ("Tradition NA") is a "diversified inter-dealer broker" that wholly owns a subsidiary which is a broker/dealer and NYSE member firm. Tradition NA is a Delaware corporation with its principal place of business in New York City.[2]

5) Olorode was jointly employed by Streamingedge and Tradition NA from November 5, 2007 through April 13, 2010.

## JURISDICTION

6) This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, and principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7) A copy of the Complaint is being served on the New York City Commission on Human Rights and the Corporation Counsel.

## VENUE

8) Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Olorode's claims occurred within the Southern District of New York.

---

[1] http://www.streamingedge.com/aboutus.htm

[2] http://www.tradition-na.com/company/index.html

2

## FACTS

9) Olorode was employed by Streamingedge beginning on November 5, 2007 with the title of Systems Support Analyst. Streamingedge terminated Olorode's employment purportedly as part of a reduction in force effective April 13, 2010.

10) Throughout the course of his employment with Streamingedge, Olorode was qualified for his position and performed his duties in a professional and competent manner.

11) Olorode moved to the United States in 1992. Olorode became a United States citizen in 2009.

12) Olorode obtained the following educational training. Olorode attended University of Ibadan in Nigeria from 1989 through 1992 pursuing a degree in political science. After emigrating to the United States, Olorode studied criminal justice at Middlesex County College in 1993 and received an associates degree, a Computer Science Certificate from the Chubb Institute in 2000, and a Management Information Systems Certificate from Columbia in 2004. Furthermore, Olorode is scheduled to complete NYU's International Business & Finance Executive Management Program in the fall of 2011.

13) Prior to working for Streamingedge, Olorode was employed in a systems support or information technology technician position in excess of 10 years.

14) Nweke Wilson, Chief Executive Officer of Streamingedge who was also born in Nigeria, recruited Olorode for a position as a Systems Support Analyst in 2007. Olorode interviewed for the position during September and October of 2007. These interviews culminated with Streamingedge offering Olorode a position as a Systems Support Analyst in October of 2007. Later that month, following a negotiation, Streamingedge and Olorode agreed to a salary of $60,000.

15) Olorode's employment by Streamingedge was scheduled to commence on Monday, November 5, 2007. Accordingly, Olorode provided his previous employer, with two weeks notice prior to his resignation.

16) On Sunday, November 4, 2007, Wilson informed Olorode that Streamingedge would pay him a salary of $50,000 instead of the previously agreed to $60,000 salary. Olorode protested the reduction. In response, Wilson adjusted the salary offer to $53,000, but refused to honor the parties' prior agreement.

17) Wilson's last minute reduction in Olorode's salary began a pattern of severe and pervasive abuse that was grounded in part on Olorode's Nigerian origin that continued throughout Olorode's employment.

18) Olorode's duties as a Systems Support Analyst centered upon designing and maintaining the proper operation of the trading platform utilized by Defendant's investment brokers, and related persons such as customers, for the firm's various trading desks including the Overnight Interest Rate Swaps; (also known as the "Repo" desk); Options; Emerging Markets; Bond; Swaps; Canadian Derivatives; and Mexican Derivatives desks, among others. Olorode was expected to arrive before the brokers to ensure that the trading platform functioned properly prior to the opening of the markets. Accordingly, Olorode was required to begin each day between 5 and 6 a.m. This was not the routine start time for the other Systems Support Analysts.

19) After Olorode's probationary period ended, he entered into a new employment contract in March of 2008 with Streamingedge. The contract reinstated Olorode's $60,000 salary. Additionally, the contract provided a variety of benefits, including but not limited to, (1) 13 annual sick days; (2) 10 annual vacation days; (3) reimbursement of business expenses; and (4) in the event of termination without cause, (a) three months notice, (b) salary for such notice

4

period, (c) a pro rata bonus for the year in which Olorode was terminated, and (d) payment for accrued but unused sick and vacation days.

20) Shortly after Olorode began his employment, Wilson began to require Olorode to perform menial tasks unrelated to Olorode's position as a Systems Support Analyst. These duties included assisting the maids by cleaning floors and desks and performing Wilson's personal errands. Wilson did not require the other Systems Support Analysts to perform tasks of a similar nature.

