

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - -X

TAIWO OLORODE,

                    Plaintiff,


        -against-                    Case No.

                                11 Civ. 6934 (GBD)


STREAMINGEDGE, INC., and TRADITION

(NORTH AMERICA) INC.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - -X

                    November 30, 2012

                    10:18 a.m.


DEPOSITION of TAIWO OLORODE, the Plaintiff herein,

taken pursuant to Notice, and held at the offices

of Liddle & Robinson, LLP, 800 Third Avenue, New

York, New York, before Leeann Bertorelli, a Court

Reporter and Notary Public of the State of New

York.



2

```
 1   A P P E A R A N C E S :

 2

 3        LIDDLE & ROBINSON, LLP

 4             Attorneys for the Plaintiff

 5             800 Third Avenue

 6             New York, New York 10022

 7        BY:  MATTHEW J. MCDONALD, ESQ.

 8

 9        REISMAN, RUBEO & McCLURE, LLP

10             Attorneys for the Defendants

11             151 Broadway

12             Hawthorne, New York 10532

13        BY:  MARK I. REISMAN, ESQ.

14

15

16

17

18

19

20

21

22

23

24
```



1          IT IS HEREBY STIPULATED AND AGREED by

2    and between the attorneys for the respective

3    parties herein, that filing and sealing be and the

4    same are hereby waived.

5

6          IT IS FURTHER STIPULATED AND AGREED that

7    all objections, except as to the form of the

8    question, shall be reserved to the time of the

9    trial.

10         IT IS FURTHER STIPULATED AND AGREED that

11   the within deposition may be signed and sworn to

12   before any officer authorized to administer an

13   oath, with the same force and effect as if signed

14   and sworn to before the Court.

15

16

17

18

19

20

21

22

23

24

4                     **TAIWO OLORODE**

1

2                         TAIWO OLORODE,

3     having been first duly sworn by the Notary Public

4     (Leeann Bertorelli), and stating his address as

5     151 Norfolk Street, Apartment 3, New York, New

6     York 10002, was examined and testified as follows:

7

8     EXAMINATION BY

9     MR. REISMAN:

10          Q.    Good morning.

11          A.    Good morning, sir.

12          Q.    Good morning.  My name is Mark Reisman.

13    My law firm represents Streamingedge Incorporated

14    in the lawsuit which is the subject of today's

15    deposition.  I'm going to ask you some questions.

16    If you don't understand anything that I say, please

17    tell me so.

18          A.    Okay.

19          Q.    I do not read from a script when I ask

20    questions, so I may say something that makes sense

21    to me, but it may not make sense to you.  If that's

22    the case, I will apologize in advance.  The

23    purpose, from my perspective, of this deposition is

24    to get information, not to trick you.



1       A.   So as I said, if you don't understand

2   what I say, please tell me so, and I'll be happy to

3   clarify the question.

4       A.   Okay.

5       Q.   If at any time during this deposition

6   you need to take a break, please say so, and we'll

7   obviously give you that opportunity.  The only

8   thing that I ask is that you not ask for a break

9   until after you finish the last question that's

10  been asked.

11      A.   Okay.

12      Q.   There may come times during the

13  deposition when your attorney may object to a

14  question that I've asked for some reason that he,

15  as a lawyer, understands.  If he does that, please

16  give Mr. McDonald and myself an opportunity to

17  discuss his objection, and then we'll obviously

18  figure out whether you should answer the question

19  or not.

20      A.   Yes.

21      Q.   Also, please make sure that you answer

22  questions using words.  While in everyday

23  discussions between human beings, we sometimes nod

24  our head or make sounds that people understand to



6                          TAIWO OLORODE

1    mean a particular thing.  Court reporters are very

2    specific.  They can only record words, so please

3    answer using words.

4          A.    Yes, I do.

5          Q.    Okay.  Also, I have a bad habit, which I

6    will also apologize in advance for doing two

7    things:  Number one, speaking in a voice that other

8    people sometimes can't hear, and, number two,

9    stopping my question in mid-sentence.  So if you

10   hear me ask a question like I just did and stop

11   before it sounds like I reached the end of the

12   sentence, it's probably because I haven't reached

13   the end of the sentence, and, again, I apologize.

14   If you can't hear what I'm saying, please ask me to

15   raise my voice, and I'll do that.

16         A.    So meaning, in essence, wait till you

17   finish and answer?

18         Q.    Yes.

19         A.    Okay.

20         Q.    All right.  Do you understand everything

21   I've said so far?

22         A.    Yes, I do.

23         Q.    All right.  The address that you've just

24   gave, 151 Norfolk Street in New York City, for how



```
 1    long have you lived there?
 2         A.    I've lived there for over ten years now.
 3         Q.    And are you married?
 4         A.    Yes, I am.
 5         Q.    What is your wife's name?
 6         A.    Akiko Olorode.
 7         Q.    Could you please spell that.
 8         A.    A-K-I-K-O.  Last name is O-L-O-R-O-D-E.
 9         Q.    And do you have children?
10         A.    Yes.
11         Q.    What are their names and ages?
12         A.    I have two children.  The older boy's
13    name is Sidney Taiyo, T-A-I-Y-O.  Same last name as
14    my last name, Olorode, O-L-O-R-O-D-E.
15         Q.    And his age?
16         A.    He's 11.
17         Q.    And your second child?
18         A.    Omotola, O-M-O-T-O-L-A.  Last name is
19    O-L-O-R-O-D-E, and he's 9.
20         Q.    Are you presently employed?
21         A.    I'm sorry.  Do you mind if I ask what
22    you mean by if I'm presently employed?
23         Q.    Well, are you presently working outside
24    of your home?
```



1        A.    Yes.

2        Q.    And by whom are you presently employed?

3        A.    By myself.

4        Q.    And when you say that you're

5    self-employed, what type of work do you do?

6        A.    I run an import/export business.

7        Q.    Does the business have any particular

8    name?

9        A.    Water Regents Global, Limited.

10       Q.    Could you spell Regents, please.

11       A.    R-E-G-E-N-T-S, Global Limited.

12       Q.    And does the company have an office?

13       A.    I don't have an office outside of my

14   home.  I run out of my home.

15       Q.    All right.  So would it be fair to say

16   that the office of Water Regents Global, LTD is

17   based in your home at 151 Norfolk Street, New York

18   City?

19       A.    That is correct.

20       Q.    Is Water Regents Global, LTD a company

21   formed in New York State?

22       A.    That is true, yes.

23       Q.    And in what year was the company formed?

24       A.    In what year?  The company was formed



1  November -- I'm sorry, either September -- I'm not
2  exactly sure exactly what month, but either
3  September or October 2011.
4      Q.   And when you say that Water Regents
5  Global, LTD is an import/export business, does the
6  company import and/or export any particular types
7  of products?
8      A.   I export mainly consumer goods and also
9  automobiles, used automobiles, and incidental parts
10  as well.
11      Q.   When you say "parts," automobile parts?
12      A.   Exactly.
13      Q.   And does the company import any
14  particular types of goods?
15      A.   Currently, no.
16      Q.   Since the time that the company was
17  formed in September or October 2011, has it engaged
18  in any business -- any type of business activity
19  other than what you just told me about?
20      A.   There's -- has it engaged, what do you
21  mean by "engaged"?
22      Q.   In other words, other than exporting
23  consumer goods and used automobiles and auto parts,
24  since September or October 2011, has the company



1    been involved in the export of any goods other than

2    those that you just told me about?

3         A.    No.

4         Q.    Prior to September or October 2011, were

5    you employed outside of your home -- withdrawn.

6              MR. MCDONALD:  Objection to form.  Time

7         frame.

8              MR. REISMAN:  I'll withdraw.

9         Q.    I think we can agree, correct me if I'm

10   wrong, that your employment with Streamingedge

11   Incorporated ended in April 2010.

12             MR. MCDONALD:  I would agree, yes.

13             MR. REISMAN:  Okay.

14        Q.    Mr. Olorode, do you agree with that?

15   I'm not necessarily asking you to agree why, but

16   can we agree --

17        A.    Yes.

18        Q.    -- that you stopped working for

19   Streamingedge at some point in April 2010?

20        A.    Yes.

21        Q.    All right.  So since -- between

22   April 2010 when you stopped working for

23   Streamingedge and September or October 2011, when

24   you've indicated that you formed the company that



1    I'll call for short Water Regents, were you

2    employed at all?

3         A.    No.

4         Q.    Are you presently a shareholder in the

5    company known as Water Regents, for short?

6         A.    Yes.

7         Q.    And are there any shareholders in the

8    company other than yourself?

9         A.    Yes.

10        Q.    And how many shareholders are there?

11        A.    Myself and my wife.

12        Q.    And other than yourself and your wife,

13   are there any other shareholders?

14        A.    No.

15        Q.    All right.   Since the time that the

16   company was formed, have there been any

17   shareholders of the company other than your wife

18   and yourself?

19        A.    No.

20        Q.    Between approximately April 2010 and the

21   time that the company known as Water Regents, for

22   short, was formed, did you work in any capacity in

23   the import/export business?

24        A.    I'm sorry.   Can you repeat that



1    question, sir.

2        Q.    Sure.    Sometimes when we go along, if

3    you ask for a question to be repeated, I'll ask the

4    court reporter to read it back so that you can hear

5    exactly what was said, and that's what I'm going to

6    do right now.

7            MR. REISMAN:    Could you read it back,

8        please.

9

10           (The requested testimony was read back.)

11

12        A.    Okay.    The answer is if you -- okay.

13    I'm going to answer the question in two parts, if

14    that's okay.    I've engaged in what you would call

15    -- how do I say -- feasibility studies prior to

16    then in terms of looking into the possibility of

17    making a successful business or whether it's

18    something that I can get into.    Prior to then, I

19    have not worked in any kind of export or import,

20    but once I decided to actually maybe start

21    registrations and do things that -- things that

22    would make -- once we started to get into going to

23    different areas to acquire merchandise and business

24    activity, that's when I would say I actually

1    started any kind of employment activity.  So if

2    you're asking between my -- the end of my

3    employment with Streamingedge and the time that I

4    started the company, I hadn't engaged in any kind

5    of business activity.

6        Q.    When you say that you conducted

7    feasibility studies, was the purpose of the

8    feasibility studies to determine whether or not it

9    would make sense for you to get into the

10   import/export business?

11       A.    Yes.

12       Q.    And, approximately, when, if you can

13   recall, did you begin doing the feasibility studies

14   that ultimately led to the formation of this

15   company?

16       A.    I can't -- it's going to be hard for me

17   to give specific dates, but I would say months,

18   several months.

19       Q.    And when you say "several months," would

20   you, in your best estimate, approximate that you

21   started engaging in the feasibility studies less

22   than six months prior to forming the company known

23   as Water Regents for more than six months?

24       A.    It's very hard for me to put my finger



14                     **TAIWO OLORODE**

1   on it, because there's many aspects to these that I

2   think it's -- it's very hard for me to say it's

3   less than six months or -- but I know for sure that

4   at some point I started to look into whether this

5   is possible, but probably less than six months

6   probably.  But that's not necessarily precise

7   answer.

8         Q.   I understand.  Are there any documents

9   or things of any kind, either here or anywhere

10  else, that would help you to more accurately be

11  aware of when you began doing the feasibility

12  studies that we've been discussing?

13        A.   I doubt it.  I mean, it's online, going

14  to several Web sites or sometimes making physical

15  inspections of sites, talking to people.  It's not

16  something I would say concise in terms of

17  recordkeeping.

18        Q.   All right.  Did you keep any records as

19  you were doing the feasibility studies?

20        A.   No, I wasn't.

21        Q.   Prior to approximately September 2011 or

22  October 2011, when Water Regents was formed, did

23  you have any experience in the export of consumer

24  goods?

800.DAL.8779
dalcoreporting.com


1          MR. MCDONALD:  At any time?

2          MR. REISMAN:  Yes.

3      A.   I'm sorry.  Can you -- can you explain

4  exactly what you mean by that in terms of

5  experience?

6      Q.   Sure.  You indicated that one of the

7  types of business that Water Regents engages in is

8  in the export of consumer goods; is that accurate?

9      A.   Yes.

10     Q.   What types of consumer goods in

11 particular does Water Regents export?

12     A.   I would say diapers, household goods,

13 lotion, soaps.  I would say many American products

14 that aren't as scarce in the market that I

15 currently face.  And the automobile -- I mean, it's

16 part of the experience I had also while I was

17 working for Mr. Nweke.  So I met several people

18 while I used to go to different auctions for Mr.