21) Wilson also regularly required Olorode to perform tasks unrelated to the work at Streamingedge in support of Wilson's personal life and obligations, including, but not limited to, bringing Wilson's car in for maintenance; coordinating the resolution of a dispute concerning a bill between Wilson and Best Care, his nanny agency; locating a car Wilson wished to purchase; facilitating the travel of Wilson's nephews to Barbados – including Olorode's traveling to Barbados to arrange visas for these nephews; facilitating the immigration to the United States of Wilson's brother, Ikenna; and assisting Ikenna in performing his duties for Streamingedge. Wilson did not require the other Systems Support Analysts to perform tasks of a similar nature

22) Wilson's additional assignments lengthened Olorode's work day considerably. As a result, Olorode's work day routinely exceeded 12 hours and his work week regularly exceeded 60 hours and was rarely less than 60 hours.

23) Wilson also frequently required Olorode to work on weekends to perform menial tasks.

24) Wilson assigned the aforementioned menial tasks to Olorode because of his national origin.

5

25) Olorode did not receive overtime compensation despite routinely working in excess of 8 hours per day and 40 hours per week.

26) The discriminatory atmosphere at Streamingedge – which was made known to the management of Streamingedge – is evidenced by the following instant message conversation between a business analyst ("Jesse") and a developer ("J0ren G4ucher"):

| | |
|---|---|
| Jesse: | "they don't want to do anything because they don't know how"<br>"great support ppl working here" |
| J0ren G4ucher: | "i think in the next couple of months im going to start pushing EVERYTHING on them<br>repo everything<br>and get repo to f*cking cry to wilson<br>and then that will make wilson realize what morons they are"… |
| Jesse: | "f*cking babies<br>they're so stupid<br>you can just tell by talking to them<br>**monkeys**"… |
| J0ren G4ucher: | "yeah taiwo<br>hes a f*cking moron" |

27) Streamingedge's management did nothing to address the discriminatory atmosphere.

28) In or around May of 2008 Olorode complained to Adnan Jaballah, Streamingedge's Global Developer Manager, concerning the menial tasks that Wilson assigned to him which were unrelated to his duties as a Systems Support Analyst, the additional hours he was forced to work without compensation, and the retaliation he suffered for complaining about such assignments and hours.

29) Jaballah suggested that Olorode bring his complaints to the attention of Larry Rosenshein, at that time CEO of Streamingedge and an affiliated company, TFS Energy, as well

6

as a member of the Board of Directors of Viel, a more senior company within the Tradition Group.

30) Olorode subsequently met with Rosenshein. During this meeting, Olorode reiterated his complaint to Jaballah and expressed his concern that he would be further retaliated against for complaining. Rosenshein requested that Olorode collect documentation to support his allegations.

31) Wilson's inappropriate assignments and failure to pay overtime continued, and in fact escalated, throughout 2008 and 2009. Wilson began demanding that Olorode ship certain letters and advance payment on his behalf, promising to repay the expended funds latter. Wilson failed to repay Olorode, despite Olorode's request for repayment.

32) Wilson's personal use of the company's shipping accounts came to the attention of the accounting department and Streamingedge's parent company in or around the fall of 2008. Representatives of the accounting department demanded that Olorode repay Streamingedge's expenses incurred in connection with the packages he shipped on behalf of Wilson. Wilson forced Olorode to take responsibility for the improper shipping costs despite the fact he directed Olorode to send the packages. At first, Wilson completely refused to reimburse Olorode for the expenses incurred on his behalf. A few months later, Wilson agreed to reimburse Olorode for some, but not all, of the expenses.

33) In September 2009, Olorode spoke to Rosenshein and provided him with e-mails and other information of Wilson's discriminatory treatment.

34) Rosenshein met with Olorode again in or around October 2009. Rosenshein asked Olorode to compile additional documentation available to him in support of his concerns.

35) Shortly after Olorode's second meeting with Rosenshein in the fall of 2009, Wilson summoned Olorode to his office. Wilson informed Olorode that he knew of his discussion with Rosenshein. Wilson then introduced Olorode to a lawyer friend of Wilson's from Nigeria, who was also present. The lawyer proceeded to question Olorode concerning Olorode's complaints to Rosenshein without explaining why he was present, the nature of his relationship with Streamingedge, or the purpose of his inquiries. The questioning intimidated Olorode causing him substantial distress and fear that Wilson would learn of any further complaints or information provided by Olorode and retaliate against him.

36) Following the interrogation, Wilson told Olorode that as Nigerians they have to "stick together" to succeed – both the lawyer and Wilson are also of Nigerian descent. Olorode responded by insisting that advancement should be based upon merit, not "sticking together." Wilson immediately dismissed Olorode from his office.