19 Nweke, my former boss at Streamingedge.

20          Consequently, also, there are certain -- my

21 line of education at the moment, I attend NYU

22 School of Continuing Education and Professional

23 Studies, and my major happen to be international

24 business and finance, and part of why I became



1    convinced that something right for me was also some

2    of the classes I've taken.  I've taken -- so if you

3    want to consider that experience, meaning in terms

4    of what -- in terms of knowing more about the

5    business I want to get into, if I get you

6    correctly, is through school and prior experience

7    and some people I've met before and talking to

8    them, finding out how much it is to acquire certain

9    goods, how much -- how quickly it is to dispose of

10   in certain markets, and how -- the possibility of

11   this being something successful, so I would say all

12   of this experience over the years, you know,

13   combined into the final decision to go into the

14   business.

15        Q.    Okay.  Now, you indicated a moment ago

16   that you're a student at NYU School of --

17        A.    Continuing Education.

18        Q.    Continuing Education.

19        A.    And Professional Studies.

20        Q.    And Professional Studies.  For how long

21   have you been enrolled at NYU?

22        A.    I started in probably the fall of '09 or

23   spring of 2010, either of the two.  I would have to

24   --



1      Q.   All right.  And are you presently a

2  full-time student at the NYU school of -- whatever

3  it is.  I'm sorry.  Withdrawn.

4           Are you presently a full-time student at

5  NYU?

6      A.   Part time.

7      Q.   And when you say "part time,"

8  approximately, how many credits or courses per

9  semester do you take or whatever other trimester or

10  semester basis?

11      A.   This is my last semester at the school,

12  and I'm currently -- I just sat for the midterm

13  exam for my last class completion of this program.

14      Q.   I'm sorry.  What program?

15      A.   I said I just sat for my last -- this is

16  the last --

17           MR. MCDONALD:  Listen to the question.

18      Q.   You said you sat for your last midterm?

19      A.   Right.  Okay.  What I meant to say --

20  let me -- can you --

21      Q.   Sure.

22      A.   What I was saying was this is my last

23  semester in the international business and finance

24  program, which I mentioned earlier to you, sir.

800.DAL.8779
dalcoreporting.com

 DALCO

18                           **TAIWO OLORODE**

1        Q.    Okay.

2        A.    And so this will be my last semester in

3    the program.

4        Q.    Do you expect to receive some type of

5    degree at the end of this semester?

6        A.    I expect to receive advanced business --

7    international business and finance with

8    specialization in emerging markets, U.S. and

9    overseas.

10        Q.    Now, will this degree be a master's in

11    business administration or something else?

12        A.    It would be a graduate certification.

13        Q.    A graduate certification?

14        A.    Yes.

15        Q.    Since the time that you began attending

16    this program at NYU, have you ever attended as a

17    full-time student?

18        A.    I have never attended -- let me see.   I

19    have never attended as a full-time student.

20        Q.    Approximately, if there is or was a

21    typical number of classes per semester or

22    trimester, as the case may be, that you took while

23    attending, what is that number?

24        A.    Approximately, I would say two, but



1  there had been times when I've taken three.

2       Q.   Do you recall the time periods when you

3  took three classes per semester or trimester,

4  whatever it is?

5       A.   I don't want to speculate, but I think

6  it would have to be -- okay.  Either the spring of

7  -- either fall -- it would have to probably be the

8  fall of 2010.  You know what, that's a guess.  I

9  don't want to guess.

10       Q.   I understand.  Are there records or

11  documents of some type, here or anywhere else, that

12  would show the schedule of classes that you took as

13  a student at NYU?

14       A.   I'm sorry.  Can you reiterate or explain

15  what you mean by schedule of -- you want the

16  grades, you want --

17       Q.   Well, let me start it this way:  When

18  you would typically begin a semester of studies at

19  NYU, would you get a schedule of classes?

20       A.   Yes.

21       Q.   And would the schedule indicate the days

22  of the week when the classes were given?

23       A.   Yes.

24       Q.   And would the schedule also indicate the



1     beginning time of the class and the time when the

2     class would end?

3          A.    Yes.

4          Q.    That's the kind of information that I'm

5     looking for.

6          A.    Okay.

7          Q.    So do you have those kinds of records,

8     either here or somewhere else?

9          A.    Yes, I do.

10         Q.    I would ask that you -- and I probably

11    have to follow it up in writing with your lawyer,

12    but I would ask that you search your records to

13    show the class schedules for your course work at

14    NYU.

15

16    DOCUMENT/INFORMATION REQUESTED:

17

18         Q.    Now --

19         A.    No problem.

20         Q.    -- do you have any -- do you or your

21    company have any particular type of certifications

22    or licenses or permits that permits the company to

23    export the types of goods that you told me about

24    earlier?



1      A.    I have a business registration with New
2   York department of -- division of corporations.
3      Q.    And when you say "a business
4   registration," is that the certificate of
5   incorporation?
6      A.    Yes.
7      Q.    Other than a certificate of
8   incorporation, does the company have any special
9   permits through organizations -- used to be called
10  the customs and immigration service.  It's called
11  ICE now, I-C-E -- to export goods or import goods
12  or anything like that?
13     A.    There are licenses which is obtained
14  through the different auctions where I acquire the
15  used automobiles in the Tri-State area.  There are
16  different, how do I say it, paperwork that is
17  required.  And depending on what you're exporting
18  also, the kind of automobiles that you're
19  exporting, there are ones where the shipping line
20  or the shipping agent is the one that helps you to
21  do the clearance -- export clearance, they call it.
22  The paperwork is done through shipping line or the
23  shipping agent that helps --
24     Q.    That kind of agent is also known as a



1    freight forwarder; does that sound familiar?

2        A.    Yes.

3        Q.    Okay.  Is the company registered or

4    permitted to do business with any particular auto

5    auctions?  In other words, are you on the list of

6    accepted --

7        A.    Yes.

8        Q.    And what auto auctions is that -- or

9    would that be, I should say?

10       A.    IAAI.

11       Q.    Do you know what that means; is that an

12   abbreviation?

13       A.    Yes.  And, also, I would get -- I don't

14   know exactly -- I can't give you the exact meaning

15   of the abbreviation, but I can look it up for you.

16            MR. MCDONALD:  Answer the question.

17       Q.    Okay.

18       A.    Also -- just bear with me.

19       Q.    Take your time.

20       A.    Also -- I'm sorry.  I just -- I just

21   have this mental block right now.  Just one moment.

22   IAAI.  I also have -- I have two others, which I

23   will give you now.  Okay.  You know what, I have

24   two others.  You know what, can we move forward?



1       Q.   Why don't we do this:  Why don't we

2   leave a space in the record.  Your lawyer, I'm

3   sure, understands what that means, and after the

4   completion of the deposition, what I would ask is

5   that you attempt to remember the other

6   organizations or companies that you've indicated

7   your company is registered with and just provide

8   the information.

9       A.   I'm sorry.

10          MR. MCDONALD:  You are not to speak

11       unless there's a question pending.  You can

12       only answer the questions.  Okay.  This is

13       not a conversation.  Mr. Reisman asks

14       questions, you provide answers.

15          THE WITNESS:  I was actually trying to

16       help Mr. Reisman.

17          MR. MCDONALD:  That's not your job.  Your

18       job is answer Mr. Reisman's questions, so

19       please.

20       Q.   So why don't we do this --

21       A.   Okay.  I remember the --

22          MR. MCDONALD:  Tai, there's no question.

23       A.   IAAI stands for Insurance Auto Auction.

24       Q.   Is that organization based in any



24                          **TAIWO OLORODE**

1    particular city or town or state?

2          A.    The headquarters is in Chicago, but they

3    have satellite offices throughout the Tri-State --

4    actually, throughout the United States, east coast

5    and west coast.  They operate out of Carteret, New

6    Jersey.

7          Q.    Is your company on some type of list of

8    companies that is permitted to do business with

9    that auto auction?

10         A.    Yes.

11         Q.    And do you have here or somewhere else

12   some type of document that indicates that your

13   company is permitted to do business with IAAI?

14         A.    Yes, I have an account.

15         Q.    All right.  At the conclusion of the

16   deposition, I ask that you search your records and

17   provide that documentary information to your

18   lawyer, and your lawyer will -- your lawyer and I

19   will discuss that later.  You don't have to answer.

20

21   DOCUMENT/INFORMATION REQUESTED:

22

23         Q.    Other than IAAI, are there any other

24   companies or organizations that your company is



1   permitted to do business with with respect to

2   automobiles?

3       A.   I think the confusion I'm having -- can

4   I just --

5           MR. MCDONALD:  You have to answer the

6       question.

7       A.   Mr. Reisman, the confusion I'm having is

8   that the business name and the registration in the

9   Web site, it's almost like they have certain catchy

10  names, which is ove.com, O-V-E.com.

11      Q.   Okay.

12      A.   But the business name itself, the legal

13  name that you sign papers on, it's different.

14  That's one of the reasons why I'm trying to

15  remember now, but there are two auctions -- I

16  remember now, the second one, Auto Exchange, and

17  the third one --

18      Q.   The name of the company is Auto

19  Exchange?

20      A.   Auto Exchange.

21      Q.   And they're based where?

22      A.   New Jersey.  The township, I believe, is

23  -- I just have it put on my GPS.

24      Q.   It's fine.  Why don't we leave --



26                          **TAIWO OLORODE**

1       A.   It's off the Garden State Parkway.  It's

2   a very popular auction house.

3       Q.   All right.  So why don't we leave a

4   space in the record.  I will request that you

5   provide to counsel the company name and address

6   information for Auto Exchange following the

7   conclusion of this deposition.

8

9   DOCUMENT/INFORMATION REQUESTED:

10

11      Q.   Do you have any documents, here or

12  anywhere else, which indicate that your company,

13  Water Regents, is permitted to do business with

14  this company known as Auto Exchange?

15      A.   Yes.  I had to sign a contract, and

16  along with the contract, there's also standard

17  operating procedures as to how you are -- which

18  establishes the relationship, more like a

19  memorandum of understanding establishing my

20  relationship as a buyer and exporter, buyer or

21  exporter.  It's used it interchangeably sometimes,

22  which establish my relationship with the company.

23      Q.   All right.  And do you have in your

24  possession a copy of the contract between yourself



1    and/or Water Regents, as the case may be, and this

2    Auto Exchange?

3        A.   I can look it up.  I'm not sure, but I

4    can -- I can -- I will do a search for it.

5        Q.   Fine.  At the conclusion of the

6    deposition, I would simply ask that you search your

7    records for the agreement that you just told me

8    about between Water Regents and/or yourself and

9    this company known as Auto Exchange, and that you

10   provide a copy of that agreement to your lawyer.

11

12   DOCUMENT/INFORMATION REQUESTED:

13

14       Q.   Are there any other companies other than

15   the ones that you've just told me about that Water

16   Regents is authorized to do business with by a

17   certificate, a letter agreement, or something

18   similar?

19       A.   No.

20       Q.   Does Mrs. Olorode work in the Water

21   Regents business?

22       A.   She doesn't.

23       Q.   What is your title, if any, at Water

24   Regents?

800.DAL.8779
dalcoreporting.com



1        A.     Director, managing director.

2        Q.     Other than yourself, does Water Regents

3    have any employees?

4        A.     No.

5        Q.     Since the time that your company was

6    formed, has Water Regents had any employees other

7    than yourself?

8        A.     No.

9        Q.     Now, in addition to the degree that

10   you've indicated that you expect to receive from

11   NYU, you also have some other educational degrees;

12   am I accurate when I say that?

13       A.     That is true.

14       Q.     All right.  I understand, correct me if

15   I'm wrong, that you have a degree from the Columbia

16   University School of General Studies.

17       A.     School of -- yes -- not general study,

18   school of continuing education, yes.

19              MR. MCDONALD:  Can we pause for a second?

20              MR. REISMAN:  Sure.

21              MR. MCDONALD:  Off the record, if that's

22       okay.

23              MR. REISMAN:  Yes.

24



1              (An off-the-record discussion was held.)

2

3    BY MR. REISMAN:

4         Q.   We had an off-the-record discussion, and

5    your counsel pointed out something which may be

6    correct.  Other than Auto Exchange and IAII --

7         A.   IAAI.

8         Q.   -- IAAI, are there any other companies

9    that Water Regents is authorized to do business

10   with in the auto auction/automobile business by

11   contracts, certificate, or anything else?

12        A.   There is -- a third company, for some

13   reason, I think I gave you their Web site just now,

14   Manheim.

15        Q.   Is that located in Manheim,

16   Pennsylvania?

17        A.   No, they're located throughout the

18   country.  It's a national auto auction with

19   regional offices, satellite offices throughout the

20   country.  It's a nationwide auto auction company.

21        Q.   And what type of agreement or

22   authorization or something similar does Water

23   Regents have with Manheim?

24        A.   A buyer/exporter agreement.



1        Q.    When you say "a buyer/exporter

2    agreement," can you explain what that means.   In

3    other words, what does it consist of; what are you

4    authorized to do?

5        A.    I'm authorized to -- I would say every

6    automobile that I purchased from the auction, the

7    authority I have there is to be able to export them

8    out of the country, not for resale in the local

9    market.