37) After Olorode met with Wilson, Olorode was reluctant to participate further with Roshenshein.

38) Wilson's discriminatory and retaliatory conduct increased following his fall 2009 meeting with Olorode.

39) In the fall of 2009, Olorode began to be excluded from meetings and e-mails concerning his group. His e-mail address was removed from the System Support Group's e-mail list.

40) In the fall of 2009, Wilson continued to demean Olorode and demanded that Olorode research and facilitate the acquisition of numerous used cars on behalf of himself and his family for their personal use. Wilson required Olorode to attend auctions, pay deposits, and to facilitate the shipping, painting, refitting, and financing of the cars. Wilson also demanded that

8

Olorode travel to Virginia, New Jersey and Long Island in connection therewith on numerous occasions. Wilson further demanded that Olorode monitor the situation on a daily basis and update him accordingly. These tasks and updates took an average of one to two hours per day for approximately two months. Wilson did not require the other Systems Support Analysts to perform tasks of a similar nature.

41) Also in the fall of 2009, Wilson e-mailed Olorode to meet with him concerning his nephews' college expenses. During this meeting, Wilson told Olorode to audit his nephews' expenses, ensure that they were not spending money inappropriately, and continue to monitor his nephew's spending habits going forward. Wilson did not require the other Systems Support Analysts to perform tasks of a similar nature.

42) Also in the fall of 2009, Wilson called Olorode into a staff meeting for the sole purpose of instructing Olorode, in front of Olorode's co-workers, to carry his friend's bags to the lobby. Olorode was publicly humiliated and demeaned by this demand.

43) Also in the fall of 2009, Wilson's wife, on behalf of Wilson, called Olorode to demand that he come to Wilson's house and transport certain appliances and electronics to a shipping container for Wilson. Wilson did not require the other Systems Support Analysts to perform tasks of a similar nature

44) Also in the summer or fall of 2009, Wilson's brother demanded that Olorode clean out a storage container for Wilson. Olorode refused this request. Wilson did not require the other Systems Support Analysts to perform tasks of a similar nature

45) Wilson's hostility and retaliation negatively impacted Olorode's mental and physical health – including causing vomiting, significant weight loss and depression.

46) Many of the brokers begin to ask Olorode if he had AIDS. One of the brokers, James Connelly, asked Olorode to "stay home" if he was "sick" so that he "didn't spread any disease here."

47) The foregoing discriminatory and retaliatory acts caused Olorode to confront Wilson and demand that he stop harassing him. Olorode discussed his visibly deteriorating physical condition and Wilson's inappropriate conduct as it impacted his workday. Wilson dismissed these concerns stating that Olorode would have to continue to perform tasks outside of his role as a Systems Support Analyst.

48) On December 18, 2009, Olorode's physician, Dr. Rajeev Babbar, ordered Olorode to take a leave of absence for health reasons.

49) Olorode began his leave of absence on or about January 2, 2010.

50) On February 3, 2010 Olorode returned to work with the permission of Dr. Babbar. Nonetheless, Olorode's health remained compromised by Wilson's continued discriminatory and retaliatory treatment.

51) In March 2010, Olorode repeatedly attempted to meet with Rosenshein to pursue his complaints of discrimination and retaliation. Adnan Jaballah, the Global Developer Manager, eventually informed Olorode that Rosenshein was unavailable.

52) In early April, Jaballah told Olorode that his group was understaffed and therefore needed to be expanded.

53) Despite the fact that Olorode's group was understaffed, on April 11, 2010 Jaballah informed Olorode that Wilson was attempting to terminate Olorode's employment. Olorode asked whether Jaballah could assist him in transferring to the company's London office,

which was not under Wilson's management. Jaballah replied that Wilson would not approve his transfer.

54) On April 13, 2010 Wilson informed Olorode that his employment was being terminated allegedly as part of a reduction in force.

55) The stated reason for the termination of Olorode's employment was a pretext. In fact, the termination of Olorode's employment was discriminatory and in retaliation for Olorode's prior complaints.

56) Defendant breached Olorode's contract by, among other things, failing to provide Olorode with the following contractual benefits upon the termination of his employment without cause:

    a) three months notice or three months salary in lieu of notice;

    b) a bonus pro rated for six and a half months (three and a half months worked plus an additional three months notice; and

    c) payment for accrued but unused sick and vacation days.