10       Q.    And when you say that the authorization

11   from Manheim is to export the vehicles that you buy

12   from them out of the country, does that mean in

13   essence that Manheim requires that if you're going

14   to buy from them, you only buy from them for the

15   purpose of selling the autos that you purchased

16   outside of the United States?

17       A.    That's not the only -- I would have to

18   look into -- there's a lot of fine print.   I'm only

19   giving you a summarization of what I understood my

20   relationship with Manheim to be.   Basically,

21   there's different designation for affiliates of

22   Manheim.   The one that I had at the time, I

23   believe, is one where my purchase is meant for

24   export market.



1        Q.    All right.   And when you say the -- in

2    sum and substance, the authorization that you had

3    at the time, do you still have an authorization

4    from Manheim?

5        A.    I still believe my relationship with

6    them is valid.

7        Q.    Do you have some type of document here

8    or somewhere else which shows in writing the nature

9    of your relationship with Manheim?

10       A.    I would have to look into that.

11       Q.    All right.   I would ask that following

12   the completion of this deposition, you search your

13   records.   And if you do have a document that

14   reflects the relationship between yourself, meaning

15   either you personally or Water Regents, and

16   Manheim, that you provide it to your attorney.

17       A.    Yes, I will.

18

19   DOCUMENT/INFORMATION REQUESTED:

20

21           MR. MCDONALD:   There's no question

22       pending.

23           THE WITNESS:   Oh.

24       Q.    Now, going back to our discussion about



1    Columbia University, you received -- I just want to

2    make sure I understand correctly -- a degree or

3    certificate from Columbia?

4         A.    It is a certificate.

5         Q.    And the certificate is called what?

6         A.    It's called computer application and

7    technology program.  That is the program that is

8    run by school of continuing education at Columbia

9    at the time.  And my certificate was for management

10   information systems, specialization is network

11   administration, computer network administration and

12   design.

13        Q.    When you say that your specialization

14   was computer network administration and design, can

15   you tell me, as best as you can, in layperson's

16   terms, what that means?

17        A.    Only meant -- all it means is that with

18   every computer network, every company, for

19   instance, an enterprise, like she's -- they would

20   have workstations running somewhere, all the

21   workstations are connected to a mainframe

22   somewhere.  In between the mainframe is also what

23   they call IDF.

24        Q.    What's that?



TAIWO OLORODE                                33

1      A.    Intermediary data frame.

2      Q.    Is that like a smaller mainframe?

3      A.    I'm sorry.  It's more like a mainframe

4   that is dedicated to a building.  So what I'm

5   involved in is not just only the design of the

6   software related, but, also, the hardware in terms

7   of like signal a computer network infrastructure

8   from the user all the way out to telco, which is

9   the telecommunications company, so it also involves

10  network operating system installation.

11     Q.    And what does that mean?

12     A.    Network operating system, it's more like

13  a central server that is set up somewhere where you

14  have other workstations.  And everybody -- for

15  instance, we did this organization; they're

16  connected to a server, central computer that

17  administers file sharing, data sharing, printing

18  capability which is actually centralized, so file

19  sharing also in terms of security of the

20  organization, everything is centralized within the

21  organization, user account creation, giving access,

22  retrieving access, so back and forth.  More like an

23  organization setting, creating an environment where

24  everybody is able to work seamlessly while having



```
 1    one central administration.

 2         Q.    So -- okay.  I understand.  And is part

 3    of your studies at Columbia which resulted in the

 4    certificate that you told me about, did you receive

 5    training in the design of software?

 6         A.    No.

 7         Q.    Did you receive any type of training in

 8    the repair of, for lack of a better word, glitches

 9    in software that might appear from time to time?

10              MR. MCDONALD:  Objection to form, but you

11         can answer, if you understand.

12         Q.    Do you understand the question?

13         A.    I'm sorry.  Can you rephrase that.

14         Q.    Sure.  If there was a problem from time

15    to time with the software that would be used in

16    running a network administration or a larger type

17    of setup, I forget the name of it, but you

18    described it earlier, did you receive training at

19    Columbia in, for example, diagnosing problems with

20    software?

21         A.    That is true.  Yes, I did.

22         Q.    And did you receive training in

23    repairing problems with software?

24         A.    Yes.
```

800.DAL.8779
dalcoreporting.com



1      Q.    And when you say that you received that

2   kind of training, did you receive training with any

3   particular software, either by product name or by

4   software type in general or both?

5      A.    The industry language that is used in

6   most cases is, I think they will say platforms, so

7   most of the Windows platforms, I'm very familiar

8   with.  Windows Server 2000, Windows NT at the time.

9   Windows -- most -- any Windows operating system

10  that's out there, either the operating system,

11  meaning the workstation level, and the network

12  operating system at server level, most

13  Windows-related -- once I received training in, so

14  -- and also Novell.

15     Q.    Could you spell that?

16     A.    N-O-V-E-L [sic], Novell 4.11 and 5.0.

17     Q.    And what -- what are those?

18     A.    Those are also network operating

19  systems.

20     Q.    And did you receive that training during

21  the time that you studied at Columbia or at some

22  other time?

23     A.    Both at Columbia, and also at Chubb

24  Institute, C-H-U-B-B, which was my prior education



1    prior to going to Columbia.

2          Q.    At Columbia, with respect to software,

3    did you receive training to perform any other types

4    of tasks or operations other than the diagnosis and

5    fixing of software problems that you previously

6    discussed?

7          A.    I'm sorry.  Can you rephrase your

8    question, sir?

9          Q.    Okay.  Do you want me to have it read

10   back, or do you want me to -- do you not understand

11   it?

12         A.    I think, please, can you repeat

13   yourself, sir.

14         Q.    Sure.

15               MR. REISMAN:  Sure.  Can you read that

16         back.

17

18               (The requested testimony was read back.)

19

20         A.    I received training in setting up

21   network infrastructure, not necessarily only

22   diagnosis.  It means from the setup, from the

23   hardware point of view and also software point of

24   view.  To run a network, not only need the cables



1    where people plug in their computers, but also

2    other infrastructure that's always running in the

3    background, which I also received training.  You

4    know, I would say comprehensive training on, which

5    is an add-on from my previous education at Chubb,

6    so there's also testing of software and figuring

7    out what the possible delays and bottlenecks will

8    be in an enterprise setting.

9        Q.    If I can just stop you there.  When you

10   say figuring out what delays and bottlenecks might

11   be in an enterprise setting, can you describe what

12   type of work that would involve.

13       A.    It would involve, in most cases, most of

14   the computer networks like that deploy everywhere,

15   it's mainly used by people.  So you have different

16   types of users.  You have to not only understand

17   what -- okay.  You have to not only understand from

18   the users' perspective; every user has different

19   habits in terms of when they get in front of the

20   computer; they make common errors.  So you have to

21   be able to isolate user errors from

22   computer-related errors and also move beyond that

23   and move into the area from once you now decided

24   this is a computer glitch or error, find out what



1    the problem is, either hardware, a cable and plug

2    somewhere.

3            There's several patches which are like

4    updates that are released from time to time by

5    Microsoft or some other operating system

6    manufacturer or OEM manufacturer.

7        Q.    What's OEM mean?

8        A.    Original electronic manufacturer.  If

9    you are now able to pinpoint if the problem is just

10   user -- you have to do an analysis of the problem,

11   find out whether it's inadequate rights given to a

12   user preventing them from being able to access

13   certain resource on the network.  So if you are

14   able to really figure out the problem, then you are

15   able to now tackle it from finding out what the

16   issue is.  So it's a combination of looking at a

17   problem from different angles and devising a

18   solution at the most effective and efficient time.

19       Q.    Okay.  And other than that type of work,

20   and other than what you've already told me about

21   with respect to your training at Columbia, did you

22   receive any other type of training in the area of

23   software?

24       A.    Yes.



1      Q.    What would that be?

2      A.    I went to C-H-U-B-B, the Chubb

3  Institute.  It was a two-year program for computer

4  technical support and data center administration.

5      Q.    Now, would it be -- would it be accurate

6  or inaccurate to say that the studies that you did

7  at Columbia were of a more advanced nature than

8  what you did at Chubb, or were they just different?

9      A.    Well, you could say that it depends on

10  what -- from -- okay.  You could -- okay.  I'm

11  sorry.  Could you repeat that, because it's like,

12  you know what, I would put it like this --

13      Q.    I would be happy to repeat it if you

14  want me to.

15      A.    Can you put it in another way so I can

16  understand?

17      Q.    Sure.  First of all, tell me what type

18  of -- what's the name of the certificate that you

19  received from the Chubb Institute.

20      A.    It's a diploma, a two-year -- more like

21  an associate program.

22      Q.    And would it be fair to say you received

23  that diploma prior to attending Columbia?

24      A.    That is true.



40                     **TAIWO OLORODE**

1        Q.    And did you receive that in

2   approximately 1998; is that accurate?

3        A.    '98 or '99.  I'm not sure.  It's not an

4   accurate assessment.  Either '99 or '98.

5        Q.    Okay.

6        A.    Would be in that time frame.

7        Q.    So describe the type of training you

8   received at Chubb.

9        A.    The type of training I received at Chubb

10  was mainly supporting computer users from a user's

11  perspective.  Meaning, it's not -- it involves some

12  network operating systems also, but mainly it is

13  for -- it is dedicated towards helping users

14  virtually, either on the phone or working in an

15  organizational setting where people, you need to

16  set up their workstations.  Make sure they have

17  certain access rights on the network.  You need to

18  make sure that the e-mail account is set up

19  properly.  You need to -- so it's mainly supporting

20  Windows NT and Windows 2000 at the time, which are

21  all -- these are all both network operating system,

22  but at the time there were also what they would

23  call job control languages like mainframe, for

24  instance, like IBM mainframes where right now



1    they're not as popular as they were back then, only

2    maybe archaic systems use this mainframe today, but

3    it still deployed out there.

4           So my training involves supporting

5    mainframe environment, user environment, and using

6    different command languages to find out -- to get

7    resources from the network and/or to do certain

8    updates on the network.

9           Q.   When you say using a command language,

10   for example, could that involve using a particular

11   type of command language to get certain types of

12   financial data from a mainframe?

13          A.   It doesn't necessarily -- data is data.

14   It doesn't necessarily -- data is only designed to

15   fit an organizational need.  It doesn't mean you

16   could be in a financial environment.  It could mean

17   like a nonprofit organization.  It is getting data

18   either to the user or collecting data for

19   management for different users, so it would not

20   matter whether -- these are systems that could

21   either way be tailored to an organization need at

22   the time.

23          So our training, my training at the time

24   was to be as knowledgeable as possible, to be able



**TAIWO OLORODE**

```
 1    to work and support from users' perspective and
 2    also as mainframe administrator perspective, to be
 3    able to get and collect data and disseminate it to
 4    whoever requested it at the time.
 5         Q.   As part of the training at Chubb, did
 6    you receive any training or course work or anything
 7    similar in software design?
 8         A.   No.
 9         Q.   Did you receive any training in
10    troubleshooting?
11         A.   Yes.
12         Q.   And when you say that you did, did that
13    involve trouble -- troubleshooting potential
14    problems with software?
15         A.   Yes.
16         Q.   All right.  And the training that you
17    received at Chubb, was that similar to or different
18    from the troubleshooting that -- the software
19    troubleshooting training that you received at
20    Columbia?
21         A.   They are similar, but different.  From
22    -- because Columbia program from -- is more towards
23    being a network administrator, dedicated towards
24    being a network administrator, not just
```


800.DAL.8779
dalcoreporting.com
DALCO

1    administering software, but also it involves the

2    whole infrastructure, the whole network, almost

3    like having an empty building now, and putting

4    cables all in the ceiling, from dropping the cables

5    in the ceiling, from bringing it to each individual

6    cable to an intermediate data frame that would be

7    somewhere in one of the closets, to dropping it

8    down to the building and taking it out to the telco

9    company.  And also providing the software that

10   allows the administrator -- network administrator

11   to be able to share different resources of the

12   organization in the most efficient way to different

13   users.  And not only that, it also -- they have

14   Intranet that allows different satellite offices of

15   the organization to work as a group while not being

16   from the same location, but at the same time being

17   able to share resources of the organization

18   regardless of what part of the country you're in.

19         Q.   Other than the training that you've

20   indicated you received at Chubb and at Columbia,

21   did you -- have you received any other academic

22   training, I'll call it, from a university, a

23   college, or technical institute involving computer

24   networks, computer software, or anything related to



1    the field of computer hardware or software?

2        A.    I received a certificate from Bloomberg

3    Technology.

4        Q.    When did you receive that?

5        A.    This was -- I believe some time -- you

6    know what, I'm not exactly sure of exactly the

7    time, but I had a certificate that would give me

8    the time.  It was sometime either late '08 or

9    sometime early '09.  I apologize that I'm not as

10   precise at as --

11       Q.    It's okay.  When you -- can you describe

12   what you were trained to do that led to your

13   receipt of a Bloomberg certificate?