57) Defendant's breach of Olorode's March, 2008 employment contract was discriminatory and in retaliation for Olorode's complaints.

## DEFENDANTS JOINTLY EMPLOYED OLORODE

58) During the course of Olorode's employment, Streamingedge became increasingly integrated with Tradition NA. This integration included the following:

    a) Olorode received pay stubs issued by Tradition NA;

    b) Olorode's health insurance card identified Tradition NA as his employer;

   c) Olorode received a Tradition NA employee identification badge;

   d) Olorode's received a Tradition NA e-mail address;

   e) Streamingedge did not maintain a separate Human Resources department – Tradition NA's human resources personnel supported Streamingedge employees; and

   f) Tradition NA executives assumed some of the management responsibilities for Streamingedge personnel issues.

59) Streamingedge and Tradition NA's operations were highly interrelated during Olorode's employment.

60) Streamingedge and Tradition NA exercised central control of employment and labor relations.

61) Streamingedge and Tradition NA employed common management teams.

62) There is significant overlap between the ownership of Streamingedge and Tradition NA.

## FIRST CLAIM
(National Origin Discrimination in Violation of New York State Human Rights Law)

63) Plaintiff repeats and realleges the allegations contained in the preceding paragraphs, as if separately set forth herein.

64) At all relevant times, Plaintiff was an "employee" for purposes of § 296 of the New York State Human Rights Law.

65) Defendant is an "employer" for purposes of § 292 of the New York State Human Rights Law.

66) By its actions detailed above, Defendant has unlawfully discriminated against Plaintiff on the basis of his national origin in violation of § 296 of the New York State Human Rights law.

67) As a result of the willful discrimination described above, Plaintiff suffered substantial loss of earnings and benefits, and he may continue to do so in the future. Accordingly, Defendant is liable to Plaintiff for both back pay and front pay in an amount as yet undetermined, mental and emotional anguish, plus interest and costs.

## SECOND CLAIM

(National Origin Discrimination in Violation of the New York City Human Rights Law)

68) Plaintiff repeats and realleges the allegations contained in the preceding paragraphs, as if separately set forth herein.

69) Plaintiff is a "person" under § 8-102(1) of the New York City Human Rights Law.

70) Defendant is an "employer" subject to the provisions of the New York City Human Rights Law under § 8-102(5) of the Administrative Code.

71) By its actions detailed above, Defendant has unlawfully discriminated against Plaintiff on the basis of his national origin in violation of the New York City Human Rights Law.

72) As a result of the discrimination described above, Plaintiff has suffered substantial damages, including emotional distress and mental anguish, in an amount to be determined at trial.

73) Defendant's actions described above constitute discrimination against Plaintiff on the basis of his national origin and were taken with reckless indifference to Plaintiff's rights, entitling him to punitive damages under the New York City Human Rights Law.

## THIRD CLAIM
### (Retaliation Under the New York State Human Rights Law)

74) Plaintiff repeats and realleges the allegations contained in the preceding paragraphs, as if separately set forth herein.

75) Plaintiff opposed Defendant's unlawful, discriminatory employment practices and engaged in protected activity under the New York State Human Rights Law.

76) As described above, Defendant retaliated against Plaintiff for having engaged in the protected activity.

77) Defendant's actions constitute discrimination and retaliation against Plaintiff in violation of the New York State Human Rights Law, § 296.

78) As a result of Defendant's retaliation, Plaintiff suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

## FOURTH CLAIM
### (Retaliation Under the New York City Human Rights Law)

79) Plaintiff repeats and realleges the allegations contained in the preceding paragraphs, as if separately set forth herein.

80) Plaintiff opposed Defendant's unlawful, discriminatory employment practices and engaged in protected activity under the New York City Human Rights Law.

81) As described above, Defendant retaliated against Plaintiff for having engaged in the protected activity.

82) Defendant's actions constitute discrimination and retaliation against Plaintiff in violation of the New York City Human Rights Law, § 8-107.

83) As a result of Defendant's retaliation, Plaintiff suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

84) Upon information and belief, Defendant's retaliatory actions against Plaintiff were taken with reckless indifference to Plaintiff's rights, entitling her to punitive damages under the New York City Human Rights Law.