14       A.    A few days training where -- it involves

15   -- I already -- while I was working with

16   Streamingedge at the time, part of the product that

17   I supported at the time was Bloomberg terminal and

18   Bloomberg workstations, and I felt the need to get

19   the training while I was there when they had one of

20   their reps come to the site and when I had

21   registered for the class.  So it is a short

22   training, that -- it's about two or three days, and

23   they give you, not only a refresher, but at the end

24   of the course you take an exam to get the --

1   calibrate your knowledge of Bloomberg network and

2   software and the hardware that most of the brokers

3   that I supported every day used.  So I looked at it

4   as another way of enhancing my ability to serve my

5   employer well on the job.

6            MR. MCDONALD:  I'm sorry.  Can we just

7        take a very brief break.

8            MR. REISMAN:  Go ahead.

9

10           (A recess was taken.)

11

12  BY MR. REISMAN:

13       Q.   When you took the Bloomberg course, you

14  indicated you were employed by Streamingedge.

15       A.   That is correct.

16       Q.   And did you take the class during

17  regular business hours or at some other time?

18       A.   It must have been regular business

19  hours.

20       Q.   And when you took the Bloomberg course

21  during your regular business hours, did you take

22  the class on-site at the office of the

23  Streamingedge in New York City or somewhere else?

24       A.   It was at Bloomberg headquarters in



1  midtown.

2          Q.    Midtown Manhattan?

3          A.    Yes.

4          Q.    And was there a cost for taking the

5  class?

6          A.    No.

7          Q.    Did Bloomberg administer the course to

8  you free of charge, or, to your knowledge, did

9  someone else pay the cost of the course?

10         A.    No, nobody else paid for it.  I think it

11  was based on the fact that nobody has paid for it,

12  to my knowledge.

13         Q.    All right.  Okay.  When -- did you have

14  to submit some type of application to Bloomberg to

15  receive permission to take the class?

16         A.    A formal application?

17         Q.    Right.

18         A.    No, I don't recall.  I don't recall if I

19  have done that.  I must have indicated maybe

20  through e-mail or some other form.  I don't recall

21  if there were applications.

22         Q.    Okay.  Did you ever receive anything

23  from Bloomberg in any type of written form

24  confirming that you were registered to take the



1   class?

2        A.   Yes.

3        Q.   And did you receive it through the mail,

4   by e-mail, or by some other means?

5        A.   By e-mail.  You know what, I'm sorry.

6   I'm sorry to have to interrupt you.  I'm very

7   sorry.

8        Q.   It's fine.

9        A.   It may either be e-mail; that's a

10  possibility it's e-mail.  Also, be a combination of

11  the two or just a phone call or an e-mail.

12       Q.   I understand.  To your knowledge, do you

13  have any records, here or anywhere else, which

14  would assist you in recalling the way in which you

15  received confirmation from Bloomberg that you were

16  enrolled to take the class that you just told me

17  about?

18       A.   I'm sorry.  Can you repeat that

19  question, sir.

20       Q.   Sure.

21            MR. REISMAN:  Can you read it back.

22

23            (The requested testimony was read back.)

24



48                          **TAIWO OLORODE**

1       A.    From -- I believe that there may have

2   been e-mails.  There may have been, like I said, or

3   a phone call.  As expected, most organizations

4   nowadays, most of the time, the standard

5   procedure --

6             MR. MCDONALD:  Tai, you've answered the

7       question.

8             THE WITNESS:  I'm sorry.

9       A.    I'm sorry.

10      Q.    That's all right.

11      A.    There may have been e-mails.

12      Q.    So what I would ask you to do then,

13  since you're not completely sure about this, if you

14  could search whatever records you have and see

15  whether there is some type of e-mail that you

16  received from Bloomberg confirming your enrollment

17  in the course, if you find something like that, I

18  would ask that you give a copy to your lawyer.

19

20  DOCUMENT/INFORMATION REQUESTED:

21

22      Q.    Prior to taking the Bloomberg course,

23  did you inform anyone at Streamingedge that you

24  were going to take it?


800.DAL.8779
dalcoreporting.com

1      A.    Yes, I did.

2      Q.    And with whom did you speak?

3      A.    I believe at the time Mr. Wilson, Mr.

4   Nweke, and I may have mentioned it also to Mr.

5   Hideki Okubo, H-I-D-E-K-I O-K-U-B-O.

6      Q.    At the time that -- withdrawn.

7            At the time that you took the Bloomberg

8   course, what position, if any, did Mr. Okubo hold

9   at Streamingedge?

10     A.    That a very hard -- we worked in the

11  same department.

12     Q.    And what department was that?

13     A.    System support.

14     Q.    Did you and Mr. Okubo have the same

15  functions at -- in the system support department at

16  Streamingedge during the time period that included

17  you taking the Bloomberg course?

18     A.    We have some functions that are similar.

19  Some that are not.

20     Q.    What functions did you and Mr. Okubo

21  have during that time period that were similar?

22     A.    I would say support of some of the

23  proprietary software.

24     Q.    And when you say that, can you be more

800.DAL.8779
dalcoreporting.com


1   specific?

2        A.   I would give you -- we supported trading

3   platforms together, which were trading platforms of

4   different security desks and --

5        Q.   Security desks within Streamingedge or

6   some other place?

7        A.   Within Tradition, which is -- within

8   Tradition North America, Inc.

9        Q.   And when you say that you supported

10  proprietary software, trading platforms, at

11  Tradition, were there particular desks that you,

12  Mr. Olorode, were responsible for and some certain

13  desks that Mr. Okubo was responsible for?

14       A.   It was a team effort.

15       Q.   Okay.  And does that mean that you and

16  he, with respect to supporting the proprietary

17  software at the trading desks, performed similar

18  functions?

19       A.   Yes.

20       Q.   And when you say that you and he

21  performed similar functions, can you describe

22  specifically what those functions were?

23       A.   With regards to some desks, certain

24  individuals within the organization were much more



1    specialized on particular software.  I will talk

2    about my area, which is the options desk.  It

3    involves when we have newly hired employees who are

4    brokers within the setting, within the desk, of

5    about -- I would say the option desk is about 50

6    individuals, and I also supported lower development

7    -- lower developed currency, which is called LLDC.

8        Q.    And when you say that, that means the

9    currency of countries that are not as developed as

10   the United States economically?

11       A.    No, that is the industry term that is

12   used.  It is more -- I would say bonds and emerging

13   markets also.  Some kind of virtual money market.

14   For some reason it's an industry term, so -- but,

15   in essence, that's what it means.  It just means

16   developing countries, new markets.

17       Q.    Right.  So getting back simply to the

18   type of work that you indicated you performed that

19   was similar to what Mr. Okubo performed, what types

20   of roles did you and he have in common with respect

21   to the software platforms at those particular desks

22   during the time period that you took the Bloomberg

23   class?

24       A.    We -- the functions we had in common, if



1    you were part of the support team, which we were

2    called at the time, was any problem that would

3    impact the seamless operation or including trades

4    onto the platform by the trader -- I'm sorry, by

5    the broker; we had to get to it as quickly as

6    possible.  It's mainly looking at the problem,

7    sometimes like -- I will give you an example.  My

8    area where later on, which is the options desk,

9    involves setting up the user account whenever they

10   hire new broker.

11       Q.   And when you say "they," you mean

12   Tradition?

13       A.   I'm sorry?

14       Q.   Would it be fair to say that the brokers

15   worked for Tradition, not for Streamingedge?

16       A.   Yes.

17       Q.   Okay.  I'm sorry.  Go ahead.

18       A.   Whenever there's new employees hired, we

19   would create a new account and also identify from

20   the area of the desk what type of securities these

21   individuals are allowed to trade.  We were to give

22   them access rights and also regulate their rights

23   in some areas where they don't have access -- it

24   has to be based on what type of securities you are



1  trading and also -- we would also find out who your

2  counter -- who the traders, because brokers are, in

3  essence, an entity that bring two traders from

4  different banks together.

5             Q.    Right.

6  A.    So we would find out what their clients'

7  names were pertaining to -- and, also, what

8  securities the individual trades with his clients.

9             Q.    I'm sorry.  If I can interrupt briefly.

10            So in other words, Tradition, correct me if

11  I'm wrong, was, in essence, the middleman, as that

12  term is sometimes used, between large financial

13  institutions, such as banks or companies such as

14  Goldman Sachs or similar other companies that trade

15  with each other in the financial products that

16  you've been talking about?

17            A.    The industry term they use is

18  inter-broker-dealer operation.

19            Q.    Okay.

20            A.    Yes.  Tradition puts two counterparties

21  together on our trading platforms, and sometimes

22  they do it through voice trading as well, where

23  once a broker is able to ascertain an individual

24  wants to be at a certain price, and he puts it in,



1    once he gathers information, he puts it in or

2    include some other type of certification that is

3    outside of my area, puts it in.

4        So from the point that he puts this trading,

5    we have to make sure that everything is as agreed

6    upon.  I'm not sure what the agreed upon service

7    level agreement is between Streamingedge and

8    Tradition, but we had to ensure that if the trade

9    -- if someone is putting a bid in and have somebody

10   hitting the bid, within a certain time or

11   millisecond, that trade has to close.  And if it

12   hangs, it is considered a software error.

13       Q.   If it --

14       A.   If it hangs.  Meaning --

15       Q.   If there is a delay?

16       A.   Exactly.  So it's considered a software

17   error.  Those are the kind of problems that I

18   attend to and Mr. Okubo attend to from time to

19   time.  But I think his area -- I also support

20   Bloomberg terminal, which he may also involve

21   communication between -- because every

22   broker-dealer has a Bloomberg terminal.  And this

23   Bloomberg terminal -- I'm sorry.  You have a

24   Bloomberg workstation, and this workstation allows



1    them to communicate, find out information from

2    different parties.

3        Q.   I'm sorry to interrupt.  When you say

4    that it allows them to find out information from

5    different parties, do you mean that it allows the

6    brokers employed by Tradition to get information

7    from various information sources?

8        A.   Different financial data.

9        Q.   Databases?

10       A.   Databases, yes.  And some of them are

11   presented in a graphical form on the screen.  And I

12   would say, also, it's more like also a platform of

13   what is happening in the market on a daily basis.

14       Q.   So if I can just interrupt you for one

15   second.  I apologize.

16       A.   Yeah, sure.

17       Q.   Would it be fair to say that the

18   function during the time that you were employed by

19   Streamingedge, of the Bloomberg system, was to

20   basically act as a realtime database that would

21   allow the brokers employed by Tradition to

22   understand what was going on in the marketplace

23   with respect to the -- to the types of financial

24   products that they were brokering?



1        A.    Exactly.   Different -- different

2   financial markets and different financial products.

3   It also involves -- from what I did on a daily

4   basis also, if you didn't have an account on a

5   Bloomberg workstation, you couldn't see exactly and

6   -- you had to also create -- we had to create --

7   each user within the group, within Tradition, so I

8   was also responsible for setting up the accounts,

9   giving access to certain products, and, also,

10  regulating them to the desk that each user or new

11  user belongs to.

12          On occasions, there are -- biometric

13  authentication system may not be working.  We may

14  have to find out what the problem is.

15      Q.    What it a biometric identification

16  system?

17      A.    It's a -- there's two ways.  There's a

18  way on the terminal on the Bloomberg workstation

19  where you are able to look into the screen and you

20  are authenticated automatically.

21          And there is another one which is almost like

22  a credit card-sized card that gives you ability to

23  put your thumb print on it, and so these are all

24  part of what I supported while I was there and part



1    of what I received training from Bloomberg.

2         Q.    I see.  So just going back for a second

3    to your completion of the course, you -- you

4    indicated prior to taking the course that -- to Ms.

5    Nweke that you planned to take it?

6         A.    I believe so.  I believe so, yes.

7         Q.    And when you told Mr. Nweke that you

8    planned to take the Bloomberg course, do you recall

9    if he gave you permission to take it?

10        A.    I believe so.

11        Q.    So would it be fair to say that Mr.

12   Nweke did approve your participation in the

13   Bloomberg course prior to the time that you

14   actually took it?

15        A.    I believe so.

16        Q.    Now, other than the Bloomberg training

17   that you just told me about and Columbia and Chubb,

18   have you received any other training given by a

19   company such as Bloomberg or by some type of

20   educational institution such as either Columbia or

21   Chubb in the area of computer hardware or software?

22        A.    Dell.

23        Q.    Dell?

24        A.    Yes.



1        Q.    And when did you receive training by

2   Dell?

3        A.    Possibly -- I'm estimating now.  I don't

4   want to estimate.  Either around '05.

5             MR. MCDONALD:  Tai, if you don't want to

6        estimate, then don't estimate.