## FIFTH CLAIM
(Failure to pay overtime compensation in violation of the Fair Labor Standards Act)

85) Plaintiff repeats and realleges the allegations contained in the preceding paragraphs, as if separately set forth herein.

86) At all relevant times, Streamingedge has been, and continues to be, an employer engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. §§ 203, 206(a) and 207(a).

87) At all relevant times, Streamingedge employed Plaintiff within the meaning of the FLSA.

88) Upon information and belief, at all relevant times, Streamingedge has had gross annual revenues in excess of $500,000.

89) As a result of Streamingedge's willful failure to compensate its employees, including Plaintiff, at a rate not less than one and one-half times the regular rate of pay for work performed in excess of forty hours in a workweek, as well as for actual hours worked, Streamingedge has violated and continues to violate the FLSA, 29 U.S.C. §§ 2-1 et seq., including 29 U.S.C. §§ 207(a)(1) and 215(a).

90) As a result of Streaminedge's failure to record, report, credit and/or compensate its employees, including Plaintiff, Streamingedge has failed to make, keep and preserve records with respect to each of its employees sufficient to determine the wages, hours and other conditions and practices of employment in violation of the FLSA, 29 U.S.C. §§ 201, et seq., including 29 U.S.C. §§ 211(c) and 215(a).

91) The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning 29 U.S.C. § 255(a).

92) Due to Streamingedge's FLSA violations, Plaintiff is entitled to recover from Streamingedge his unpaid hours worked and overtime compensation, an additional amount equal to one-hundred percent (100%) of his unpaid wages and overtime pay as liquidated damages, pre-and post judgment interest, reasonable attorneys' fees and costs and disbursements of this action, pursuant to 29 U.S.C. § 216(b).

## SIXTH CLAIM
(Failure to pay overtime compensation in violation of the New York Labor Law)

93) Plaintiff repeats and realleges the allegations contained in the preceding paragraphs, as if separately set forth herein.

94) At all relevant times, Plaintiff was employed by Streamingedge within the meaning of the New York Labor Law, §§ 2 and 651.

95) Streamingedge willfully violated Plaintiff's rights by failing to pay him overtime compensation at rates not less than one and one-half times the regular rate of pay for each hour worked in excess of eight hours per day and/or forty hours in a workweek, an additional hour of pay for each hour worked in excess of ten hours in one day and for hours actually worked.

16

96) Due to Streamingedge's New York Labor Law violations, Plaintiff is entitled to recover from Streamingedge his unpaid wages and overtime compensation, reasonable attorneys' fees, and costs and disbursements of the action, pursuant to New York Labor Law § 663(1).

## SEVENTH CLAIM
(Breach of contract)

97) Plaintiff repeats and realleges the allegations contained in the preceding paragraphs, as if separately set forth herein.

98) Defendants breached Paragraphs 5-10 of the March, 2008 Employment Agreement entered into between Defendants and Plaintiff by (a) failing to provide the required three months notice prior to terminating Plaintiff's employment without cause; (b) failing to make a mandatory pro rata bonus payment; (c) failing to pay Plaintiff for accrued but unused sick and vacation days; and (d) failing to reimburse Plaintiff for business expenses.

99) Plaintiff performed his obligations under the contract with Defendant.

100) All conditions precedent to Defendant's contractual liability were performed or occurred.

101) As a direct result of Defendant's breach as alleged herein, Plaintiff suffered damages, in an amount not less than $30,000.

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

    A. back pay and front pay in an amount to be determined at trial;

    B. reimbursement for business expenses;

    C. damages resulting from Plaintiff's mental and emotional anguish;

    D. unpaid wages and overtime compensation due under the FLSA;

E. unpaid wages and overtime compensation due under the New York Labor Law;

F. unpaid wages for failure to provide contractually guaranteed notice;

G. unpaid wages for accrued but unused sick and vacation days;

H. unpaid pro rata bonus for 2010;

I. liquidated damages;

J. compensatory damages;

K. punitive damages;

L. pre-judgment and post-judgment interest;

M. attorneys' fees, costs, expert fees, and disbursements;

N. all such other and further relief as this Court deems just and proper.

Dated: New York, New York

      October 3, 2011

      LIDDLE & ROBINSON, L.L.P.

By: _____
Marc A. Susswein
Matthew J. McDonald
Attorneys for Plaintiff
800 Third Avenue
New York, New York 10022
(212) 687-8500
msusswein@liddlerobinson.com
mmcdonald@liddlerobinson.com