7             THE WITNESS:  Okay.

8        Q.    All right.  As you sit here today, can

9   you tell me the approximate time period when you

10  received training from Dell?

11       A.    I can give you not exact date but -- I

12  can give you -- I can give you a period based on

13  where I was working at the time.

14       Q.    Fine.  So at the time that you received

15  training from Dell, were you employed by some

16  entity other than Streamingedge?

17       A.    Yes.

18       Q.    And what was the name of the company you

19  were employed by at the time you received the Dell

20  training?

21       A.    DecisionOne Incorporated.

22       Q.    DecisionOne --

23       A.    Yes.

24       Q.    -- Incorporated.



800.DAL.8779
dalcoreporting.com

1        And where is that company located?

2        A.    I think it's headquartered somewhere in

3   Pennsylvania.  I'm not sure exactly what the

4   township is or the city, but I know it's in

5   Pennsylvania.  This is a company also that is --

6   it's headquartered in Pennsylvania, but they have

7   regional offices.  I worked out of the New York

8   City and sometime service there, satellite client

9   in New Jersey area.  I worked in the Tri-State

10  area.

11       Q.    And starting approximately when and

12  ending approximately when were you employed by

13  DecisionOne Incorporated?

14       A.    2003 or 2004.

15       Q.    And, approximately, when did you stop

16  working there?

17       A.    '07.

18       Q.    Do you recall approximately when in 2007

19  you stopped working for DecisionOne Incorporated?

20       A.    I'm not sure of the exact month, but I

21  think it's probably towards the -- sometime in the

22  fall.

23       Q.    Do you recall whether it was in

24  September 2007 or in some other month?


800.DAL.8779
dalcoreporting.com

1        A.    I don't recall.

2        Q.    Do you have any records, here or

3    anywhere else, that would help you remember?

4        A.    Not that I know of.

5        Q.    All right.  Was DecisionOne Incorporated

6    the company that you were last employed by prior to

7    becoming employed by Streamingedge?

8        A.    Yes.

9        Q.    What were your job responsibilities at

10   DecisionOne Incorporated?

11       A.    I was a field service engineer.

12       Q.    And can you describe the duties that you

13   had as field service engineer.

14       A.    I serviced OEM accounts, original

15   equipment manufacturer account, such as Dell and

16   Sony.  Those were my primary responsibilities.  So

17   it would also -- my responsibilities was mainly --

18   I was deployed in the field anywhere where there

19   was a service agreement -- where there is a

20   manufacturer warranty, within that one year time

21   frame when something -- if any of the hardware that

22   is purchased or software that is purchased from

23   either Dell or Sony was to break down, I would be

24   sent out to fix the problem and report the issue.

1    So, basically, I was out there doing field service

2    work for DecisionOne.

3        Q.   So would it be fair to say then that the

4    company known as DecisionOne Incorporated had the

5    job on behalf of companies such as Sony and Dell

6    of --

7        A.   And HP.  Sorry.

8        Q.   Hewlett-Packard also?

9        A.   Uh-huh.

10       Q.   -- of fulfilling customer warrantees?

11   So in other words, if a product was warranted by

12   Sony or Hewlett-Packard or by Dell, and there was a

13   problem, the customer would get in touch with, I

14   suppose, one of those three companies, who in turn

15   would send out you as an employee from DecisionOne

16   to see what, if anything, was wrong with the

17   product?

18       A.   That's part of my job.

19       Q.   All right.  Other than that part of your

20   job, what other responsibilities did you have when

21   you worked for DecisionOne Incorporated?

22       A.   There's also a portion called on-site

23   service and support.  Meaning, I may be at a

24   specific place for, I would say, depending on the



1    duration of the project, to do almost same thing

2    that I did, but on a different -- it may be moving

3    or a network station, meaning moving of stations,

4    meaning from one place to another to on-site

5    support also.

6           Q.   So when you say "moving a station,"

7    would that mean, for example, picking up and moving

8    from one room to another or from one building to

9    another, the computer hardware that is part of a

10   particular network?

11          A.   No.

12          Q.   What would it mean?

13          A.   It would mean if a user -- for instance,

14   if a user is moved from this office to another

15   office in another office area, and there's a

16   possibility that in most cases either the user does

17   not have an established network port established

18   already, we would have to create one for this user.

19          Q.   A network port, meaning, a way for that

20   particular user to access the network?

21          A.   Exactly.  So network -- we would have to

22   create a new network port and be able to give the

23   user access, plus it may also involve moving his

24   workstation from where he was before to where is he



800.DAL.8779
dalcoreporting.com

1   now and establishing a new connection for the user.

2   Depending on -- there are different service

3   agreements they have with different organizations

4   that would entail other things like from time to

5   time other data support-type environment.  It may

6   be doing like tape backup for the network

7   department, so more like I would say -- more like

8   technology support from time to time.

9        Q.   During the time that you were employed

10  by DecisionOne Incorporated, did that company do

11  business of any kind with Streamingedge?

12       A.   I'm sorry.  When you say "did business,"

13  can you explain a bit.

14       Q.   Yes, I understand your question.

15       During the time that you were employed by

16  DecisionOne Incorporated, were you, on behalf of

17  DecisionOne, ever asked to do any work at the

18  offices of Streamingedge?

19       A.   Yes.

20       Q.   And can you tell me on approximately how

21  many occasions prior to the time that you stopped

22  working for DecisionOne Incorporated you actually

23  did work at Streamingedge -- on-site at

24  Streamingedge, I should say?



**TAIWO OLORODE**

```
 1        A.    Quite a few times, some time.
 2        Q.    Do you know if it was more than ten or
 3   less?
 4        A.    I can't say.
 5        Q.    All right.  Was there any particular
 6   type of work that you did at the Streamingedge
 7   location during the time that you were employed by
 8   DecisionOne?
 9        A.    I'm sorry.  Can you come again.
10        Q.    Sure.
11              MR. REISMAN:  Can you read it back.
12
13              (The requested testimony was read back.)
14
15        A.    Yes.
16        Q.    What type of work did you do?
17        A.    I did a laptop support; meaning, system
18   board replacement.
19        Q.    System board replacement?
20        A.    Yes.
21        Q.    All right.  And what specifically does
22   that mean?
23        A.    Means taking apart the laptop and
24   replacing the mother board, which is what houses
```



1    all the other ports like we plug in the network

2    cable into, the USB.  Meaning, in essence,

3    reengineering -- replacing the systems, the

4    hardware part where everything else that is plugged

5    into that we see on the outside.  So, in essence,

6    the only thing that is not replaced is just the

7    case, so whatever makes the computer work, the

8    hardware, taking it -- opening it and replacing the

9    system board.

10        Q.   When you received the training that

11   you've indicated you received from the Dell

12   company, was it in the area of motherboard

13   replacement, or did it involve something else?

14        A.   Anything that pertains to hardware.

15   And, usually, every manufacturer trains you from

16   their products' perspective.  Meaning, they want

17   you to have a background in their product so that

18   while you have their -- as new products come out,

19   you have to constantly get up to the minute --

20   up-to-date training to make sure you're able to

21   support them.

22        Q.   And did you receive any type of

23   certificate from Dell indicating, in words or

24   substance, that you had successfully completed



1  their training program?

2       A.   I believe so, but -- I believe so.

3       Q.   All right.  Do you have a copy of that

4  certificate in your possession anywhere?

5       A.   Not that I know of, but I can look into

6  it.

7       Q.   I ask that you search your records, and

8  if you find it, please give it to your lawyer.

9

10 DOCUMENT/INFORMATION REQUESTED:

11

12      Q.   Other than the training from companies

13 such as Dell and Bloomberg, do you have any -- did

14 you successfully complete any training programs

15 provided by any other specific companies?

16      A.   Sony.

17      Q.   And what type of training did you

18 receive from them?

19      A.   Similar to Dell.

20      Q.   Understood.  And did you receive some

21 type of certificate or something indicating that

22 you had successfully completed their training

23 program -- not training program, but the training

24 that they gave you to service their products?



1        A.    I don't recall.

2        Q.    All right.  Did you receive training

3   from any other companies?

4        A.    From Tradition, I remember.

5        Q.    When you say that you received training

6   from Tradition, what type of training did you

7   receive?

8        A.    I think it was financial products

9   training in -- I think it was Series 7 class, they

10  call it.  Either Series 3 or Series 7 class which I

11  enrolled in, but it was not specifically given by

12  Tradition.  It's a class -- it's a FINRA class

13  which you had to take off-site at some school very

14  close to my office at the time.

15       Q.    When you say your office at the time,

16  was that at the headquarters of Streamingedge?

17       A.    Yes.  75 Park Place, New York, New York.

18       Q.    New York City.  And when you say that

19  you took a FINRA course, did you receive any type

20  of certificate of completion of the course?

21       A.    I was let go before -- I didn't complete

22  it.

23       Q.    Can you tell me when you began the

24  training course, approximately?

1          A.    I don't recall, but --

2          Q.    Do you recall the approximate year?

3          A.    I believe it was in 2010, I believe.

4          Q.    And do you recall approximately when in

5     2010 you began the FINRA training class?

6          A.    Sometime in -- at the beginning of the

7     year.

8          Q.    Beginning of 2010?

9          A.    Either February, or it may have been

10    late '09 -- between late '09, starting from October

11    to sometime in February.  I can I look into it.  I

12    don't know.

13         Q.    When you -- now, what was the purpose of

14    this training class that you enrolled in with -- at

15    FINRA?

16         A.    It is to familiarize myself more -- I'm

17    saying -- you said -- I'm sorry.  Can you rephrase

18    that question again?

19         Q.    Absolutely.  You indicated that at some

20    point in time, either late in 2009 or toward the

21    beginning of 2010, you enrolled in a class given by

22    an organization called FINRA; correct?

23         A.    It's a FINRA-sanctioned organization.

24    Most of the courses that are given are financial



1    information.  It's almost like information on the

2    background of the market, and the issue of the

3    markets, different products, how they work,

4    different algorithms that are used to calculate

5    different products, and pretty much giving me a

6    whole -- how do I say -- boot camp on the operation

7    of the market.  But it is itself not -- it's not

8    FINRA itself, but it's a FINRA-sanctioned

9    organization; meaning, a school that deploys

10   FINRA-sanctioned courses.

11       Q.   I understand.  And was the purpose of

12   this course work that you began to take to get a

13   certificate or license or something that would

14   enable you to trade these products, or was the

15   purpose of the course to enable you to do something

16   else?

17       A.   The purpose of course was mainly to be

18   able to understand full background of what I

19   supported on a daily basis.

20       Q.   All right.  Was -- was -- was this

21   course designed for people involved in the

22   information technology end of the securities

23   business?

24       A.   I didn't see.



1            MR. MCDONALD:  I'm going to object to the

2       form.  I'm not sure -- lack of foundation.

3       I'm not sure he established he knows how it

4       was formed or why it was formed.

5            MR. REISMAN:  All right.

6       Q.   Prior to enrolling in this FINRA course

7   that you've been telling me about, did you have a

8   discussion with anyone from Tradition about signing

9   up to take the class?

10       A.   Yes.

11       Q.   And with whom did you discuss it?

12       A.   I don't remember her name, but she was

13   in charge of compliance, the compliance director.

14       Q.   At Tradition?

15       A.   Yes.  And also with Wilson, Mr. Nweke.

16       Q.   And when you spoke to -- well,

17   withdrawn.

18            Did Mr. Nweke suggest to you that you

19   take this class, or did you ask him for permission

20   to take the class?

21       A.   I believe so.  I must have.

22       Q.   I'm sorry.  Which?  Did you -- did Mr.

23   Nweke approach you either in person or by some

24   other means and say, in words or substance, Mr.



1    Olorode, I'd like you to take this FINRA class, or

2    did you approach him and indicate, in words or

3    substance, that you would like to take the class?

4         A.    I approached him.

5         Q.    And can you tell me in approximately

6    what year you approached Mr. Nweke and told him, in

7    words or substance, that you wanted to take the

8    FINRA class?

9         A.    It has to be in between '09 and '10,

10   like I told you.

11        Q.    Okay.

12        A.    Sometime in '09 or '10.

13        Q.    Now, when you communicated to Mr. Nweke

14   your desire to take the class, did you do that

15   verbally, by e-mail, or by some other means?

16        A.    I believe I did speak to him verbally

17   about it first, and, eventually, I had to also

18   update him on what the course -- details of the

19   course, and so I had to update him on details of

20   the course, and so, basically, just giving him

21   background of the course.  I'm sure at some point I

22   must have sent an e-mail, but I'm not sure.  But

23   I'm sure there's probably an e-mail record of it.

24        Q.    All right.  And when you say that



1   there's probably an e-mail record of it, to the

2   best of your recollection, does that mean that you

3   sent an e-mail to Mr. Nweke or that Mr. Nweke sent

4   an e-mail to you or something else?

5         A.    Either or.

6         Q.    Okay.  Do you have, in your possession,

7   here or anywhere else, any type of writing which

8   would describe the nature of the course that you

9   began to take during -- at FINRA, I'm sorry, during

10  the time that you were employed by Streamingedge?

11        A.    I'm sorry?

12        MR. MCDONALD:  Objection.  I don't think

13        he said it was at FINRA.  I think you

14        misstated the testimony.  I don't believe he

15        testified it was at FINRA.

16        MR. REISMAN:  I'm sorry.  I'll withdraw

17        and rephrase it.

18        Q.    Is there, in your possession, here or

19  anywhere else, any type of writing describing what

20  the nature of the FINRA-sanctioned course that you

21  began to take?

22        A.    I would have to say there's a

23  possibility that there's a record somewhere, but

24  I'm not sure.

800.DAL.8779
dalcoreporting.com



1      Q.    Okay.  So what I would ask you to do

2    following the conclusion of this deposition is to

3    search your records, and if you find some type of

4    writing which described the FINRA-sanctioned course

5    that you began to take while you were employed by

6    Streamingedge, please provide it to your lawyer.

7

8    DOCUMENT/INFORMATION REQUESTED:

9

10     Q.    Was there a fee for taking this class?

11     A.    Yes.

12     Q.    Do you know how much it cost?

13     A.    I don't recall, but I'm sure I paid.

14     Q.    When you say that you paid it, did you

15   physically -- withdrawn.

16           When you say that you paid the fee, did

17   you pay it by check, by electronic banking, or by

18   some other means?

19     A.    I don't recall how I paid, but that's a

20   possibility.  I may have written out a check or

21   maybe given them a credit card at the time, but

22   either of the two, I must have somehow.

23     Q.    All right.  Do you have any writing,

24   here or anywhere else, which would indicate the way



1    in which you paid for the cost of the

2    FINRA-sanctioned class?

3          A.   Do I have anything here in writing?

4          Q.   Here or anywhere.

5          A.   That shows how I paid?

6          Q.   Right.

7          A.   I don't recall.

8          Q.   All right.

9          A.   I don't recall.

10         Q.   Okay.  I'd ask that you search your

11   records, and if you find any type of writing which

12   would show the manner in which the FINRA-sanctioned

13   course was paid for, that you provide it to your

14   lawyer.

15

16   DOCUMENT/INFORMATION REQUESTED:

17

18         Q.   Did you ever submit any type of voucher

19   or request to Streamingedge or to any other company

20   requesting reimbursement for the course -- for the

21   cost of this FINRA-sanctioned class?

22         A.   I don't recall.

23         Q.   Do you have any record in writing, here

24   or anywhere else, that would assist you in



1  remembering?

2      A.   I could look to my house -- to my

3  apartment to see it.

4      Q.   I would ask that you make a search of

5  your records.

6          MR. MCDONALD:  Just answer the questions.

7      Yes or no is the answer there.  We can

8      discuss what we will producing, but stop

9      volunteering information.  Stop volunteering

10     to do things.  Just answer the question.

11         THE WITNESS:  Because he's asking me

12     to --

13         MR. MCDONALD:  Answer the questions,

14     please.

15     Q.   I would simply ask that you make a

16  search of your records to see if there is anything

17  in your possession which would indicate whether or

18  not you asked Streamingedge or any other company to

19  reimburse you for the cost of taking the

20  FINRA-sanctioned course.

21     A.   Yes, sir.

22

23  DOCUMENT/INFORMATION REQUESTED:

24



1        Q.    Was the FINRA-sanctioned course that you

2   just told me about given during daytime hours, at

3   night, or some other time?

4        A.    They were usually given nighttime.

5        Q.    And when you say "nighttime," can you

6   tell me approximately when the class began and when

7   it ended?

8        A.    I can't recall the exact hour, but it's

9   usually some time like 6:30 or 7 sometimes.  It's

10  usually very late, like usually either 7.  For each

11  class you get two-hour -- two-and-a-half hours

12  duration, like either 7:30 to 9 or 7 to 9.  Usually

13  around that time.  Usually very late.

14       Q.    Approximately, how many class sessions

15  did you attend?

16       A.    More than ten.

17       Q.    Did you ever receive a class schedule?

18       A.    Yes, at the time.

19       Q.    And do you have the class schedule in

20  your possession here or anywhere else?

21       A.    No.

22       Q.    Do you know the name of the company or

23  organization that you indicated that was

24  FINRA-sanctioned who actually gave this class?



1        A.    The name doesn't ring bells right now.

2        Q.    All right.  Do you have any written

3   document, here or anywhere else, that would help

4   you remember?

5        A.    My answer is no, but if I find

6   something --

7        Q.    I'd ask that you make a search, and if

8   you find that type of information, please give it

9   to your lawyer.

10

11  DOCUMENT/INFORMATION REQUESTED:

12

13       Q.    Other than this FINRA-sanctioned class

14  that you indicated that you took during your

15  employment at Streamingedge, have you taken any

16  other classes or courses related to the

17  software/hardware field, other than what you

18  already told me about?

19       A.    None that I could recall right now.

20       Q.    Okay.  Do you know Wilson Nweke?

21       A.    Yes.

22       Q.    Can you tell me approximately when you

23  first met him?

24       A.    Possibility is sometime in 2006.

800.DAL.8779
dalcoreporting.com


DALCO

1        Q.    And under what circumstances did you
2    become -- did you first meet Mr. Nweke?
3        A.    I was deployed to service, to do some
4    service work at 75 Park Place.
5        Q.    And was that when you were employed by
6    the company known as DecisionOne Incorporated?
7        A.    Correct.
8        Q.    And when -- how did it come to pass that
9    you first met Mr. Nweke?  I know you said you were
10   deployed to 75 Park Place, but --
11       A.    When I first met him I was employed by
12   two companies at the time, NABS, Inc., North
13   American Bolt & Screw Company.
14       Q.    North American Bolt & Screw?
15       A.    Bolt & Screw Company, yes.
16       Q.    Okay.
17       A.    And that was my daytime job, and at
18   night I kept a part-time job, still on an as-needed
19   basis for DecisionOne, so that's when in '06 when I
20   met Mr. Nweke.
21       Q.    So would it be fair to say that during
22   the time that you met Mr. Nweke, your job at
23   DecisionOne was a nighttime job?
24       A.    Was more like an -- it wasn't nighttime.



 1   It was based on -- I became more like a consultant

 2   for DecisionOne.  I was no longer full-time

 3   employee, so whatever work sometimes they would

 4   give me, if I'm able to do it or they'll say,

 5   please, we need someone, so I would do it on a

 6   convenience and as-needed basis.

 7        Q.   Okay.  So you were -- you indicated a

 8   little earlier that you were employed by

 9   DecisionOne, I think you said, from about 2003

10   until roughly the fall of 2007; is that accurate?

11        A.   Around that area, yes.

12        Q.   Okay.  So when you first became employed

13   by DecisionOne, were you a full-time employee there

14   or something else?

15        A.   Yes, I was full-time employee.

16        Q.   And did there come a time when your

17   status as a full-time employee at DecisionOne

18   changed and you became something other than a

19   full-time employee?

20        A.   Yes.

21        Q.   Tell me approximately when that

22   happened.

23        A.   I think it was around '06.  I'm sorry.

24   '06 or '07 -- actually '07.  '07.



1       Q.   And, approximately, when in 2007, if you

2   remember?

3       A.   Mid-'07.

4       Q.   So would it be fair to say that starting

5   in approximately the middle of year 2007, your

6   employment status with DecisionOne Incorporated

7   went from being a full-time employee to a

8   consultant?

9       A.   You could say that, but I think the time

10  -- remembering exactly dates, I'm having actually

11  to come up with a date -- how do I say -- unclear

12  time frame, but I know for sure that I at one point

13  was working full time, and I went to work on a

14  part-time basis for them, but giving you exact

15  dates, months, I think it's not -- I wouldn't be

16  able to give accurate answers.

17      Q.   All right.  So it would be fair to say

18  that as you sit here at this particular moment you

19  couldn't tell me accurately when your status as a

20  full-time employee of DecisionOne Incorporated

21  changed to that of a consultant person doing work

22  for DecisionOne Incorporated on what you call an

23  as-needed basis?

24      A.   It was either ending of '06 to mid-'07,



1   within that year period.  You understand.  Within

2   -- within that -- that -- ending of '06 to mid-'07,

3   around that time frame.

4       Q.   I understand.  Are there any records in

5   your possession anywhere that would refresh your

6   recollection as to when or approximately when your

7   status as a full-time employee at DecisionOne

8   Incorporated changed to that of a less than

9   full-time employee?

10      A.   No.

11      Q.   When you were employed by the North

12  American Bolt & Screw Company, what was your title

13  there?

14      A.   Assistant network administrator.

15      Q.   And when did you begin that job?

16      A.   It was early '06.

17      Q.   And when did your employment with the

18  North American Bolt & Screw Company end?

19      A.   Late '07, I believe.

20      Q.   And when you say mid-'07, can you be

21  more specific as to a month or a season?

22      A.   Probably summer.

23      Q.   And did you resign from that position,

24  or did you your job end there for some other



82                       **TAIWO OLORODE**

1   reason?

2        A.    For some other reason.

3        Q.    And what was that?

4        A.    They were -- the company was acquired by

5   another company, so offices were being relocated,

6   to my knowledge.

7        Q.    Do you know what company acquired

8   American Bolt & Screw?

9        A.    I think it was Ohio.  Some company with

10  an Ohio name.

11       Q.    All right.  Did you ever receive any

12  type of writing from North American Bolt & Screw

13  which informed you, in words or substance, that

14  your position was being terminated or that you were

15  being terminated?

16       A.    Not that I recall.

17       Q.    Did you receive any type of written

18  communication from the company that acquired

19  American Bolt & Screw that your position was being

20  terminated or that you were being terminated?

21       A.    There were interoffice communications at

22  the time with bulletins and basically I -- and I

23  think the day, maybe a week or two before, I was

24  let go, everybody that was being let go, we were



1   informed.

2        Q.   All right.  And where was American Bolt

3   & Screw located?

4        A.   State Street right down by Bowling

5   Green.  17 State Street.

6        Q.   Do you know whether the company that

7   acquired American Bolt & Screw maintained any type

8   of office presence in the former location of North

9   American Bolt & Screw?

10       A.   I don't know.

11       Q.   When your job at North American Bolt &

12  Screw ended, did you receive any type of severance

13  agreement or anything like that?

14       A.   I don't recall.

15       Q.   Do you have any documents, here or

16  anywhere else, that would help you remember?

17       A.   No.

18       Q.   I would ask that you search your

19  records, and if you find anything that would

20  indicate whether or not you received any type of

21  separation agreement, severance agreements,

22  explanation of what type of pay or other type of

23  benefits you were entitled to in connection with

24  the termination of your services or the job at

1   North American Bolt & Screw, that you give it to

2   your lawyer.

3        A.    Mr. Reisman, I think I will say that I

4   never did get anything.  The only thing we had at

5   that time was during -- even as the transition was

6   taking place, so new management coming, they were

7   passing around interoffice bulletins to let us know

8   what's happening.

9        Q.    Right.

10       A.    And I think once the venture capitalist

11  organization was done, there was a full

12  understanding that they were moving, but at that

13  time, my department was one of the ones identified

14  as ones that was, in essence, be either -- you want

15  to call it diminished.  So even if I had any paper

16  that was given to me at the time, I wouldn't have

17  records of it now.  Once, you know -- I mean, I do

18  regular cleaning every year where some things you

19  just --

20            MR. MCDONALD:  There's no question

21       pending.  You have to answer the questions

22       that were asked, and the question was

23       answered.

24            THE WITNESS:  I was trying to let him

800.DAL.8779
dalcoreporting.com


```
 1        know that I don't have records.

 2        Q.   It's okay.  When you said a moment ago

 3   you do regular cleaning, does that mean of paper

 4   documents that you have in your possession,

 5   e-mails, or something else?

 6        A.   Maybe physical records, sometimes, you

 7   know, paper documents that I feel wasn't important

 8   to me anymore at the time.  And I'm -- what I am

 9   saying is there is a possibility, you know, that

10   even -- I'm thinking right now that.

11             MR. MCDONALD:  Tai, you've answered the

12        question.  You have to stick to the questions

13        that are asked.

14             THE WITNESS:  He's asking me more

15        questions.

16             MR. MCDONALD:  I need to talk to you

17        outside.  Off the record, please.

18             THE WITNESS:  I apologize.

19

20             (An off-the-record discussion was held.)

21

22   BY MR. REISMAN:

23        Q.   Do you know whether you ever had in your

24   possession documents in any form pertaining to the
```



1   layoff from North American Bolt & Screw Company?

2        A.    No.

3        Q.    I'm sorry.  Does that mean you never had

4   documents or you don't know?

5        A.    If there were records, I wouldn't have

6   them anymore in my possession.

7        Q.    All right.  Now, when you say that you

8   were the network administrator at North American

9   Bolt & Screw Company, can you tell me briefly what

10  you're job responsibilities were.

11       A.    I said assistant network.

12       Q.    I'm sorry.  Assistant network.

13       A.    I assisted the main level administrator

14  and engineer of the company.  The office -- the

15  company had close to seven or eight satellite

16  global -- globally located offices also.  And so,

17  basically, we give -- it's identical to what I've

18  explained before.  Most of what I did was

19  administer network resources, went from giving

20  access to workstations, installing new software,

21  re-imaging new machines, recording company assets

22  in what I would say physical computer assets,

23  configuring software as needed, also administering

24  what they call just-in-time inventory system for



1    some of our vendors and sometimes clients,

2    international clients also.

3        Q.    When you say configuring software as

4    necessary, what does that mean?

5        A.    It means tailoring -- in layman terms,

6    it means tailoring the software, not only to my

7    employer's standard, but also tailoring to the need

8    of the user so that it fits into their day-to-day

9    daily activities, and they're able to, you know, do

10   their job without being impacted.

11       Q.    When you did that type of work on behalf

12   of North American Bolt & Screw, were you able to do

13   that generally independent of supervision from the

14   person that you reported to?

15       A.    In some capacity, and in some capacity,

16   no.

17       Q.    So in what capacity were you able to

18   work independently?

19       A.    Typically -- it's a typical

20   organizational flow chart where you have a user --

21   they always establish standards as to issue

22   reporting, either user reports an issue, generate a

23   ticket, this is what's wrong with my work-station.

24   I'm not able to load certain web pages or I'm not

**TAIWO OLORODE**

1    able to access certain files which is located

2    somewhere in the cloud; meaning, a secure network

3    drive somewhere.

4    Q.    Right.

5    A.    When they make those kinds of reports, they

6    enter a ticket in the system, which is the initial

7    reporting system.

8    Q.    Right.

9    A.    Once that is generated, then it goes into

10   what they call a bucket, my area, where I'm able to

11   figure out what the issue is.

12          If it's something that I could -- based

13   on what I look at something that would impact their

14   work, or depends on how -- the level of urgency

15   also which users are able to attach to their need

16   or their resolution, so to be able to figure out

17   what exactly the problem -- issue is at that time.

18   You -- based on that or how much work you have --

19   workload I have also, I'm able to go down,

20   sometimes right away, walk over to the person's

21   workstation, change things around.  And sometimes

22   it may just mean -- it may just mean, maybe there

23   are things that we have done on the network side

24   that required those -- that required those to do an

800.DAL.8779
dalcoreporting.com


1   update on the workstation side also.

2   So we would go in there and change things around to

3   -- what configuration means, making software

4   changes to make sure -- make software changes that

5   would return the computer to normal working

6   capacity before the issue was reported.  In some

7   cases, it may not be an error.  In other cases, it

8   may be a glitch.  So whatever the issue is, I'm

9   able to figure that out.

10       Q.   Right.  And in addition to doing that

11  sort of thing independently during the time that

12  you were employed by North American Screw & Bolt,

13  were you able to do other types of software-related

14  work independent of supervision from the person

15  that you reported to?

16       A.   I was able to -- it's, like I said, the

17  industry type of work that I did at that time even

18  at Streamingedge, it's usually a team effort where

19  one party hands off to the other.  And -- I don't

20  recall, but one way or the other my work impacts

21  the person I report to.  His work impacts what I do

22  also.  We may not interact physically, but

23  virtually there are things that is configured that

24  means when I come in.



1          Another independent work I would tell you

2     I do sometimes, administrative network, Windows

3     Advanced Server, which is where we administer all

4     our different network -- you have the file server,

5     print server, different servers connecting

6     together.  And we have one system administering

7     everything, create the user account, give them

8     access to certain drives in the network, delete an

9     account once an employee leaves, add new accounts,

10    make sure that a work-station has all the necessary

11    applications that we're going to be using, which is

12    not necessarily part of the operation system that

13    was assigned to them.

14    We may have Windows -- you may have -- how do I say

15    -- Windows 7, but you may not necessarily have all

16    the applications like maybe Word, Excel, you may

17    not have the total package, so everything that we

18    give to the user would be based on what the user

19    needs and what the company thinks that user in that

20    company needs.  So those are the kind of

21    independent work that I would be able to do.

22         Q.   All right.  And would it be fair to say

23    that when you worked for Northern American Nuts &

24    Bolts Corporation, you did that type of work



1  independently -- I believe independent of taking

2  specific orders from the person you reported to?

3          MR. MCDONALD:  Objection to form.  I'm

4      not -- I don't understand what you mean by

5      "that type of work."  Also, it's just North

6      American Bolt & Screw.

7          THE WITNESS:  Why don't we call it NABS,

8      Inc.

9      Q.   So with the amendment of the question to

10  reflect NABS, Inc. Instead of North American Bolt &

11  Screw, do you understand my question?

12      A.   Yes, I do.

13      Q.   Can you answer it?

14          MR. MCDONALD:  I'm still going to object

15      to form.  I mean, I don't understand the

16      question.  "That type of work," I don't think

17      that's --

18          MR. REISMAN:  Well, okay.

19      Q.   I think you had indicated -- tell me if

20  what I'm saying in summary form is accurate.  You

21  appear to have just told me that you had the

22  ability, when you worked for NABS, Inc., to assess

23  the needs of a particular user of the system.

24      A.   Yes, sir.



1        Q.    And to configure the software that that
2   person used so that that person could perform the
3   functions that he or she needed to function as a
4   NABS employee.
5             MR. MCDONALD:   I'm going to object.   I
6        think that misstates --
7        A.    That's not what I said.
8        Q.    Okay.   So when you would -- when you
9   would configure for a particular person, are you
10  saying that you were generally capable of figuring
11  out what type of software applications a person
12  would need to use in order to perform his or her
13  job?
14            MR. MCDONALD:   Objection again.
15            MR. REISMAN:   Are you telling him not to
16       answer?
17            MR. MCDONALD:   No.   No.   If you can
18       answer, but I think it misstates the record.
19       You can answer.
20       A.    I think, as I've said before, the type
21  of work that I did both at Streamingedge and at
22  NABS entails that there are specific instructions
23  that you have to take, either you're not taking
24  them on a daily basis.   It could be incremental.



1    It could be monthly that you're taking these

2    instructions.  And each instruction is based on the

3    particular need and --

4         Q.   I'm sorry, sir.  Particular need of who

5    or what?

6         A.   Who you are supporting.  Particular need

7    of who you are supporting from the company's

8    perspective.  So if there are certain applications

9    that they need, it may be on a weekly basis, I

10   would get weekly instructions, or maybe on a daily

11   basis.  From time to time my supervisor would come

12   and tell me, listen, we have X, Y, and Z person.  I

13   don't think -- this person is supposed to have X,

14   Y, and Z.  Can you give them --

15        Q.   X, Y, and Z, meaning a brand of

16   software?

17        A.   Yeah, like an application.  Can you

18   install this application to them.  Can you give

19   this person access to the just-in-time inventory

20   system.  Can you give this company access to such

21   and such database that we have somewhere.  So it

22   doesn't mean -- so there are times where the

23   instructions are daily.  There are times where they

24   are weekly.  So -- but on ongoing basis, I always



1    have to take some kind of instructions somehow as

2    to how to go about.  And, also, you have to

3    understand, sir, it is also based on tenure within

4    the organization, because of my supervisor -- the

5    supervisor capacity has been with the organization

6    for some time.  He knows more about the background

7    of each user, each department, what their needs are

8    going to be.

9              So when you come in, they tend to tell

10   you, go here, go here, go here.  So, constantly, it

11   was always a team effort and also pick up stuff

12   from my superiors.

13        Q.   Now, when you -- we began to discuss

14   this earlier.  You indicated that you first met Mr.

15   Nweke, I believe, when you worked for DecisionOne

16   Incorporated at the site of Streamingedge; is that

17   accurate?

18        A.   That is correct.

19        Q.   Okay.  And when you -- at some point in

20   time, did you learn what position, if any, Mr.

21   Nweke had at Streamingedge?

22        A.   I think at some point I was told there's

23   an opening.  At some point, I must have been told,

24   because during some of my visits to the location --



1    I'm not sure.

2         Q.   At some point in time, did you become

3    aware that Mr. Nweke was the president of

4    Streamingedge, Inc.?

5         A.   No.

6         Q.   At some point in time, did you become

7    aware that Mr. Nweke was the CEO of Streamingedge,

8    Inc.?

9         A.   I'm sorry.  What do you mean by "at some

10   point in time"?

11        Q.   Well, at some point in time ever, did

12   you become aware that he was the CEO?

13        A.   Yes.

14        Q.   When did you become aware?

15        A.   After I was hired.

16        Q.   Approximately, how soon after you were

17   hired by Streamingedge did you become aware that

18   Mr. Nweke was the CEO?

19        A.   I believe my second week or my first

20   week.  At the commencement of my employment with

21   the organization.

22        Q.   And how was it that you became aware

23   that he was the CEO?

24        A.   He called me more like a welcoming --



1   actually a welcoming -- also -- I have to also --

2   okay.  Can I just come back for a minute.  After my

3   interview, when there was a confirmation that I was

4   hired, I remember --

5        Q.    After you were interviewed by

6   Streamingedge?

7        A.    Yes, but I was not sure in terms of the

8   particular job title, but I know he was part of

9   some kind of management, a part of the management,

10  but I wasn't sure -- I didn't know his exact job

11  title.

12       Q.    During the time that you worked for

13  DecisionOne, and from time to time would work at

14  the Streamingedge site, were you aware of whether

15  Mr. Nweke had any type of management position

16  within the company?

17       A.    I knew about -- if anything, it was more

18  of a supervisory.  I didn't know the management

19  structure of the organization at the time, so I

20  think -- I didn't know -- but I think -- the answer

21  is no.

22       Q.    During the time that you were employed

23  by DecisionOne Incorporated, and from time to time

24  doing work at Streamingedge, was there any



1  particular Streamingedge employee with whom you

2  dealt most often?

3      A.    I'm sorry.  Can you rephrase that

4  question, sir.

5      Q.    Do you not understand it, or do you

6  simply want it repeated?

7      A.    When you said "dealt with," that's why I

8  said rephrase it.

9      Q.    Okay.  So sounds like you don't

10  understand.

11      A.    Yes.

12      Q.    Was there -- during the time that you

13  were employed by DecisionOne Incorporated and doing

14  work at the Streamingedge site, was there any

15  particular Streamingedge employee with whom you

16  generally interacted with when you were on-site at

17  Streamingedge?

18      A.    Either the executive assistant at the

19  time.

20      Q.    Do you know that person's name?

21      A.    I don't recall.  And there are times --

22  I think based on the setting of the room where I

23  typically go, where I'm led to do the service work,

24  it's usually a very busy room, so wherever -- I



1    don't have -- how do I say -- how do I say -- it's

2    not like I deal with the same person every time, so

3    it's whoever -- they just tell me I go there, I'm

4    here for to do service for, here goes this machine;

5    that's typically the line of conversation.

6         Q.   I understand.  So would it be fair to

7    say that other than administrative assistants

8    employed by Streamingedge at the time, there wasn't

9    any other particular individual that you would see

10   most often when you would go to the Streamingedge

11   site?

12        A.   Probably -- there's a gentleman named

13   Steve Cere.

14        Q.   I'm sorry.  His last name?

15        A.   C-E-R-E.

16        Q.   And what was his title or position at

17   Streamingedge?

18        A.   He's a developer.

19        Q.   Now, when you say "developer," does that

20   mean software developer who would create certain

21   types of software?

22        A.   Yes.

23        Q.   How did you first become aware that

24   there was an opening at Streamingedge?



1        A.    I believe it was through word of mouth

2    through some of the employees, either I heard it on

3    one or two occasions I've been there.

4        Q.    Okay.  Do you have any -- do you recall

5    the name of any particular person who told you that

6    there was an opening at Streamingedge?

7        A.    I don't recall.

8        Q.    Did you ever receive any type of e-mail

9    or anything else in writing informing you that

10   there was an opening at Streamingedge?

11       A.    I think mainly it was all through word

12   of mouth, because I think I remember -- it was all

13   through word of mouth.

14       Q.    And -- and when you say that it was

15   through word of mouth, were you told about the type

16   of position that was open?

17       A.    Yes.

18       Q.    And what was that type of position?

19       A.    Support -- system support.

20       Q.    Did there come a time when you spoke to

21   anybody about this position that you heard was

22   open?

23       A.    Yes.

24       Q.    And what who was that?



1        A.    No, actually, somebody spoke to me.

2        Q.    And who was that?

3        A.    Mr. Nweke.

4        Q.    And can you tell me approximately when

5    Mr. Nweke spoke to you about the open position?

6        A.    During one of my service visits.

7        Q.    And can you tell me the approximate

8    month and year when Mr. Nweke spoke to you?

9        A.    I don't remember, but I think it was

10   probably 2006.  Probably 2006.

11       Q.    All right.  And can you tell me

12   approximately when in 2006 he told you that there

13   was an opening?

14       A.    I think it would have to be either

15   summer or fall of '06.

16       Q.    And do you recall the substance of the

17   conversation that you had with Mr. Nweke during

18   that time other than the fact that there was an

19   opening for -- I forgot the exact title you told

20   me.  Was it systems analyst or support?

21       A.    System support analyst.

22       Q.    System support analyst.

23       A.    Was there any other type of

24   conversation?



1  Q.   Right.

2      A.   Maybe either related to -- questions

3  related to conversations that might have related to

4  the nature of the service work I was doing at the

5  time; meaning, asking questions and telling me this

6  is actually my machine that you were fixing,

7  something to that effect.

8  Q.   All right.  And when Mr. Nweke first told you

9  that there was an opening at Streamingedge for

10 system support analyst, did he tell you the type of

11 duties the job would involve?

12     A.   He must have, but I think -- I don't

13 remember.  I don't recall.

14     Q.   All right.  Do you have any written

15 documents, here or anywhere else, that would help

16 you remember whether Mr. Nweke specifically told

17 you the types of duties involved as a systems

18 support analyst during the first discussion you had

19 with him about an opening at Streamingedge?

20     A.   I don't have any documents that would

21 refresh my memory.  One thing I recall was I think

22 the first time they told me I was not -- the one

23 thing I recall very well at that time, I was not

24 interested in working there the first time I was



1   told.

2        Q.    Did you tell that to Mr. Nweke?

3        A.    I didn't feel the need to say that I

4   wasn't interested, because I just -- because

5   already I had a position elsewhere, but I think the

6   nature of what they did, also, I was curious enough

7   to ask.

8              MR. MCDONALD:   You answered the question.

9        Q.    Did you ask Mr. Nweke at some point in

10  time what type of job duties would be involved in

11  the job of systems support analyst at

12  Streamingedge?

13       A.    I spoke to some of the -- some of these

14  individuals that I mentioned.

15       Q.    Mr. Cere, C-E-R-E?

16       A.    Maybe not him, but many other people.

17  At that time it's usually a very chaotic office, a

18  lot of people.  So it's wherever -- even times

19  where people are at lunch, whoever was sitting next

20  to me at the time.  There were individuals that I

21  met that time that I no longer -- I didn't see them

22  any longer.  You have to remember most of my times

23  that were -- most of my visits there were always

24  timed.  I usually had something else I had to get



1   to afterwards.  So, usually, I don't pay a lot of

2   attention to the discussion.  It's usually the next

3   person because I was constantly being paged or

4   texted about the next place to go to.

5       Q.   All right.  But just so that I

6   understand, as you sit here today, do you have any

7   memory of the identity of the person or people with

8   whom you spoke to about the types of job duties

9   involved as a systems support analyst at

10  Streamingedge during the time that preceded your

11  employment there?

12      A.   You know what, I must have.  I think

13  that the closest thing I can come to is Mr. --

14      Q.   Mr. Nweke?

15      A.   Mr. Cere.

16      Q.   Okay.

17      A.    I think that's the closest thing I could

18  come to in terms of people I spoke to.  There were

19  so many people at that time.  There are even some

20  faces that I saw there that are no longer there

21  today -- no longer there at the time I started

22  working there.

23      Q.   Did Mr. Cere ever tell you what the job

24  duties of a systems support analyst were?



1        A.    No.

2        Q.    Did there -- it would be fair to say

3    that you're aware that Mr. Nweke is originally from

4    Nigeria?

5        A.    Eventually, yes.

6        Q.    And you're also from Nigeria?

7        A.    Yes, sir.

8        Q.    Originally.  When did you first become

9    aware that Mr. Nweke was from Nigeria?

10        A.    After I met him.  I think --

11        Q.    And when you say after you met him, was

12    that before you became employed by Streamingedge or

13    at some other time?

14        A.    Before I became -- my first time -- my

15    first conversation with him during some of his

16    service visits, it was during one of the visits to

17    the office that I may have spoken to him.

18        Q.    And did you -- did the two of you, at

19    that time, discuss whether you had mutual friends

20    back in Nigeria or acquaintances or some other

21    connections related to Nigeria?

22        A.    No.

23        Q.    Did there come a time following the

24    first time you became aware that Mr. Nweke was from



1    Nigeria that you had discussions of the type I just

2    asked you about?

3          A.    That we had mutual friends?

4          Q.    Yeah, or some type of mutual connections

5    in Nigeria.

6          A.    No.   I'm sorry.   Can you -- I think, you

7    know what, I have to be clear on what you're asking

8    me.   In terms of --

9                MR. MCDONALD:   Tai, do you understand the

10               question?   If not, please ask for it to be

11               rephrased.

12         Q.    Do you understand my --

13   A.    Can you rephrase it, sir?

14         Q.    Sure.   At some point before you were

15   hired by Streamingedge, did you and Mr. Nweke

16   discuss in any way the fact that you were both from

17   Nigeria originally?

18         A.    Did he tell me that during -- at some

19   point, yes, he did.

20         Q.    Okay.   And did you tell him at some

21   point, prior to becoming employed by Streamingedge,

22   that you too were from Nigeria?

23         A.    Yes.

24         Q.    And did you have -- other than each of



1    you telling each other that you were from Nigeria,

2    did you have any other discussions related to -- to

3    both of you being from Nigeria?

4         A.    I'm sorry.  Can you rephrase that, sir.

5         Q.    Sure.  Again, other than saying in

6    substance, how interesting, I'm from Nigeria, so

7    are you, did you have any other discussions about

8    people that you might know in common who are from

9    Nigeria, Nigerians living in the United States,

10   Nigerian social organizations or civic

11   organizations or anything similar?

12        A.    You're asking when I first met him, did

13   that kind of conversation take place?

14        Q.    Yes.

15        A.    When I first met him?

16        Q.    Right.

17        A.    No.

18        Q.    At some point after that, did a

19   conversation of that type ever take place?

20        A.    Of people that I know that he knows?

21        Q.    Sure.

22        A.    If you're asking me, there were people

23   attached to Mr. Nweke that I became acquainted with

24   later, but in terms of whether we have mutual

800.DAL.8779
dalcoreporting.com


1    friends -- mutual relationship or a distant

2    friendship somehow that we are somehow -- those

3    kinds of individuals that were connected somehow,

4    no.

5        Q.    When you say that you at some point

6    later became acquainted with people from Nigeria

7    that Mr. Nweke knew, do you recall the names of

8    those people?

9        A.    Several names.

10       Q.    Who?

11       A.    Mr. Nweke's uncle.

12       Q.    What's his name?

13       A.    Samuel Nweke.

14       Q.    How did you meet Mr. Samuel Nweke?

15       A.    I never met him in person, but virtually

16   I talk to him daily every other week while I was

17   employed with Streamingedge.  I met Mr. Nweke's

18   nephews.

19       Q.    What were their names?

20       A.    Purpose Nweke.

21       Q.    I'm sorry?

22       A.    Purpose.

23       Q.    Could you spell that?

24       A.    P-U-R-P-O-S-E.



1      Q.    Oh, Purpose.  Anybody else?

2      A.    Champion Nweke.

3      Q.    Did you meet them in person?

4      A.    Yes, I did.  Covington Aguzie.

5      Q.    Could you spell the last name, please.

6      A.    C-O-V-I-N --

7      Q.    No, that I understand.  The other name.

8  I'm sorry.

9      A.    Aguzie, A-G-U-Z-I-E, and his wife,

10 Unis --

11     Q.    And who were they?

12     A.    -- Aguzie.  They were distant relatives

13 of Mr. Nweke.  Michael Babatunde.

14     Q.    Could you spell?

15     A.    B-A-B-A-T-U-N-D-E.  Jim, I don't recall

16 the last name now.  There's endless list of name, a

17 lot of names of people.  I can't continue to give

18 you a lot.  There are so many names of people that

19 eventually I met through Mr. Nweke.

20     Q.    Did you ever socialize with any of the

21 people that were introduced to you by Mr. Nweke?

22          MR. MCDONALD:  Objection to form.

23     A.    What do you mean by "socialize"?

24     Q.    Did you ever go out to dinner, go to a



```
 1    party, go to a movie, go to a sporting event?
 2              MR. MCDONALD:  Still objection to form,
 3         but go ahead.
 4         A.   When you mean "socialize," what do you
 5    mean?
 6         Q.   Were you invited to somebody's house for
 7    a meal; did you go out to a restaurant for a meal;
 8    did you -- were you invited to a party; were you
 9    invited to a wedding; did you go to a social event
10    or a sporting event, that sort of thing.  That's a
11    partial list of what I would mean.
12         A.   The answer is no.  The only time I
13    recall ever being inside -- someone who is mutually
14    acquainted with Mr. Nweke was when they had -- when
15    the whole staff, office staff, went to the naming
16    ceremony, which is a traditional Nigerian thing,
17    when Mr. Nweke's wife had their second child or
18    third child, so every member of the New York team
19    went to this location.  So that's the only social
20    setting that I recall.
21         Q.   Okay.  So did there come a time when you
22    applied for a job at Streamingedge?
23         A.   Yes, I did at one point.
24         Q.   And can you tell me approximately when
```



1   you did that?

2        A.   I suspect sometime in -- probably

3   sometime in August or -- sometime in August.  It's

4   not an accurate description, but it's just -- I'm

5   giving you a rough estimate of around the time when

6   I eventually applied of '07.

7        Q.   And when you say that you applied

8   roughly that time period, did you submit a written

9   application, or did you apply by some other means?

10        A.   I gave my resume.

11        Q.   To whom did you give your resume?

12        A.   Mr. -- either to -- there were two

13   individuals that I may have given it to, which was

14   at that point Hideki Okubo, who I mentioned

15   earlier.

16        Q.   Yes.

17        A.   Or there's another gentleman there

18   called Srini.

19        Q.   Could you spell?

20        A.   S-R-I-N-I.

21        Q.   And is there any particular reason why

22   you gave your resume to either Mr. Okubo or to

23   Srini?

24        A.   I think at that time -- when I



1    eventually applied at that time, I became aware

2    that he was involved in the support area, in the

3    service support.

4         Q.    That would be Hideki?

5         A.    Yes.

6         Q.    And did you physically hand it to him,

7    or did you give it to him by some other means?

8         A.    Physically.

9         Q.    All right.  And what happened after you

10   physically gave him your resume?

11        A.    I think maybe a month or two passed, and

12   I gave up already on it, and I was called for an

13   interview.

14        Q.    And who called you for the interview?

15        A.    Actually, there was a voicemail that was

16   left, Srini.

17        Q.    And would it be fair to say that Srini,

18   in words or substance, asked you to call to set up

19   an interview?

20        A.    That is correct.

21        Q.    Did you do that?

22        A.    Yes, I did.

23        Q.    And did you interview with somebody?

24        A.    Several people.



1      Q.   Did you interview with several people

2  together or separately or some combination?

3      A.   Several people together and eventually

4  Hideki separately.

5      Q.   Okay.  So --

6      A.   It was a group interview.  I was sitting

7  across, and there were about three or four IT

8  people interviewing me.

9      Q.   And do you recall the names of the IT

10  people who interviewed you as part of that group

11  interview?

12      A.   Hideki was present.  Srini was present.

13  I think another gentleman, Alex.

14      Q.   Do you know Alex's last name?

15      A.   I don't recall the last name.

16      Q.   Okay.  Was anybody else present?

17      A.   There may have been one more person.  I

18  don't recall.

19      Q.   Did you take any notes during the

20  interview of any kind?

21      A.   Probably.

22      Q.   Do you have them at the present time

23  anywhere?

24      A.   No.

800.DAL.8779
dalcoreporting.com



```
 1        Q.    At the time -- now, was this interview
 2   at the Streamingedge offices?
 3        A.    That is correct, on Park Place.
 4        Q.    And following that group interview, did
 5   you have another one?
 6        A.    Yes.
 7        Q.    And did it happen on the same day or
 8   some point after that?
 9        A.    On the same day much later.  I was told
10   to wait around or come back.
11        Q.    And so the second interview that you
12   had, that was with whom?
13        A.    Mr. Okubo.
14        Q.    And during the interview with Mr. Okubo,
15   did he tell you what your job duties would be if
16   you were hired?
17        A.    I was told in the interview also.
18        Q.    What were you told your job duties would
19   be?
20        A.    It was mainly systems and support of --
21   systems support of company proprietary productive
22   services, which was proprietary software in the
23   areas of trading platforms -- trading platforms,
24   some middle office applications like
```

