UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

TAIWO OLORODE,                              :

                   Plaintiff,          :          11 Civ. 6934 (GBD) (AJP)

              -against-              :          **REPORT AND RECOMMENDATION**

STREAMINGEDGE, INC., and TRADITION           :
(NORTH AMERICA), INC.,
                               :

              Defendants.            :

                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable George B. Daniels, United States District Judge:**

        Taiwo Olorode, a native Nigerian, brings this action against his former employer,

defendant Streamingedge, Inc., alleging that he was discriminated against on the basis of his national

origin and retaliated against for making complaints in violation of the New York State Human

Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").  (Dkt. No. 6:

Am. Compl. ¶ 1.)[1]  Olorode additionally asserts claims for breach of contract and violations of the

Fair Labor Standards Act ("FLSA") and the New York Labor Law entitling him to overtime

payments.  (Am. Compl. ¶ 1.)

        Presently before the Court is Streamingedge's summary judgment motion.  (Dkt. No.

70: Streamingedge Notice of Motion.)  For the reasons set forth below, Streamingedge's motion

should be <u>GRANTED</u>.

---

[1]      Judge Daniels granted defendant Tradition's motion to dismiss on July 15, 2012.  (Dkt. No. 29.)

## FACTS

### Background

The evidence in the summary judgment record, construed in the light most favorable to Olorode as the nonmoving party, is as follows.

### Taiwo Olorode

Olorode is a 38-year old male who was born in Nigeria and became a United States citizen in 2009.  (Dkt. No. 76: Streamingedge Rule 56.1 Stmt. ¶¶ 5-6.)[2/]  Olorode received an associates degree from Middlesex County College in 1993, a Computer Science Certificate from the Chubb Institute in 2000, and a Management Information Systems Certificate from Columbia University in 2004.  (Streamingedge Rule 56.1 Stmt. ¶ 9; Dkt. No. 6: Am. Compl. ¶ 12.)  At the time

---

[2/]     Neither Olorode nor his new counsel responded to Streamingedge's Rule 56.1 Statement. Accordingly, the facts in Streamingedge's Rule 56.1 Statement are "deemed to be admitted for purposes of the motion."  SDNY-EDNY Local Rule 56.1(c); see also, e.g., Inesti v. Hogan, 11 Civ. 2596, 2013 WL 791540 at *1 n.2 (S.D.N.Y. Mar. 5, 2013) (Peck, M.J.) ("'Courts in this circuit have not hesitated to deem admitted the facts in a movant's Local [Civil] Rule 56.1 Statement that have not been controverted by a Local Rule 56.1 statement from the non-moving party.'" (quoting Ballard v. Children's Aid Soc'y, 781 F. Supp. 2d 198, 202-03 (S.D.N.Y. 2011))), report & rec. adopted, 2013 WL 5677046 (Sept. 30, 2013); Wolfson v. Bruno, 844 F. Supp. 2d 348, 350-51 n.4 (S.D.N.Y. 2011) (Peck, M.J.); Newsome v. Artale, 09 Civ. 10196, 2011 WL 5172543 at *1 n.1 (S.D.N.Y. Nov. 1, 2011) ("Plaintiff's affidavit in opposition does not specifically controvert the relevant facts set forth in Defendants' Rule 56.1 submission, and thus the Court deems admitted the facts recounted in Defendants' statement."); Crawford-Bey v. N.Y. & Presbyterian Hosp., 08 Civ. 5454, 2011 WL 4530193 at *1 n.1 (S.D.N.Y. Sept. 30, 2011) ("Because Plaintiff failed to submit her own [Local Civil Rule] 56.1 statement, despite specific prompting from the Court, the facts set forth in Defendant's 56.1 statement . . . are deemed admitted."); Buckman v. Calyon Sec. (USA) Inc., 817 F. Supp. 2d 322, 328 n.42 (S.D.N.Y. 2011) (Local Civil Rule "56.1 statements not explicitly denied by plaintiff are deemed admitted."); Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals, 812 F. Supp. 2d 357, 361 n.2 (S.D.N.Y. 2011) ("[A]ny facts averred in Plaintiff's Rule 56.1 submission that are supported by the record and not specifically and expressly controverted by properly supported statements in Defendants' Reply Memorandum [are considered] to be admitted by Defendants."); Butler v. Gonzalez, 09 Civ. 1916, 2010 WL 3398156 at *6 (S.D.N.Y. May 18, 2010), report & rec. adopted, 2010 WL 3398150 (S.D.N.Y. Aug. 26, 2010).

he filed this suit, Olorode was enrolled in New York University's International Business & Finance Executive Management Program.  (Am. Compl. ¶ 12.)  Prior to joining Streamingedge, Olorode worked in a systems support or technology technician position for over ten years.  (Streamingedge Rule 56.1 Stmt. ¶ 10; Am. Compl. ¶ 13.)

Olorode's at-will employment with Streamingedge began on November 5, 2007.  (Streamingedge Rule 56.1 Stmt. ¶¶ 8, 13; Am. Compl. ¶ 9.)

**Streamingedge, Inc.**

Streamingedge is a New Jersey corporation with its principal place of business in New York.  (Dkt. No. 76: Streamingedge Rule 56.1 Stmt. ¶ 7; Dkt. No. 6: Am. Compl. ¶ 3.)  Streamingedge is a small technology company that provides software, real time and straight through processing systems, products, strategies and solutions to brokers and traders to effectuate the quick and efficient trade of financial products.  (Streamingedge Rule 56.1 Stmt. ¶ 7; Am. Compl. ¶ 3; Dkt. No. 72: Okubo Aff. ¶ 5.)

At all times during Olorode's employment, an anti-discrimination and sexual harassment policy was posted visibly in a high-traffic area outside Streamingedge's Personnel Office.  (Streamingedge Rule 56.1 Stmt. ¶ 27; Dkt. No. 73: Fayman Aff. ¶ 8.)  The policy "encourages [employees] to report discrimination or harassment before it becomes severe or pervasive," and to "immediately report the matter to [a] supervisor or the Personnel Manager." (Dkt. No. 71: Reisman Aff. Ex. F: Streamingedge Harassment Policy at 2.)[3]  The policy further assures that the company "will not tolerate retaliation against an employee because he or she reports

---

[3]     Unless otherwise noted, all references to "Exs." refer to the Exhibits attached to the Reisman Affidavit, Dkt. No. 71.

discrimination or harassment or provide[s] information related to such complaints." (Streamingedge Harassment Policy at 2.)

### Wilson Nweke

Wilson Nweke, Streamingedge's founder, was born in Nigeria.  (Dkt. No. 76: Streamingedge Rule 56.1 Stmt. ¶ 11; Dkt. No. 72: Okubo Aff. ¶¶ 4, 7.)  Nweke was Streamingedge's Chief Executive Officer when Olorode was hired and held that position until April 2009, when he became President.  (Streamingedge Rule 56.1 Stmt. ¶ 11; Okubo Aff. ¶¶ 4, 7.)

### Hideki Okubo

Olorode reported to Hideki Okubo, a Systems Deployment Manager.  (Dkt. No. 76: Streamingedge Rule 56.1 Stmt. ¶¶ 8, 24; Dkt. No. 72: Okubo Aff. ¶¶ 4, 8.)  Okubo's responsibilities included supervising the team of systems support analysts, assigning work schedules, and providing help and feedback.  (Okubo Aff. ¶ 8.)  Okubo also managed Streamingedge's email system.  (Okubo Aff. ¶ 39.)  Okubo interviewed Olorode in October and November 2007, recommended that Streamingedge hire him, and was authorized by Nweke to hire Olorode.  (Okubo Aff. ¶ 10; see also Ex. P: Nweke Dep. at 15-17.)  At the time of Olorode's hire, Jorge Rivas was the only other Systems Support Analyst.  (Okubo Aff. ¶ 14.)  Rivas, who is of Hispanic origin, remains employed by Streamingedge in that capacity.  (Okubo Aff. ¶ 14.)

### Larry Rosenshein

Larry Rosenshein replaced Nweke as Streamingedge's CEO in the spring of 2009. (Ex. Q: Rosenshein Dep. at 7-8.)  Approximately one year later, Yann L'Huillier replaced Rosenshein as CEO.  (Rosenshein Dep. at 8.)

### Olorode's Contract and Prescribed Job Duties

On November 16, 2007, Olorode executed an employment agreement with Streamingedge for the position of Systems Support Analyst. (Dkt. No. 76: Streamingedge Rule 56.1 Stmt. ¶ 12; Dkt. No. 6: Am. Compl. ¶¶ 9, 14; Ex. C: Olorode 11/07 Contract.) Olorode's starting annual salary was $53,000. (Streamingedge Rule 56.1 Stmt. ¶ 12; Olorode 11/07 Contract ¶ 4; Am. Compl. ¶ 16.)[4] In March 2008, following an initial probationary period, Olorode's salary was increased to $60,000. (Streamingedge Rule 56.1 Stmt. ¶ 16; Am. Compl. ¶ 19.) Streamingedge presented Olorode with an updated employment contract reflecting his salary increase, but Olorode never signed it. (Streamingedge Rule 56.1 Stmt. ¶ 17; Am. Compl. ¶ 19.) Both the original and the subsequent, unsigned contract provided for annual salaries, not payment on an hourly basis. (See Olorode 11/07 Contract ¶ 4; Ex. D: Olorode 3/08 Contract ¶ 4.) The benefits provided by both contracts included: (1) thirteen annual sick days; (2) ten annual paid vacation days; and (3) reasonable reimbursement of business expenses incurred in carrying out one's job duties. (Am. Compl. ¶ 19; Olorode 3/08 Contract ¶¶ 5, 7, 9.)[5] In the event of termination without cause, the contracts required: (1) three months notice of the termination; (2) salary for the notice period; (3) any previously accrued and unpaid annual bonuses; (5) a pro rata bonus, if applicable, for the year of termination; and (5) payment for accrued but unused sick and vacation days. (Am. Compl. ¶ 19;

---

[4]     Olorode claims that Streamingedge originally offered him a $60,000 salary, but withdrew that offer the day before Olorode's employment was to begin and offered a $50,000 salary instead. (Am. Compl. ¶¶ 14, 16; but see Ex. P: Nweke Dep. at 20-23.) Olorode alleges he was able to negotiate his salary back up to $53,000. (Am. Compl. ¶ 16.)

[5]     Both contracts provided the benefits except during a new employee's three-month probationary period. (Olorode 11/07 Contract ¶ 2.1; Olorode 3/08 Contract ¶ 2.1.) Presumably, the first contract was to govern Olorode's probationary period and the March 2008 contract was intended to supplant the former contract.

Olorode 03/08 Contract ¶ 10(c).)  Receipt of termination benefits was contingent upon the execution

of a release waiver.  (Olorode 11/07 Contract ¶ 11; Olorode 3/08 Contract ¶ 11.)

The signed agreement described Olorode's duties as follows:

> Duties include but not limited to systems analysis, software research and development, support, maintenance and testing, networking, and assistance with site installations.  In addition, [Olorode] shall perform further duties as are incidental, implied from the foregoing, consistent with the background, training, and qualifications of [Olorode], or may be reasonably delegated as being in the best interests of the Company.

(Olorode 11/07 Contract ¶ 3.)  Olorode's position required minimal supervision.  (Streamingedge

Rule 56.1 Stmt. ¶ 15.)  Because of the work schedules of the brokers that Streamingedge services,

it was necessary to have support staff at work by 6 a.m., and Olorode's initial hours were 6 a.m. to

3 p.m.  (Okubo Aff.  ¶¶ 25-26; Am. Compl. ¶ 18.)

**Alleged Discriminatory Treatment**

**Menial Tasks**

Olorode alleges that he was discriminated against by Nweke on the basis of national

origin culminating in his termination allegedly for complaining about that discrimination.  (Dkt. No.

6: Am. Compl. ¶¶ 1, 17, 24, 35-38, 63-84.)  Olorode alleges that shortly after the start of his

employment, Nweke required Olorode to perform menial tasks unrelated to his Systems Support

Analyst position.  (Am. Compl. ¶ 20; see Dkt. No. 76: Streamingedge Rule 56.1 Stmt. ¶ 20.)[6]

Nweke admitted that Olorode performed the following specific tasks while employed at

Streamingedge: (1) obtaining health insurance for Nweke's mother (Ex. P: Nweke Dep. at 143, 169-

---

[6]     Although it is undisputed that Olorode performed these tasks, it is disputed as to whether Olorode volunteered, as Nweke claims (e.g., Nweke Dep. at 190-91), or was ordered to do so.  For the reasons discussed in Part II.A.1 below, that is immaterial for the purposes of this summary judgment motion.

74); (2) traveling to Barbados to secure student visas for Nweke's relatives (Nweke Dep. at 190; Am.
Compl. ¶ 21): (3) assisting in the selection of an au pair for Nweke's children (Nweke Dep. at 198);
(4) aiding in Nweke's acquisition of personal cars (Nweke Dep. at 200; Am. Compl. ¶¶ 21, 40); (5)
participating in an overnight renovation of Streamingedge's office (Nweke Dep. at 224-25; Am.
Compl. ¶ 21); and (6) shipping various personal items for Nweke (Nweke Dep. at 205; Am. Compl.
¶ 32).  In addition, Nweke testified that Olorode generally, like other employees, engaged in various
tasks around the office when it was needed.  (See generally Nweke Dep. at 143-71.)

       Olorode alleges, but Nweke denies, that Nweke required Olorode to perform the
following tasks: (1) carrying bags for a visiting Nigerian business partner (compare Am. Compl. ¶
42, with Nweke Dep. at 207-08, 217); (2) transporting personal electronics to a shipping container
(compare Am. Compl. ¶ 43, with Nweke Dep. at 217); and (3) cleaning out Nweke's storage
container (compare Am. Compl. ¶ 44, with Nweke Dep. at 217-18).

       Nweke testified that Streamingedge employees including Hideki Okubo, Ikenne
Nweke and Jorge Rivas performed the following tasks: (1) paying Nweke's personal phone bills
(Nweke Dep. at 148); (2) resolving warranty issues with Nweke's personal electronic equipment
(Nweke Dep. at 149-53); (3) setting up personal computers in Nweke's home (Nweke Dep. at 154-
56); and (4) managing Nweke's personal credit cards (Nweke Dep. at 156).  Okubo stated in his
affidavit that when Nweke "was gone [on business trips], . . . it fell upon myself, Mr. [Jorge] Rivas,
Ikenna [Nweke] and other company employees to help Wilson [Nweke] handle things that he could
not cover."  (Dkt. No. 72: Okubo Aff. ¶ 19.)  He further stated that he "helped Wilson [Nweke] with
matters which might be considered 'menial' including, among others, moving computer equipment
from the company's offices into storage, installing computer equipment in Wilson's home, helping
him pay his bills, and moving furniture and equipment within and out of Streamingedge's office

space." (Okubo Aff. ¶ 19.) Olorode denies that other employees performed menial tasks. (Dkt. No. 89: Olorode Aff. ¶ 30.)

### Olorode's Other Evidence of Alleged Discrimination

Olorode was not included on an email chain that was sent to other members of his support team. (Dkt. No. 6: Am. Compl. ¶ 39; Dkt. No. 72: Okubo Aff. ¶ 39.) Okubo admitted that Olorode mistakenly had been left off the distribution list of one email. (Okubo Aff. ¶ 39.) Olorode further alleges that his email was hacked and that he was locked out of certain systems. (Am. Compl. ¶ 39; Okubo Aff. ¶ 39.) Okubo found no evidence of hacking; he determined that Olorode had attempted to log into the wrong part of the system and instructed Olorode on the correct access procedures. (Okubo Aff. ¶ 39.)

Olorode also alleges that Nweke intimidated Olorode with a lawyer from Nigeria in response to Olorode's complaints to Rosenshein, telling him that as Nigerians, they needed to stick together. (Am. Compl. ¶¶ 35-36.) Nweke denied this and denied knowing of Olorode's complaints. (Nweke Dep. at 218-20.)

### Complaints Lodged by Olorode

On December 24, 2008, Olorode emailed Okubo complaining about Okubo's treatment of him. (Dkt. No. 76: Streamingedge Rule 56.1 Stmt. ¶ 24; Ex. G: 12/24/08 Email; Dkt. No. 72: Okubo Aff. ¶ 29.) The email made no mention of Olorode's national origin or race. (See 12/24/08 Email.) On March 31, 2009, Olorode again emailed Okubo complaining about his management style. (Okubo Aff. ¶ 29; Ex. H: 3/31/09 Emails.) The emails centered around information that Olorode believed Okubo was withholding from him and, which he felt prevented him from doing his job properly. (See 3/31/09 Emails.) On April 7, 2009, Okubo and Olorode had another altercation. (See Okubo Aff. ¶ 30; Ex. I: 4/7/09 Email.) Okubo emailed Nweke

memorializing a heated exchange concerning Olorode's sick and vacation days where Olorode accused Okubo in front of other employees of being dishonest and deceptive and refused to work under his supervision. (Okubo Aff. ¶ 30; 4/7/09 Email.) Okubo expressed in the email to Nweke that his "patience is reaching the limit." (Okubo Aff. ¶ 30; 4/7/09 Email.) There is no mention of Olorode's race or national origin; the subject matter of the complaints wholly focused on work-related disagreements. (4/7/09 Email.)

Olorode complained to Adnane Jaballah, Streamingedge's Global Software Development Manager, about the menial tasks that Nweke had assigned him, the increased workload they were creating, and the lack of additional compensation. (Streamingedge Rule 56.1 Stmt. ¶ 20; see also Am. Compl. ¶ 28.)[7] Jaballah referred Olorode to Larry Rosenshein, who had become the Streamingedge CEO in April 2009. (Streamingedge Rule 56.1 Stmt. ¶ 21; Dkt. No. 6: Am. Compl. ¶ 29; Ex. N: Olorode 1/13 Dep. at 368-69.)

Olorode met with Rosenshein in the spring or summer of 2009. (Streamingedge Rule 56.1 Stmt. ¶¶ 21-22; Am. Compl. ¶ 30.) Olorode complained about the extra, non-work related assignments, the additional uncompensated hours, that he was not reimbursed for certain expenses, and that his work email account was being monitored. (Streamingedge Rule 56.1 Stmt. ¶ 22; Am. Compl. ¶ 30; see also Ex. Q: Rosenshein Dep. at 18-23, 27-31; Olorode 1/13 Dep. at 277.) Rosenshein instructed Olorode to gather documentary evidence supporting his allegations. (Streamingedge Rule 56.1 Stmt. ¶ 22; Am. Compl. ¶ 30.) Rosenshein further suggested that Olorode speak with Human Resources. (Streamingedge Rule 56.1 Stmt. ¶ 21; Rosenshein Dep. at 14, 23.)

---

[7]     Olorode alleges that as a result of the extra assignments, his workday regularly exceeded twelve hours and his work week regularly exceeded sixty hours, including time on the weekends. (Am. Compl. ¶¶ 22-23.)

Olorode neither provided any evidence to Rosenshein nor spoke with Human Resources. (Streamingedge Rule 56.1 Stmt. ¶ 22; Rosenshein Dep. at 31-32; see also Dkt. No. 73: Fayman Aff. ¶ 12.)[8]  Rosenshein stated that he did not speak with Nweke about his meeting with Olorode. (Rosenshein Dep. at 28.)  However, Olorode claims that Nweke called him to ask why he had gone to Rosenshein.  (Olorode 1/13 Dep. at 350, 370.)

**Complaints About Olorode's Performance at Streamingedge**

On April 9, 2009, Nweke, Jaballah, and Okubo received an email from Streamingedge employee John Bojtos stating:

> I want Taiwo idiot fired.  He has the WORST attitude of anyone in this organization and he is mentally unstable.
>
> I asked him to update an RTNS client record entry from 1 to 3 before we had our project meeting (which he did) and during that meet[ing] I remembered that the actual ticket record needs to be updated from Active to Accept in order to push the trade through.  When I came back out he started freaking out at me because I didn't tell him to do that in the first place.
>
> The guy is losing it.  He seems to think that a simple request copied to ttc-support from me is a direct affront to his capabilities or that it calls his intelligence into question.  Even [another coworker] was sitting here scratching his head as to why he would get upset about that email.  And [that coworker] is the only person capable of tolerating him.
>
> I don't want him anywhere NEAR TTC or TTS anymore.  He doesn't support anything for me.  And if you have ANY sense you will fire him asap as no one else wants him around this company either.

(Ex. E: Olorode Personnel File at 56: 4/9/09 Bojtos Email.)[9]

---

[8]    Olorode's Amended Complaint asserts that he provided Rosenshein with "e-mails and other information of Wilson [Nweke's] discriminatory treatment" in September 2009 (Am. Compl. ¶ 33), but he has failed to produce those documents here.

[9]    The pages referenced in Olorode's personnel file refer to the ECF pagination.

On October 22, 2009, Olorode sent a mass email to Streamingedge's employees about establishing an "'umbrella fund'" in response to a co-worker asking Olorode to reimburse her for an umbrella Olorode had borrowed but not returned.  (Streamingedge Rule 56.1 Stmt. ¶ 32; Okubo Aff. ¶ 32.)  Okubo (verbally) and Jaballah (by email) warned Olorode not to use the company-wide email for personal matters and a warning notice was placed in Olorode's personnel file.  (Streamingedge Rule 56.1 Stmt. ¶ 32; Okubo Aff. ¶ 32, see also Olorode Personnel File at 15-19, 35.)

The following instant message exchange occurred between Jesse Caruso and Joren Gaucher, both employees of Streamingedge:

| | |
|---|---|
| Jesse says: | they don't want to do anything because they don't know how |
| Jesse says: | great support ppl working here |
| J0ren G4ucher says: | I think in the next couple of months im going to start pushing EVERYTHING on them |
| . . . . | |
| J0ren G4ucher says: | and get repo to fucking cry to wilson [Nweke][10] |
| J0ren G4ucher says: | and then that will make wilson [Nweke] realize what morons they are |
| Jesse says: | dude you shouldnt be doing support work |
| Jesse says: | thats what they're here for! |
| Jesse says: | fucking babies |
| Jesse says: | they're so stupid |
| Jesse says: | you can just tell by talking to them |
| Jesse says: | monkeys |

---

[10]     "Repo" refers to Streamingedge's Overnight Interest Rate Swaps trading desk.  (Dkt. No. 6: Am. Compl. ¶ 18.)

> J0ren G4ucher says:   hahahahah YUP
>
> . . . .
>
> J0ren G4ucher says:   who is that guy?
>
> J0ren G4ucher says:   talking to bob
>
> Jesse says:           some dude, name's Face
>
> J0ren G4ucher says:   FYI
>
> J0ren G4ucher says:   that guy is 1000x the idiot amy is
>
> J0ren G4ucher says:   its hard to believe but trust me
>
> . . . .
>
> Jesse says:           what about taiwo [Olorode]
>
> Jesse says:           guy flipped yesterday
>
> J0ren G4ucher says:   yeah taiwo [Olorode]
>
> J0ren G4ucher says:   hes a fucking moron
>
> . . . .
>
> J0ren G4ucher says:   seriously.. that guy wrote an email accusing me of sabotaging
>                       streamingedge
>
> Jesse says:           guy flips out because I asked him to enter some trades
>
> . . . .
>
> J0ren G4ucher says:   both those guys over there are fucking sub 60 IQ

(Ex. J: Instant Messages at 1-2, fn. added.)  Olorode could not recall how he obtained the transcript

of the instant messages.  (Ex. N: Olorode 1/13 Dep. at 412.)

Despite being hired for a 6 a.m. shift, Olorode was unable to arrive consistently by

6 a.m., and so Okubo shifted Olorode's start time to 7 a.m. and thereafter 8 a.m.  (Okubo Aff. ¶¶ 27-

28.)  Okubo and Ikenna regularly began their shifts at 6 a.m.  (Okubo Aff. ¶ 27.)  At some point in 2009, Okubo and Jaballah verbally warned Olorode about his continuing tardiness.  (Streamingedge Rule 56.1 Stmt. ¶ 30; Okubo Aff. ¶ 33.)  When Olorode's lateness persisted, Okubo urged Nweke to terminate Olorode's employment.  (Streamingedge Rule 56.1 Stmt. ¶ 30; Okubo Aff. ¶ 33.)  Nweke told Okubo that he did not want to fire Olorode and instructed Okubo to find a way to keep him.  (Streamingedge Rule 56.1 Stmt. ¶ 31; Okubo Aff. ¶ 33.)  From January 2, 2010 to February 3, 2010, Olorode took a medical leave of absence.  (Streamingedge Rule 56.1 Stmt. ¶ 30; Am. Compl. ¶¶ 48-50; Okubo Aff. ¶ 33.)  Upon returning from leave, Olorode continued to arrive late to work.  (Okubo Aff. ¶ 35.)  On April 1, 2010, Okubo emailed Nweke a detailed list of dates and times that Olorode arrived late or failed to show up at all.  (Okubo Aff. ¶ 35; Ex. K: 4/1/10 Email.)

**Olorode's Termination**

In early April 2010, Yann L'Huillier replaced Rosenshein as Streamingedge's CEO. (Dkt. No. 76: Streamingedge Rule 56.1 Stmt. ¶ 35; Dkt. No. 74: L'Huillier Aff. ¶ 4.)  At this time, Streamingedge had been ordered to cut costs.  (Streamingedge Rule 56.1 Stmt. ¶ 36; L'Huillier Aff. ¶ 5; see also Ex. P: Nweke Dep. at 92-94.)  Streamingedge had executed a prior round of layoffs in 2009, during which Nweke's wife, an administrative assistant, had been terminated.  (Streamingedge Rule 56.1 Stmt. ¶ 40; Dkt. No. 72: Okubo Aff. ¶ 18; Nweke Dep. at 90-91.)  L'Huillier reviewed the personnel roster and revenue and budget projections, and informed Nweke that staff positions needed to be cut.  (L'Huillier Aff. ¶ 5.)  Nweke instructed Okubo to eliminate one Systems Support Analyst position and Okubo recommended Olorode.  (Okubo Aff. ¶¶ 37-38.)  At the time Okubo recommended Olorode's termination, he was unaware of any complaints by Olorode alleging discrimination on the basis of race or national origin.  (Okubo Aff. ¶ 38.)  L'Huillier and Nweke engaged in multi-day discussions and Nweke submitted a list of five employees that were to be

terminated as part of the reduction in workforce, including Olorode.  (Streamingedge Rule 56.1 Stmt. ¶ 36; L'Huillier Aff. ¶¶ 6-7; <u>see also</u> Ex. L: 4/9/10 Email.)  These layoffs were projected to save Streamingedge $545,000 per year.  (L'Huillier Aff. ¶ 7; 4/9/10 Email.)

On April 13, 2010, Nweke informed Olorode that his employment was being terminated as part of a reduction in workforce (<u>i.e.</u>, without cause).  (Streamingedge Rule 56.1 Stmt. ¶ 37; L'Huillier Aff. ¶¶ 6-7; Dkt. No. 6: Am. Compl. ¶ 54; <u>see also</u> Ex. L: 4/9/10 Email.)  L'Huillier had never met Olorode at the time of his termination.  (L'Huillier Aff. ¶ 8-9.)  None of the other four employees being terminated were of Nigerian origin.  (Streamingedge Rule 56.1 Stmt. ¶ 39; Dkt. No. 73: Fayman Aff. ¶ 11.)  No notice was given prior to the termination; however, Olorode did not sign a release form entitling him to the termination benefits listed in paragraph ten of the contract and thus none were paid.  (Am. Compl. ¶¶ 54, 56; Ex. N: Olorode 1/13 Dep. at 426-27, 477-80.)  From 2007 to 2010, no System Support Analysts were paid discretionary bonuses under paragraph five of the employment agreement.  (Okubo Aff. ¶ 18.)  Since Olorode's termination, no additional Systems Support Analysts have been hired.  (Streamingedge Rule 56.1 Stmt. ¶ 46; Okubo Aff. ¶ 37.)[11]

---

[11]    In April and May 2010, the latter date being post-termination, Olorode wrote a series of emails to Rosenshein regarding a possible business development involving Russian oil interests.  (Dkt. No. 76: Streamingedge Rule 56.1 Stmt. ¶ 25; Ex. R: Rosenshein Dep. Ex. 3: Russian Oil Emails.)    The emails were all business; there was no mention of discrimination, retaliation, or even Olorode's recent termination.  (<u>See generally</u> Russian Oil Emails.)

## ANALYSIS

I.   **LEGAL PRINCIPLES**

   A.   **General Summary Judgment Standard**

   Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Humphreys v. Cablevision Sys. Corp., No. 12-4431-cv, --- F. App'x ----, 2014 WL 185010 at *1 (2d Cir. Jan. 17, 2014); Connolly v. Calvanese, 515 F. App'x 62, 62 (2d Cir. 2013); Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991).

   The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment.  See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Alzawahra v. Albany Med. Ctr., No. 12-4517, --- F. App'x ----, 2013 WL 6284286 at *1 (2d Cir. Dec. 5, 2013); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53; Dolan v. Cassella, No. 12-2486, --- F. App'x ----, 2013 WL 6150763 at *1 (2d Cir. Nov. 22, 2013).

   To defeat a summary judgment motion, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)).  Instead, the non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed."  Fed. R. Civ. P. 56(c)(1); see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356; Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (at summary judgment, "[t]he time has come . . . 'to put up or shut up'"), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[12/] The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented.  See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact.  See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which

---

[12/]    See also, e.g., Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y., No. 13-2921-cv, --- F. App'x ----, 2014 WL 185012 at *2 (2d Cir. Jan. 17, 2014); Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.

facts are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g., Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

### B.     Additional Summary Judgment Standards in Employment Discrimination Cases

When a case turns on the intent of one party, as employment discrimination and retaliation claims often do, a "trial court must be cautious about granting summary judgment."  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).[13]  Because the employer rarely leaves direct evidence of its discriminatory or retaliatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the employer's explanations for its actions.  E.g., Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1224.  "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error."  Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted).  Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory

---

[13]     Accord, e.g., Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004); Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) ("[I]n an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment."); McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997) ("[C]aution must be exercised in granting summary judgment where motive is genuinely in issue."); Cardoza v. Healthfirst, Inc., 210 F. Supp. 2d 224, 227 (S.D.N.Y. 1999); see also, e.g., Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994).

allegations of discrimination or retaliation, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer.  E.g., Budde v. H&K Distrib. Co., No. 99-9449, 216 F.3d 1071 (table), 2000 WL 900204 at *1 (2d Cir. June 29, 2000); Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); Meloff v. N.Y. Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995).

In other words, to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  Stern v. Trs. of Columbia Univ., 131 F.3d at 312; see, e.g., Schnabel v. Abramson, 232 F.3d 83, 90-91 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) ("[T]he question [on summary judgment is] . . . whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination.  To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." (quotations & alterations omitted)), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge'").[14]  Indeed, the Second Circuit "went out of [its] way to remind district courts that the 'impression that summary judgment is unavailable to

---

[14]     See also, e.g., Budde v. H&K Distrib. Co., 2000 WL 900204 at *1; Scaria v. Rubin, 94 Civ. 3333, 1996 WL 389250 at *5 (S.D.N.Y. July 11, 1996) (Peck, M.J.), aff'd, 117 F.3d 652 (2d Cir. 1997).

defendants in discrimination cases is unsupportable.'"  Weinstock v. Columbia Univ., 224 F.3d at 41.

### C.       Governing Legal Standard for NYSHRL and NYCHRL Cases

Both the NYSHRL and NYCHRL make it an "unlawful discriminatory practice" for an employer, "because of an individual's age, race, creed, color, [or] national origin, . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296(1)(a); see also N.Y. City Admin. Code § 8-107(1).

Claims of employment discrimination brought under the NYSHRL and NYCHRL are analyzed under the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).  See, e.g., Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010) ("This Court has determined that a plaintiff's discrimination claims under both the NYSHRL and the NYCHRL are subject to the burden-shifting analysis applied to discrimination claims under Title VII."); Benson v. Otis Elevator Co., 10 Civ. 3246, 2012 WL 4044619 at *6 (S.D.N.Y. Sept. 13, 2012), aff'd, No. 12-4112-cv, --- F. App'x ----, 2014 WL 657942 (2d Cir. Feb 21, 2014).[15/]  Additionally, claims brought pursuant to the NYCHRL are to be more liberally construed than those brought under federal or New York State law.  See, e.g., Benson v. Otis Elevator Co., 2012 WL 4044619 at *6; Sotomayor v. City of N.Y., 862 F. Supp. 2d 226, 257 (E.D.N.Y. 2012) (Weinstein, D.J.) ("[T]he NYCHRL requires that courts give the

---

[15/]    See also, e.g., Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir. 2009) ("[D]iscrimination claims brought pursuant to the NYSHRL, and the NYCHRL are analyzed under the Title VII framework."); Fall v. N.Y.S. United Teachers, 289 F. App'x 419, 422 (2d Cir. 2008) ("The McDonnell Douglas burden-shifting analysis 'is also applicable to [the plaintiff's] claims under the NYSHRL.'"); John v. Dep't of Info. Tech. & Telecomm., 06 Civ. 13119, 2008 WL 4694596 at *3 (S.D.N.Y. Oct. 23, 2008) (McDonnell Douglas analysis applies to NYSHRL and NYCHRL claims).

statute an independent and more liberal construction than its federal and state counterparts."), aff'd,

713 F.3d 163 (2d Cir. 2013).[16]

Under the familiar McDonnell Douglas burden-shifting analysis, the plaintiff has the

burden at the outset of "proving by the preponderance of the evidence a prima facie case of

discrimination."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089,

1093 (1981); see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct.

2097, 2106 (2000); McDonnell Douglas Corp. v. Green, 411 U.S. at 802, 93 S. Ct. at 1824.[17]

---

[16]    See also, e.g., Adams v. City of N.Y., 837 F. Supp. 2d 108, 127 (E.D.N.Y. 2011); Bennett
v. Health Mgmt. Sys., Inc., 92 A.D.3d 29, 34, 936 N.Y.S.2d 112, 116 (1st Dep't 2011),
appeal denied, 18 N.Y.3d 811, 945 N.Y.S.2d 645 (2012); Williams v. N.Y.C. Hous. Auth.,
61 A.D.3d 62, 75, 872 N.Y.S.2d 27, 37-38 (1st Dep't), appeal denied, 13 N.Y.3d 702, 885
N.Y.S.2d 716 (2009); see also, e.g., Albunio v. City of N.Y., 16 N.Y.3d 472, 477-78, 922
N.Y.S.2d 244, 246 (2011) ("In answering this question, we must be guided by the Local
Civil Rights Restoration Act of 2005 (LCRRA), enacted by the City Council 'to clarify the
scope of New York City's Human Rights Law,' which, the Council found 'has been construed
too narrowly to ensure protection of the civil rights of all persons covered by the law.'  The
LCRRA, among other things, amended Administrative Code § 8-130 to read: 'The provisions
of this title . . . shall be construed liberally for the accomplishment of the uniquely broad and
remedial purposes thereof, regardless of whether federal or New York State civil and human
rights laws, including those laws with provisions comparably-worded to provisions of this
title, have been so construed.'  The application of the LCRRA provision to this case is clear:
we must construe Administrative Code § 8-107(7), like other provisions of the City's Human
Rights Law, broadly in favor of discrimination plaintiffs, to the extent that such a
construction is reasonably possible." (citation omitted)).

[17]    See also, e.g., Raytheon Co. v. Hernandez, 540 U.S. 44, 50 n.3, 124 S. Ct. 513, 517 n.3
(2003); O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 310, 116 S. Ct. 1307, 1309
(1996); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 113 S. Ct. 2742, 2746-47 (1993);
Ruszkowski v. Kaleida Health Sys., 422 F. App'x 58, 60 (2d Cir. 2011); United States v.
Brennan, 650 F.3d 65, 93 (2d Cir. 2011); Leibowitz v. Cornell Univ., 584 F.3d at 498;
Dorfman v. Doar Commc'ns, Inc., 314 F. App'x 389, 390 (2d Cir. 2009); DeSalvo v.
Volhard, 312 F. App'x 394, 396 (2d Cir.), cert. denied, 558 U.S. 932, 130 S. Ct. 70 (2009);
Fall v. N.Y.S. United Teachers, 289 F. App'x at 420-21; Nader v. ABC Television, Inc., 150
F. App'x 54, 55 (2d Cir. 2005); Mandell v. Cnty. of Suffolk, 316 F.3d 368, 377-78 (2d Cir.
2003); Mario v. P&C Food Mkts., Inc., 313 F.3d 758, 767 (2d Cir. 2002); Collins v. N.Y.C.
Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002); Schnabel v. Abramson, 232 F.3d 83, 87 (2d
Cir. 2000); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

Establishment of a prima facie case "'in effect creates a presumption that the employer unlawfully discriminated against the employee.'"  St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 506, 113 S. Ct. at 2747 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 254, 101 S. Ct. at 1094).[18]

Once a plaintiff claiming employment discrimination establishes a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for its employment decision.  E.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142-43, 120 S. Ct. at 2106; McDonnell Douglas Corp. v. Green, 411 U.S. at 802, 93 S. Ct. at 1824.[19]  The burden on the defendant at this phase is one of production rather than persuasion.  E.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142, 120 S. Ct. at 2106.[20]

---

[18]    See also, e.g., Crawford v. Dep't of Investigation, 324 F. App'x 139, 141 (2d Cir. 2009); Smith v. New Venture Gear, Inc., 319 F. App'x 52, 54 (2d Cir. 2009); Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006), cert. denied, 549 U.S. 1282, 127 S. Ct. 1855 (2007); Mandell v. Cnty. of Suffolk, 316 F.3d at 380; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997).

[19]    See also, e.g., Raytheon Co. v. Hernandez, 540 U.S. at 50 n.3, 124 S. Ct. at 517 n.3; O'Connor v. Consol. Coin Caterers Corp., 517 U.S. at 310, 116 S. Ct. at 1309; St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 506-07, 113 S. Ct. at 2747; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 253-54, 101 S. Ct. at 1093-94; Desir v. City of N.Y., 453 F. App'x 30, 33-34 (2d Cir. 2011); United States v. Brennan, 650 F.3d at 93; Leibowitz v. Cornell Univ., 584 F.3d at 498-99; Dorfman v. Doar Commc'ns, Inc., 314 F. App'x at 390; DeSalvo v. Volhard, 312 F. App'x at 396; Fall v. N.Y.S. United Teachers, 289 F. App'x at 421; Nader v. ABC Television, Inc., 150 F. App'x at 55; Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004); Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003); Mandell v. Cnty. of Suffolk, 316 F.3d at 380; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Schnabel v. Abramson, 232 F.3d at 88; Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003); Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); Scaria v. Rubin, 117 F.3d at 654; Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 38.

[20]    See also, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 507, 113 S. Ct. at 2747; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 257, 101 S. Ct. at 1096; Terry v. Ashcroft, 336 F.3d at 144 n.17; Scaria v. Rubin, 117 F.3d at 654.

(continued...)

"Although intermediate evidentiary burdens shift back and forth under [the McDonnell Douglas] framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 143, 120 S. Ct. at 2106.

If the defendant articulates a non-discriminatory reason, the McDonnell Douglas burden-shifting framework drops out of the picture, and the plaintiff must show that the adverse employment decision more likely than not was motivated in whole or part by discriminatory reasons. E.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142-43, 120 S. Ct. at 2106.[21/] "Moreover, although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, . . . the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 143, 120 S. Ct. at 2106 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 255 n.10, 101 S. Ct. at 1095 n.10).

The Supreme Court in 2000 clarified the standard at this stage of the McDonnell Douglas analysis:

---

[20/]   (...continued)

[21/]   See also, e.g., Raytheon Co. v. Hernandez, 540 U.S. at 50 n.3, 124 S. Ct. at 517 n.3; St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 510, 113 S. Ct. at 2749; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 253, 101 S. Ct. at 1093-94; Allen v. Murray-Lazarus, 463 F. App'x 14, 16 (2d Cir. 2012); Desir v. City of N.Y., 453 F. App'x at 34; United States v. Brennan, 650 F.3d at 93; Leibowitz v. Cornell Univ., 584 F.3d at 499; DeSalvo v. Volhard, 312 F. App'x at 396; Fall v. N.Y.S. United Teachers, 289 F. App'x at 421; Feingold v. New York, 366 F.3d at 152; Mandell v. Cnty. of Suffolk, 316 F.3d at 380-81; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Weinstock v. Columbia Univ., 224 F.3d at 42; Scaria v. Rubin, 117 F.3d at 654.

[I]n <u>St. Mary's Honor Center</u> . . . . we held that the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not <u>compel</u> judgment for the plaintiff.  The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct."  In other words, "[i]t is not enough . . . to <u>dis</u>believe the employer; the factfinder must <u>believe</u> the plaintiff's explanation of intentional discrimination."

In reaching this conclusion, however, we reasoned that it is <u>permissible</u> for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. . . .

Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.  In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.  Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt."  Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.  Thus, <u>a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated</u>.

<u>This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability</u>.  Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.  For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.  To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50 [or Rule 56], and we have reiterated that trial courts should not "'treat discrimination differently from other ultimate questions of fact.'"

<u>Whether judgment as a matter of law [or summary judgment] is appropriate in any particular case will depend on a number of factors.  Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's</u>

> explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 146-49, 120 S. Ct. at 2108-09 (emphases added & citations omitted).

After Reeves, the Second Circuit has made clear that merely proving a prima facie case and disproving the employer's explanation for its conduct at the third step of the McDonnell Douglas analysis will not preclude summary judgment in all cases; rather, a case-by-case analysis is necessary:

> In examining the impact of Reeves on our precedents, we conclude that Reeves prevents courts from imposing a per se rule requiring in all instances that a [Title VII] claimant offer more than a prima facie case and evidence of pretext. . . . But the converse is not true; following Reeves, we decline to hold that no [Title VII] defendant may succeed on a summary judgment motion so long as the plaintiff has established a prima facie case and presented evidence of pretext. Rather, we hold that the Supreme Court's decision in Reeves clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."

Schnabel v. Abramson, 232 F.3d at 90 (emphasis added).[22]

----

[22]    See also, e.g., Braun v. Securitas Sec. Servs. USA, Inc., 372 F. App'x 113, 114 (2d Cir. 2010); Butts v. N.Y.C. Dep't of Hous. Pres. & Dev., 307 F. App'x 596, 599 (2d Cir. 2009); Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005); Feingold v. New York, 366 F.3d at 152; Roge v. NYP Holdings, Inc., 257 F.3d 164, 167-68 (2d Cir. 2001); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 469-70 (2d Cir.), cert. denied, 534 U.S. 993, 122 S. Ct. 460 (2001); James v. N.Y. Racing Ass'n, 233 F.3d 149, 156-57 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d at 42 ("In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."); Aksamit v. 772 Park Ave. Corp., 00 Civ. 5520, 2003 WL 22283813 at *6 (S.D.N.Y. Oct. 2, 2003) ("[A] plaintiff's establishment of a prima facie case and rebuttal of a nondiscriminatory reason for the adverse action do not save the plaintiff from summary judgment when there is insufficient evidence of discrimination."), aff'd, 128 F. App'x 204 (2d Cir. 2005); Weiser v. Forest Pharm., Inc., 99 Civ. 1809, 2001 WL 293951 at *7-8 (S.D.N.Y. Mar. 26, 2001); Tanay v. Saint Barnabas Hosp., 99 Civ. 9215, 2001 WL 262695 at *4 (S.D.N.Y. Mar. 15, 2001); Connell v. Consol. Edison Co., 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000) (Chin, D.J.) ("The key is whether there is sufficient evidence in the record
(continued...)

## II.     STREAMINGEDGE'S SUMMARY JUDGMENT MOTION SHOULD BE GRANTED AS TO OLORODE'S DISCRIMINATION CLAIMS

Olorode alleges that he was discriminated against on the basis of his Nigerian national origin.  (Dkt. No. 6: Am. Compl. ¶¶ 1, 17, 24; see also Dkt. No. 89: Olorode Aff. ¶¶ 28, 45, 48-51.)

### A.     Olorode's Allegations Fail To Establish A Prima Facie Case Of Discrimination

It is well settled that a plaintiff asserting claims under the NYSHRL and the NYCHRL must first establish a prima facie case of discrimination.  (See cases cited at pages 18-20 above.)  A NYSHRL plaintiff meets that burden by showing that:  (1) he was within a protected group, (2) he was qualified for the functions of her position, (3) he suffered an adverse employment action, and (4) the action took place under circumstances giving rise to an inference of discrimination.  See, e.g., Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012); Lore v. City of Syracuse, 670 F.3d 127, 169 (2d Cir. 2012); Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010).[23/]  "The NYCHRL modifies the third prong of the prima facie case so that the adverse action need not be 'material.'  Instead, a plaintiff bringing a NYCHRL claim must simply demonstrate differential treatment that is 'more than trivial, insubstantial, or petty.'"  Jeune v. City of N.Y., 2014 WL 83851 at *4 (citing Spiegel v. Schulmann, 604 F.3d at 80); see also, e.g., Williams v. Regus Mgmt. Grp., LLC, 836 F. Supp. 2d 159, 173 (S.D.N.Y. 2011).  "The burden of establishing a prima

---

[22/]    (...continued)
– whether it consists of just the prima facie case and proof of pretext alone or those items together with additional evidence – to support an inference of discrimination.").

[23/]    See also, e.g., Jeune v. City of N.Y., 11 Civ. 7424, 2014 WL 83851 at *4 (S.D.N.Y. Jan. 9, 2014); McCoy v. People Care Inc., 11 Civ. 2689, 2013 WL 5313433 at *5 (S.D.N.Y. Sept. 20, 2013); Brooks v. D.C. 9 Painters Union, 10 Civ. 7800, 2013 WL 3328044 at *2 (S.D.N.Y. July 2, 2013).

facie case is not onerous, and has been frequently described as minimal." <u>Scaria</u> v. <u>Rubin</u>, 117 F.3d

652, 654 (2d Cir. 1997); <u>accord</u>, <u>e.g.</u>, <u>St. Mary's Honor Ctr.</u> v. <u>Hicks</u>, 509 U.S. 502, 506, 113 S. Ct.

2742, 2746-47 (1993).[24/]

   For purposes of this motion, Streamingedge concedes that Olorode satisfies the first

three prongs of the <u>McDonnell Douglas</u> analysis for his discriminatory termination claim.  (Dkt. No.

75: Streamingedge Br. at 5.)[25/]  However, Olorode fails to establish that his termination took place

under circumstances giving rise to an inference of discrimination.

   As the party bearing the initial burden of proof under <u>McDonnell Douglas</u>, Olorode

offers the following evidence to support an inference of discrimination:  (1) menial tasks that he

performed for Nweke unrelated to Olorode's Systems Support Analyst position (<u>see</u> pages 6-8

above); (2) his alleged reduction in salary at the start of his employment (<u>see</u> page 5 n.4 above); and

(3) an instant message conversation between two Streamingedge employees that used the term

"monkeys" in reference to the support staff (<u>see</u> pages 11-12 above).  (<u>See generally</u> Dkt. No. 88:

---

[24/]  <u>See also</u>, <u>e.g.</u>, <u>Broich</u> v. <u>Inc. Vill. of Southampton</u>, 462 F. App'x 39, 43 (2d Cir.), <u>cert.</u>
<u>denied</u>, 133 S. Ct. 527 (2012); <u>Mathirampuzha</u> v. <u>Potter</u>, 548 F.3d 70, 78 (2d Cir. 2008);
<u>Weinstock</u> v. <u>Columbia Univ.</u>, 224 F.3d 33, 42 (2d Cir. 2000), <u>cert. denied</u>, 540 U.S. 811,
124 S. Ct. 53 (2003); <u>Austin</u> v. <u>Ford Models, Inc.</u>, 149 F.3d 148, 152 (2d Cir. 1998); <u>Raskin</u>
v. <u>Wyatt Co.</u>, 125 F.3d 55, 64 (2d Cir. 1997); <u>Chambers</u> v. <u>TRM Copy Ctrs. Corp.</u>, 43 F.3d
29, 32 (2d Cir. 1994); <u>Fisher</u> v. <u>Vassar Coll.</u>, 114 F.3d 1332, 1335 (2d Cir. 1997), <u>cert.</u>
<u>denied</u>, 522 U.S. 1075, 118 S. Ct. 851 (1998); <u>Williams</u> v. <u>N.Y.C. Dep't of Sanitation</u>, 00
Civ. 7371, 2001 WL 1154627 at *16 (S.D.N.Y. Sept. 28, 2001) (Peck, M.J.); <u>Gonzalez</u> v.
<u>N.Y.C. Transit Auth.</u>, 00 Civ. 4293, 2001 WL 492448 at *13 (S.D.N.Y. May 9, 2001) (Peck,
M.J.); <u>Cobian</u> v. <u>New York City</u>, 99 Civ. 10533, 2000 WL 1782744 at *16 (S.D.N.Y. Dec. 6,
2000) (Peck, M.J.), <u>aff'd</u>, 23 F. App'x 82 (2d Cir. 2001); <u>Weber</u> v. <u>Parfums Givenchy, Inc.</u>,
49 F. Supp. 2d 343, 357 (S.D.N.Y. 1999) (Wood, D.J. & Peck, M.J.).

[25/]  Because Olorode's satisfaction of the third prong is not disputed, there is no difference in the
way his NYSHRL and NYCHRL claims are analyzed with respect to discrimination.  <u>See</u>
<u>Jeune</u> v. <u>City of N.Y.</u>, 2014 WL 83851 at *5 n.3 ("Although NYCHRL claims are normally
reviewed separately from federal and state discrimination claims, the Court considers them
together here because Plaintiff fails to point to any evidence supporting an inference of
discrimination, which is required for all claims." (citation omitted)).

Olorode Opp. Br. at 6-8.)  These allegations are insufficient to create an inference that Olorode's

treatment at Streamingedge was the product of discrimination.

The plaintiff's inference of discrimination standard "is a 'flexible one that can be

satisfied differently in differing factual scenarios.'" Howard v. MTA Metro-North Comm. R.R., 866

F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81,

91 (2d Cir. 1996)).  The Second Circuit has held that an inference of discrimination can be drawn

from circumstances such as:

> "the employer's continuing, after discharging the plaintiff, to seek applicants from
> persons of the plaintiff's qualifications to fill that position; or the employer's criticism
> of the plaintiff's performance in ethnically degrading terms; or its invidious
> comments about others in the employee's protected group; or the more favorable
> treatment of employees not in the protected group; or the sequence of events leading
> to the plaintiff's discharge."

Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir.), cert. denied, 534 U.S. 993, 122

S. Ct. 460 (2001) (quoting Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994)); see

also John v. Kingsbrook Jewish Med. Ctr. / Rutland Nursing Home, No. 11-CV-3624, 2014 WL

1236804 at *9 (E.D.N.Y. Mar. 25, 2014).  However, a plaintiff's "mere subjective belief that he was

discriminated against . . . does not sustain a . . . discrimination claim," and mere "'unfairness in the

workplace that is not the result of discrimination against a protected characteristic is simply not

actionable.'" Gue v. Suleiman, 10 Civ. 8958, 2012 WL 4473283 at *8 (S.D.N.Y. Sept. 27, 2012).[26]

---

[26]   See also, e.g., Karim-Seidou v. Hosp. of St. Raphael, No. 09 CV 51, 2012 WL 6628886 at
*5 (D. Conn. Dec. 19, 2012) (plaintiff's claim unable to survive summary judgment where
plaintiff "was unable to present any evidence, aside from his own subjective beliefs, from
which [the] Court could draw a reasonable inference of racial discrimination"); Casciani v.
Nesbitt, 659 F. Supp. 2d 427, 463-64 (W.D.N.Y. 2009) (plaintiff's "subjective beliefs, and
naked allegations, unsupported by any facts" were insufficient to support a discrimination
claim based on plaintiff's national origin), aff'd, 392 F. App'x 887 (2d Cir. 2010), cert.
denied, 131 S. Ct. 2096 (2011).

1.      **The Menial Tasks Performed by Olorode Do Not Give Rise to an Inference of Discrimination**

Olorode claims that the menial tasks were unrelated to his position as a Systems Support Analyst and that he was the only one required to perform them because Nweke, an "East Coast" Nigerian, singled out Olorode because of his national origin as a "West Coast" Nigerian. (Dkt. No. 6: Am. Compl. ¶¶ 20, 24; Dkt. No. 88: Olorode Opp. Br. at 6; Dkt. No. 89: Olorode Aff. ¶¶ 45, 49-51.)  Despite Olorode's claim of disparate treatment, the evidence proves otherwise.

It is undisputed that, at Nweke's request, Olorode: (1) obtained health insurance for Nweke's mother; (2) traveled to Barbados to secure student visas for Nweke's relatives; (3) assisted in the selection of an au pair for Nweke's children; (4) aided in Nweke's acquisition of personal cars; (5) participated in an overnight renovation of Streamingedge's office; and (6) shipped various personal items for Nweke.  (See pages 6-8 above.)  There is no evidence from which a jury could reasonably find that Olorode was assigned these tasks because of his national origin.

First, Streamingedge has offered evidence that multiple non-Nigerian employees at Streamingedge, a small company, were asked (or perhaps ordered) by Nweke to perform tasks outside their typical job-related duties.  For example, Hideki Okubo, Olorode's supervisor, testified that he regularly performed similar tasks.  (See, e.g., Dkt. No. 72: Okubo Aff. ¶ 19 ("Before and during Mr. Olorode's employment at Streamingedge, [Okubo] helped [Nweke] with matters which might be considered 'menial' including, among others, moving computer equipment from the company's offices into storage, installing computer equipment in [Nweke's] home, helping him pay his bills, and moving furniture and equipment within and out of Streamingedge's office space."); see also pages 7-8 above.)  Okubo further testified that when Nweke "was gone, . . . it fell upon myself, Mr. [Jorge] Rivas, Ikenna and other company employees to help [Nweke] handle things that he

could not cover." (Okubo Aff. ¶ 19.) Indeed, Nweke testified at length about how employees performed personal services for him when he became too consumed with work. (Ex. P: Nweke Dep. at 143-171.) Nweke testified that he "would consider all system support analysts, Hideki, Ikenna, Jorge Rivas, have all, including Mr. Olorode, have been doing personal things, as well." (Nweke Dep. at 155.) Olorode's only response to this evidence is a statement that Nweke did not order other employees "to clean and vacuum." (Olorode Aff. ¶ 30; see Olorode Opp. Br. at 6-8; see also page 2 n.2 above.)

Crucially, even if Olorode were the only employee forced to perform menial tasks, Olorode's many complaints about his treatment at work, and particularly his long hours, never indicated a belief that the treatment was a result of his national origin. In his initial complaints to Adnane Jaballah and CEO Larry Rosenshein, Olorode complained of late nights and office work unrelated to his job-related responsibilities. (See Ex. Q: Rosenshein Dep. at 14-21; Ex. N: Olorode 1/13 Dep. at 277, 350.) The record contains two email exchanges between Olorode and Okubo, but no complaint in the emails reasonably can be construed to relate to Olorode's national origin. (See Ex. G: 12/24/08 Email; Ex. H: 3/31/09 Email; see pages 8-9 above.) Olorode even emailed Rosenshein after his termination where, instead of complaining about discrimination, Olorode solicited a business deal. (See page 14 n.11 above.)

Olorode may have a legitimate complaint that he was overworked and required to perform personal tasks for Nweke, but there is no evidence that this was a form of discrimination. Indeed, Olorode's late-filed affidavit contains contradictory explanations of how the extra work was tied to his Nigerian national origin. (Olorode Aff. ¶¶ 28, 39-40, 45, 48-51.) First, Olorode claims that he "came to believe" the reason for the demeaning tasks was because he was Nigerian. (Olorode Aff. ¶ 28.) He does not explain any basis for coming to that belief. Then, Olorode claims

that when he complained to Nweke about doing personal tasks, Nweke explained that it was because Olorode was a "native home boy" (Olorode Aff. ¶ 39)—implying that Nweke trusted Olorode because of their shared Nigerian heritage.  Then, Olorode raises the tribal differences between West and East Nigeria, and because his workday was demoralizing, he had "come to figure over the year[s] that Mr. Nweke is a 'tribalist.'" (Olorode Aff. ¶¶ 48-51.)  In other words, not from any comment by Nweke but by the long hours, he concluded Nweke discriminated against him.  Olorode cannot prove discrimination by such speculation, even at the summary judgment stage.  Under these circumstances, it is clear that Olorode's discrimination claims are grounded in nothing more than his subjective beliefs, which are insufficient to sustain such a claim.  (See cases cited at page 27 above.)  The Court finds that there is no evidence from which a reasonable jury could draw an inference of discrimination from the way Olorode was treated at work.  See, e.g., Jeune v. City of N.Y., 11 Civ. 7424, 2014 WL 83851 at *5 (S.D.N.Y. Jan. 9, 2014) ("The only evidence [plaintiff] proffers in support of th[e] assertion [that he was treated differently], however, is his own conclusory testimony that [defendant] 'didn't . . . [treat] the white officers or the Latin officers' in a similar fashion, and that he '[didn't] think [defendant] would' extend the hours of someone whose child was sick if the person was 'of her own race.'  But this testimony lacks the detail necessary to support an inference of discrimination." (record citations omitted)); Moore v. Kingsbrook Jewish Med. Ctr., No. 11-CV-3625, 2013 WL 3968748 at *7 (E.D.N.Y. July 30, 2013) ("Plaintiff has not offered any evidence from which a jury could reasonably find that Plaintiff was the subject of racial or national origin discrimination.  Plaintiff has pointed to no allegations that anyone made either ethnic or racist comments to or about him regarding his race or national origin, or that others not in either his race or national origin class were treated more favorably than Plaintiff."); Karim-Seidou v. Hosp. of St. Raphael, No. 09 CV 51, 2012 WL 6628886 at *5 (D. Conn. Dec. 19, 2012) ("While

Plaintiff disagrees with Defendant's decision to terminate his employment during his probationary period, he was unable to present any evidence, aside from his own subjective beliefs, from which this Court could draw a reasonable inference of racial discrimination.  Considering the entire record, this Court finds Plaintiff was not terminated due to his race or national origin.").

### 2.    Olorode's Co-Workers' Comments Do Not Give Rise to an Inference of Discrimination

There is no evidence that any decision-maker, or anyone with influence over a decision-maker, made any racially or ethnically charged comments that would give rise to an inference of discrimination.[27/]  See, e.g., Joseph v. Owens & Minor Dist. Inc., No. 11-CV-5269, --- F. Supp. 2d ----, 2014 WL 1199578 at *8 (E.D.N.Y. Mar. 24, 2014) ("Defendant is correct that, absent any evidence that [a co-worker] was involved in the decision to terminate Plaintiff, any racial bias or insensitivity on the part of [that co-worker] cannot be attributed to the actions of the decision-maker who terminated Plaintiff."); White v. Pacifica Found., 11 Civ. 2192, --- F. Supp. 2d ----, 2013 WL 5288851 at *13 (S.D.N.Y. Sept. 19, 2013) (no inference of discrimination found where the allegedly discriminatory remarks were made by someone other than the person making the adverse employment decision); Tucker v. N.Y.C., 05 Civ. 2804, 2008 WL 4450271 at *5 (S.D.N.Y. Sept. 30, 2008) (Lynch, D.J.), aff'd, 376 F. App'x 100 (2d Cir. 2010).  The only comment that arguably was racially charged was made by Streamingedge employee Jesse Caruso's text message (to another employee) referring to the support staff as "monkeys."  (See page 11 above.)  However, Caruso played no role in Olorode's termination and thus his comments are not relevant.

---

[27/]    Olorode's opposition brief asserts that Nweke referred to Olorode as his "'Yoruba Boy,'" supposedly a derogatory term.  (Dkt. No. 88: Olorode Opp. Br. at 6, citing Ex. P: Nweke Dep. at 212-13.)  In those deposition pages, Nweke denied that he used that expression, and there is no evidence in the record to the contrary.  Even Olorode's late-filed affidavit does not claim that Nweke ever called him a derogatory term.  (See Dkt. No. 89: Olorode Aff. ¶¶ 39, 48-51.)

There is no evidence as to how Olorode obtained the message, which was not sent to or meant to be seen by him.  (See page 12 above.)  Moreover, there is no evidence that a decision-maker at Streamingedge was aware of, let alone influenced by, the comments at the time Olorode was terminated.  Rather, the complaint conclusorily asserts that "Streamingedge's management did nothing to address the discriminatory atmosphere" exemplified in the instant message conversation without establishing any nexus between the comment and Olorode's treatment.  (See Am. Compl. ¶ 27.)  This offering cannot withstand summary judgment.  See Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 115 (2d Cir. 2007) ("[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark."); Sethi v. Narod, No. 11-CV-2511, --- F. Supp. 2d ----, 2014 WL 1343069 at *26 (E.D.N.Y. Apr. 2, 2014) ("Where remarks are unrelated to a decision taken with respect to a plaintiff, they are not probative of discriminatory intent.").[28]

      In any event, based on the context of the entire instant message conversation, there is no evidence that the comment was made in reference to Olorode's race or national origin.  To the contrary, the entire conversation between Caruso and Joren Gaucher evinces a widespread, general, and indiscriminate disdain for many of their co-workers without regard to their race, gender, creed, or national origin.  See John v. Kingsbrook Jewish Med. Ctr. / Rutland Nursing Home, 2014 WL 1236804 at *13 (no inference of discrimination where the allegedly discriminatory animus of a comment was belied by the comment's context); Humphries v. City Univ. of N.Y., 13 Civ. 2641,

---

[28]    Accord, e.g., Joseph v. Owens & Minor Dist. Inc., 2014 WL 1199578 at *8-9 (no inference of discrimination where there was no evidence that the person making the allegedly racially charged remark was involved in the decision to terminate the plaintiff); White v. Pacifica Found., 2013 WL 5288851 at *13 (colleague's comments not probative where the colleague played no role in the plaintiff's suspension or termination).

2013 WL 6196561 at *9 (S.D.N.Y. Nov. 26, 2013) ("Whether remarks by defendants or defendants' employees support an inference of discrimination depends, however, on the context in which they were made . . . .").

### 3.   Olorode Has Failed to Establish Any Connection Between His National Origin and His Allegedly Reduced Starting Salary

Olorode has provided no evidence that his salary was ever reduced, let alone that it was reduced because of his national origin.  The only evidence of Olorode's agreed upon salary is the signed contract itself, which indicates a starting salary of $53,000.  (See page 5 above.) Moreover, even if Olorode could show that he was originally offered $60,000, Olorode has failed to produce evidence about the alleged reduction from which this Court could reasonably draw an inference of discrimination.  Such bald, conclusory assertions are insufficient to create a disputed material fact.  (See cases cited at pages 15-16 above.)

### 4.   Nweke's Nigerian National Origin Further Undercuts Olorode's Discrimination Claims

Although "[t]he Supreme Court has 'rejected any conclusive presumption' that an employer . . . will not discriminate against members of their own race,"[29] the fact that both Olorode and Nweke are Nigerian (see pages 2, 4 above) undermines any possible inference of discriminatory animus.  See, e.g., Baguer v. Spanish Broad. Sys., Inc., 04 Civ. 8393, 2010 WL 2813632 at *11 (S.D.N.Y. July 12, 2010) ("Courts draw an inference against discrimination where the person taking the adverse action is in the same protected class as the [a]ffected employee."), aff'd, 423 F. App'x 102 (2d Cir. 2011); Walder v. White Plains Bd. of Educ., 738 F. Supp. 2d 483, 501 (S.D.N.Y. 2010) (Peck, M.J.) ("Any inference of sex discrimination is further undermined by the fact that . . . the

---

[29]   Feingold v. N.Y., 366 F.3d 138, 155 (2d Cir. 2004) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 118 S. Ct. 998, 1001 (1998)).

supervisor who allegedly discriminated against [plaintiff] as to the terms of her duties, is a woman.").[30/]  Olorode's opposition brief states that "Nigerians from the East and West Coast[s] often view each other with disfavor and dis[d]ain, as they are from different 'tribes.'"  (Dkt. No. 88: Olorode Opp. Br. at 7; see also Dkt. No. 89: Olorode Aff. ¶¶ 48-51.)  Olorode, however, merely assumes, without any basis, that Nweke harbored said prejudices.

   In sum, although Olorode may sincerely have felt "humiliated and demeaned" by overwork and doing personal tasks for Nweke (Dkt. No. 6: Am. Compl. ¶ 42), he has provided no admissible evidence that it was grounded in his race or national origin.  Accordingly, Olorode cannot prove a prima facie case of discrimination.

### B. In Any Event, Olorode's Discrimination Claim Fails At The Third McDonnell Douglas Step

   Even assuming that Olorode could establish a prima facie case, Olorode cannot meet his burden of establishing pretext.  Streamingedge has presented evidence that Olorode was one of

---

[30/] See also, e.g., Eder v. City of N.Y., 06 Civ. 13013, 2009 WL 362706 at *8 (S.D.N.Y. Feb. 12, 2009) (Plaintiff's "immediate supervisor who assessed Plaintiff's performance and determined that it was lacking, are members of the same protected class. Thus, any inference of discrimination, without additional evidence, is not warranted."); Tucker v. New York City, 05 Civ. 2804, 2008 WL 4450271 at *5 (S.D.N.Y. Sep. 30, 2008) ("[A]ny inference of race discrimination is further undermined by the fact that all three superintendents under whom [plaintiff] worked as well as three of his four direct supervisors at the DOE were also African-American."), aff'd, 376 F. App'x 100 (2d Cir. 2010); Fosen v. N.Y. Times, 03 Civ. 3785, 2006 WL 2927611 at *5 (S.D.N.Y. Oct. 11, 2006) ("Any inference of discrimination was also critically undermined by the fact that the supervisors responsible for Plaintiff's termination" were part of the same protected class as plaintiff.); Morris v. N.Y.C. Dep't of Sanitation, 99 Civ. 4376, 2003 WL 1739009 at *7 (S.D.N.Y. Apr. 2, 2003) ("Where all decision-makers are members of a plaintiff's protected class, courts have found an inference against discriminatory intent."); Marlow v. Office of Ct. Admin., 820 F. Supp. 753, 757 (S.D.N.Y. 1993), aff'd, 22 F.3d 1091 (2d Cir.), cert. denied, 513 U.S. 897, 115 S. Ct. 252 (1994); Toliver v. Cmty. Action Comm'n to Help the Econ., Inc., 613 F. Supp. 1070, 1074 (S.D.N.Y. 1985), aff'd, 800 F.2d 1128 (2d Cir.), cert. denied, 479 U.S. 863, 107 S. Ct. 217 (1986).

five employees terminated as part of a company-wide reduction in force.  (See pages 13-14 above.)

The evidence also showed that Olorode chronically was late to work, did not work well with his

colleagues, did not follow directions, and was prone to outbursts.  (See pages 8-13 above.)  His

tardiness particularly was bad in the weeks leading up to his firing.  (See pages 12-13 above.)

Moreover, it was Hideki Okubo, Olorode's supervisor, who recommended Olorode's termination to

Nweke after Nweke previously had urged Okubo to retain him.  (See page 13 above.)  At the time

of his termination, Olorode had not complained to Okubo about discrimination and Okubo otherwise

was unaware of Olorode's complaints to Rosenshein (which were about over-work, not

discrimination).  (See page 13 above.)  However, Okubo acutely was aware of Olorode's volatility

in the workplace, evidenced by his accusatory emails and confrontations with coworkers, and his

consistent tardiness.  (See pages 8-13 above.)  These all are legitimate reasons for Olorode's

termination, even if Streamingedge was erroneous in reaching these conclusions.  See, e.g., Sethi

v. Narod, No. 11-CV-2511, --- F. Supp. 2d ----, 2014 WL 1343069 at *29 (E.D.N.Y. Apr. 2, 2014)

("Defendants presented evidence that . . . they suspended Plaintiff because by February 2010,

Plaintiff's 'inexplicable anger, belligerence and hostility towards his . . . colleagues . . . made it

impossible for him to carry out his duties and responsibilities effectively.'  Defendants have met

their burden.  These are legitimate reasons for Plaintiff's treatment, even if Defendants were

erroneous in reaching any of these conclusions." (record citation omitted)); Wade v. N.Y.C. Dep't

of Educ., 11 Civ. 5278, 2014 WL 941754 at *9 (S.D.N.Y. Mar. 10, 2014) ("Even assuming,

arguendo, that Plaintiff could establish a prima facie case of discrimination, Defendant has given

a legitimate nondiscriminatory explanation for her termination.  An OSI investigator substantiated

allegations that Plaintiff had cursed at students, shook her breasts in his face, and attempted to

coerce a student into making a false statement regarding the other allegations.  These events,

according to the employer, led to her termination. . . . That Plaintiff disputes the accuracy of the nondiscriminatory justification for her termination is not enough to establish pretext.").[31]

The burden then shifts to Olorode to offer evidence from which a reasonable jury could conclude by a preponderance of the evidence that discrimination against Olorode's race or national origin played a role in Streamingedge's termination decision.  (See cases cited at pages 22-24 above.)  Olorode does not need to show that Streamingedge's proffered reasons are false, only that discrimination was at least one of the motivating factors.  (See cases cited at pages 22-24 above.)  Because Olorode's evidence of discrimination is insufficient to make out a prima facie showing, it is undoubtedly insufficient to satisfy the third step of the McDonnell Douglas test.  See, e.g., Kennedy v. Related Mgmt., 403 F. App'x 566, 568 (2d Cir. 2010) ("[E]ven if we were to assume that [defendant's] asserted reason was pretextual, there is no evidence in the record from which a reasonable jury could find that it was a pretext to hide a discriminatory motive."), cert. denied, 131 S. Ct. 2451 (2011); Beachum v. AWISCO N.Y., 785 F. Supp. 2d 84, 97 (S.D.N.Y. 2011) ("Moreover, the evidence that Plaintiff pointed to in his attempt to establish a prima facie case does not alter this analysis.  As stated above, the alleged disparate treatment and Plaintiff's conclusory, vague statements about racially-motivated jokes are insufficient to establish an inference of discrimination at step one, let alone at step three of the McDonnell Douglas framework."), aff'd, 459 F. App'x 58 (2d Cir. 2012); Sicular v. N.Y.C. Dep't of Homeless Servs., 09 Civ. 0981, 2010 WL

---

[31]     See also, e.g., Oliveras v. Wilkins, 06 Civ. 3578, 2012 WL 3245494 at *13 (S.D.N.Y. June 26, 2012) (even if employer's conclusion about plaintiff's behavior was incorrect, "that error in and of itself would not allow one to infer a . . . discriminatory motive underlying the resulting decision to terminate plaintiff"), report & rec. adopted, 2012 WL 3245493 (S.D.N.Y. Aug. 3, 2012); Miller v. Nat'l Ass'n of Sec. Dealers, Inc., 703 F. Supp. 2d 230, 247 (E.D.N.Y. 2010) ("The relevant inquiry is not whether the performance-based justification for plaintiff's termination articulated by defendant is accurate or fair, but whether plaintiff can show any evidence that it was not the actual justification.").

423013 at *21 (S.D.N.Y. Feb. 4, 2010) (Peck, M.J.) ("As described above in connection with [plaintiff's] prima facie case, he either has not made out a prima facie case (which this Court has so held) or if he has, it is an incredibly weak showing.  While [plaintiff] challenges some of defendants' claims of his insubordination, he concedes that the factual basis for the main reasons DHS gave for firing him – his lateness and his improper comments about immigrants and foreigners – are true.  Accordingly, at the third <u>McDonnell Douglas</u> step, the case for granting summary judgment to defendants is even stronger than at the prima facie case stage." (citations omitted)), <u>report & rec. adopted</u>, 2010 WL 2179962 (S.D.N.Y. May 28, 2010), <u>aff'd</u>, 455 F. App'x 129 (2d Cir. 2012).

Olorode simply has not presented any evidence from which a rational jury could reasonably infer that Olorode's treatment and termination occurred under circumstances giving rise to any inference of discriminatory intent.  Accordingly, Streamingedge's summary judgment motion as to Olorode's claim of racial and national origin discrimination should be granted.

**III.    STREAMINGEDGE'S SUMMARY JUDGMENT MOTION SHOULD BE GRANTED AS TO OLORODE'S RETALIATION CLAIMS**

Claims of retaliation for engaging in protected conduct under the NYSHRL are analyzed under the <u>McDonnell Douglas</u> burden-shifting framework.  <u>Summa</u> v. <u>Hofstra Univ.</u>, 708 F.3d 115, 125 (2d Cir. 2013) ("The burden-shifting framework laid out in <u>McDonnell Douglas</u> . . . governs retaliation claims under both Title VII and the NYSHRL."); <u>Schiano</u> v. <u>Quality Payroll Sys., Inc.</u>, 445 F.3d 597, 609 (2d Cir. 2006).[32/]  To establish a prima facie case of retaliation:

"a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find (1) that [s]he engaged in protected [activity] under [the anti-discrimination statutes], (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the

---

[32/]    <u>Accord</u>, <u>e.g.</u>, <u>Joseph</u> v. <u>Owens & Minor Dist., Inc.</u>, No. 11-CV-5269, --- F. Supp. 2d ----, 2014 WL 1199578 at *13 (E.D.N.Y. Mar. 24, 2014); <u>Jeune</u> v. <u>City of N.Y.</u>, 11 Civ. 7424, 2014 WL 83851 at *6 (S.D.N.Y. Jan. 9, 2014).

protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action."

Fincher v. Dep. Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (quoting Kessler v. Westchester Cnty. Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006)).  "The elements of a retaliation claim under the NYCHRL are identical, 'except that the plaintiff need not prove any "adverse" employment action; instead, he must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity.'"  Jeune v. City of N.Y., 2014 WL 83851 at *6 (quoting Leon v. Columbia Univ. Med. Ctr., 11 Civ. 8559, 2013 WL 6669415 at *12 (S.D.N.Y. Dec. 17, 2013)).  However, like NYCHRL discrimination claims, NYCHRL retaliation claims are to "'be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed.'"  Mihalik v. Credit Agricole Cheuvreux N.A., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (quoting the Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85 § 7); see also, e.g., Joseph v. Owens & Minor Dist. Inc., 2014 WL 1199578 at *18.  "If the plaintiff succeeds [in establishing a prima facie case], then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory."  Fincher v. Dep. Trust & Clearing Corp., 604 F.3d at 720.  If the employer succeeds at the second stage, then the presumption of retaliation dissipates and the plaintiff must show that retaliation was a substantial reason for the complained-of action.  Id.

Interpreting the pleadings liberally, Olorode contends that he engaged in protected activity when he complained in 2008 and 2009 that he was routinely performing tasks outside his job requirement.  (Dkt. No. 6: Am. Compl. ¶¶ 28-30, 33-34, 35.)  Olorode further contends that his

termination in April 2010 constituted retaliation for these complaints. (Am. Compl. ¶ 55.) There is no dispute as to the third element of this claim.

First, complaining about over-work or menial assignments is not a protected discrimination claim. (See cases cited on page 27 above.) Second, assuming arguendo that Olorode's allegations were sufficient to establish the first three elements of a prima facie retaliation case, Olorode has failed to demonstrate any causal connection between his allegedly protected activities and his termination. A causal connection can be established by showing "(1) direct proof of retaliatory animus directed against the plaintiff; (2) disparate treatment of similarly situated employees; or (3) that the retaliatory action occurred close in time to the protected activities." McNair v. N.Y.C. Health & Hosp. Co., 160 F. Supp. 2d 601, 604 (S.D.N.Y. 2001); see also, e.g., Krasner v. City of N.Y., 11 Civ. 2048, 2013 WL 5338558 at *15 (S.D.N.Y. Sept. 23, 2013); White v. Pacifica Found., 11 Civ. 2192, --- F. Supp. 2d ----, 2013 WL 5288851 at *18 & n.8 (S.D.N.Y. Sept. 19, 2013). Olorode cannot show a causal connection between his allegedly protected activity and eventual termination by any of these means.[33]

Olorode has failed to show a sufficient temporal connection between his complaints to Rosenshein and his eventual termination. Although the Second Circuit has not "'drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish'" a causal connection, Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009), district courts within this

_____

[33] Olorode failed to produce, and the Court failed to find, any direct evidence in the record of retaliatory animus directed against Olorode. Moreover, Olorode has proffered no other circumstantial evidence, such as the "e-mails and other information of [Nweke's] discriminatory treatment" that allegedly he provided Rosenshein (Am. Compl. ¶ 33). Olorode's assertion in his amended complaint that Nweke held a meeting with Olorode after his complaints to Rosenshein for the purpose of intimidation fails to establish a genuine dispute of material fact. See, e.g., Maxton v. Underwriters Labs, Inc., No. 12-cv-1337, --- F. Supp. 2d ----, 2014 WL 1017062 at *11 (E.D.N.Y. Mar. 17, 2014).

Circuit "have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation," Murray v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases); see also, e.g., Brundidge v. Xerox Corp., No. 12-CV-6157, 2014 WL 1323020 at *4 (W.D.N.Y. Mar. 31, 2014); Jeune v. City of N.Y., 11 Civ. 7424, 2014 WL 83851 at *7 (S.D.N.Y. Jan. 9, 2014).

Accepting Olorode's allegation that he last met with Rosenshein in October 2009 to be true for the purposes of this motion, over six months elapsed before Olorode was terminated. (Am. Compl. ¶ 33.)[34/]  The temporal gap between these two events is too large by itself to create the requisite inference of causal connection.  See, e.g., Hahn v. Bank of Am. Inc., 12 Civ. 4151, 2014 WL 1285421 at *18 (S.D.N.Y. Mar. 31, 2014) ("Here, according to Plaintiff's own version of the facts, she complained in 'early August 2011' about [a] derogatory remark regarding Plaintiff's German national origin, but Plaintiff was not terminated until November 2, 2011, approximately 11 weeks after she claims to have made the complaint.  Without more, this period of time between Plaintiff's protected activity and her termination is too long to constitute evidence capable of sustaining Plaintiff's burden to establish a causal connection to support her retaliatory termination claim." (record citations omitted)); Chukwueze v. NYCERS, 891 F. Supp. 2d 443, 456-58 (S.D.N.Y. 2012) (three- to six-month gap insufficient to establish causal connection); Murray v. Visiting Nurse Servs. of N.Y., 528 F. Supp. 2d at 275 ("[T]here was approximately seventeen to nineteen months between plaintiff[']s 2003 complaint and the termination decision, and approximately seven to eight months between his 2004 complaint and the termination decision.  Based on these facts, it is beyond doubt that, with regard to the termination decision, there is insufficient evidence to infer a causal

---

[34/]   To the extent Olorode's email complaints to Okubo, of which Nweke was aware, constitute a protected activity, the last email exchange in the record occurred in April 2009, approximately one year before Olorode was fired.  (See pages 8-9 above.)

connection between plaintiff's protected activities and his termination. For this reason, plaintiff's retaliation claim must fail.").

Even assuming that Olorode could establish a prima facie case of retaliation, Olorode's claim nevertheless fails because he cannot show that, even under the more liberal NYCHRL retaliation standard, his termination was motivated by his complaints of mistreatment. As discussed above, Streamingedge presented substantial evidence that Olorode was one of five employees terminated as part of company-wide reduction in force.  (See pages 13-14 above.)  The undisputed evidence also showed that Olorode chronically was late to work, did not work well with his colleagues, did not follow directions, and was prone to outbursts.  (See pages 8-13 above.)  His tardiness particularly was bad in the weeks leading up to his firing.  (See pages 12-13 above.) Moreover, despite Okubo's prior requests to fire Olorode, Nweke had refused to do so.  (See page13 above.)  Olorode was terminated only when the company was forced to downsize.  (See pages 13-14 above.)  Given the overwhelming evidence supporting Streamingedge's decision and the void of evidence linking the decision to Olorode's complaints, Olorode has failed to meet his burden.  See, e.g., Johnson v. IAC/Interactive Corp., 11 Civ. 7909, --- F. Supp. 2d ----, 2014 WL 715666 at *8, *10 (S.D.N.Y. Feb. 24, 2014) ("The record evidence clearly and consistently supports defendants' contention that plaintiff's poor performance—and not unlawful discrimination—prompted her termination.  Most persuasively, defendants have submitted numerous contemporaneous documents from multiple sources, including [Plaintiff's] supervisor and others who directly reviewed her work, attesting to problems with [Plaintiff's] editing skills, work product, pace of work, and comedic sensibilities.  The testimonial evidence from [Plaintiff's] colleagues and supervisors, to the extent relevant, echoes the same performance issues reflected in the documents. . . . Plaintiff has failed to present 'sufficient evidence to support a rational finding that the legitimate nondiscriminatory

reasons proffered by the employer were false, and that more likely than not discrimination was the real reason for the discharge,' and thus does not raise a genuine issue of material fact . . . ."(record citation omitted)); Joseph v. Owens & Minor Dist., Inc., No. 11-CV-5269, --- F. Supp. 2d ----, 2014 WL 1199578 at *19 (E.D.N.Y. Mar. 24, 2014) ("In the absence of evidence beyond Plaintiff's speculation that his supervisor . . . and/or the human resources department of [Defendant] were motivated to terminate Plaintiff in response to Plaintiff's complaints . . . , Plaintiff cannot establish retaliation under the less stringent standard of the NYCHRL."); Pacheco v. Comp. Pharm. Servs., 12 Civ. 1606, 2013 WL 6087382 at *14, *16 (S.D.N.Y. Nov. 19, 2013) (finding plaintiff could not establish that defendant's reason for termination was pretext and denying her retaliation claim under NYCHRL where she denied that she possessed poor interpersonal skills, but did not dispute that she had received "multiple staff complaints" about her interpersonal skills).

## IV.   STREAMINGEDGE'S SUMMARY JUDGMENT MOTION SHOULD BE GRANTED AS TO OLORODE'S FLSA AND NEW YORK LABOR LAW CLAIMS

### A.   The FLSA Statutory Framework[35]/

"Section 7(a)(1) of the FLSA provides that, subject to certain exceptions, an employee who works more than forty hours per week must receive compensation for 'employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.'" Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558-59 (2d Cir. 2012) (quoting 29 U.S.C. § 207(a)(1)). Included in these exemptions are employees "employed in a bona fide executive, administrative, or professional capacity," or who "is a computer systems

---

[35]/   "The NYLL . . . mandates overtime pay and applies the same exemptions as the FLSA." Reiseck v. Univ. Comm'ns of Miami, Inc., 591 F.3d 101, 105 (2d Cir. 2010) (citing N.Y. Comp. Codes R. & Regs., tit. 12, § 142–3.2 ("An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of sections 7 and 13 of 29 U.S.C. 201 et seq., the Fair Labor Standards Act of 1938, as amended . . . .")).

analyst, computer programmer, software engineer, or other similarly skilled worker." 29 U.S.C. §

213(a)(1), (17).  "Employees who perform a combination of exempt duties as set forth in the

regulations in this part for executive, administrative, professional, outside sales and computer

employees may qualify for exemption."  29 C.F.R. § 541.708.  Streamingedge asserts that Olorode

falls into one or more of these exemptions and therefore is not entitled to any overtime payments.

(Dkt. No. 75: Streamingedge Br. at 19-26.)

The United States Supreme Court recently explained why Congress chose to exempt

certain classes of employees from the FLSA's overtime requirements:

> The exemption is premised on the belief that exempt employees "typically earned
> salaries well above the minimum wage" and enjoyed other benefits that "se[t] them
> apart from the nonexempt workers entitled to overtime pay."  It was also thought that
> exempt employees performed a kind of work that "was difficult to standardize to any
> time frame and could not be easily spread to other workers after 40 hours in a week,
> making compliance with the overtime provisions difficult and generally precluding
> the potential job expansion intended by the FLSA's time-and-a-half overtime
> premium."  Petitioners—each of whom earned an average of more than $70,000 per
> year . . . —are hardly the kind of employees that the FLSA was intended to protect.

Christopher v. SmithKline Beecham Corp., --- U.S. ----, 132 S. Ct. 2156, 2173 (2012) (citations

omitted).

"'[B]ecause the FLSA is a remedial act, its exemptions . . . are to be narrowly

construed,' and the burden rests on the employer to prove that a particular employee is exempt from

the Act's requirements."  Havey v. Homebound Mtg., Inc., 547 F.3d 158, 163 (2d Cir. 2008)

(quoting Martin v. Malcolm Pirnie, Inc., 949 F.2d 611, 614 (2d Cir. 1991), cert. denied, 506 U.S.

905, 113 S. Ct. 298 (1992)).[36/]

---

[36/]    See also Reiseck v. Univ. Comm'ns of Miami, Inc., 591 F.3d at 104; Young v. Cooper
Cameron Corp., 586 F.3d 201, 204 (2d Cir. 2009); June-Il Kim v. SUK Inc., 12 Civ. 1557,
2014 WL 842646 at *2 (S.D.N.Y. Mar. 4, 2014); Carhaupoma v. N.Y.-Presbyterian
Healthcare Sys., Inc., 11 Civ. 8670, 2013 WL 1285295 at *13 (S.D.N.Y. Mar. 29, 2013).

Whether an exemption applies to a particular employee "is a mixed question of law and fact." Myers v. Hertz Corp., 624 F.3d 537, 548 (2d Cir. 2010), cert. denied, 132 S. Ct. 368 (2011). "The question of how the [employees] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law . . . ." Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 106 S. Ct. 1527, 1530 (1986).

**B.      The Computer Systems Analyst Exception**

The FLSA exempts from its overtime requirements "any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty" is:

> (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;
>
> (B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>
> (C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or
>
> (D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $27.63 an hour.

29 U.S.C. § 213(a)(17).  The Department of Labor's ("DOL") regulations define "primary duty" as the employee's "principal, main, major or most important duty" and describe the court's inquiry as follows:

> Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.  Factors to consider when determining the primary duty of an employee

include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a).  "The amount of time an employee spends performing exempt work can be a 'useful guide' in determining whether his primary duty consists of exempt work."  Clarke v. JPMorgan Chase Bank, N.A., 08 Civ. 2400, 2010 WL 1379778 at *16 (S.D.N.Y. Mar. 26, 2010).

Prior to his employment at Streamingedge, Olorode earned a Computer Science Certificate from the Chubb Institute and a Management Information Systems Certificate from Columbia University.  (See page 2 above.)  Olorode was trained at Chubb to "support[] computer users from a user's perspective," which encompassed setting up workstations, email, and network access for the system's suers.  (Ex. M: Olorode 11/12 Dep. at 40.)  Similarly, Olorode's certificate from Columbia "was for management information systems, specialization [was] network administration, computer network administration and design."  (Olorode 11/12 Dep. at 32, 42-43.)  Olorode was trained to both diagnose and repair software problems.  (Olorode 11/12 Dep. at 34.)  Olorode testified that this training permitted him to "look[] at a problem from different angles and devis[e] a solution at the most effective and efficient time."  (Olorode 11/12 Dep. at 38.)  Additionally, Olorode was employed in systems support or information technology technician positions for over ten years prior to joining Streamingedge.  (See page 3 above.)

While at Streamingedge, Olorode served as a Systems Support Analyst.  (See page 5 above.)  In this capacity, which accounted for the majority of Olorode's time, Olorode was responsible for "designing and maintaining the proper operation of the trading platform" used by

46

Streamingedge's investment brokers.  (Dkt. No. 6: Am. Compl. ¶ 18; see also page 6 above.)[37/]  The

specific duties outlined in Olorode's employment agreement included "systems analysis, software

research and development, support, maintenance and testing, networking, and assistance with site

installations."  (See page 6 above.)  Olorode described that each morning he would check

Streamingedge's systems before trading began to ensure that the network was functioning properly.

(Olorode 11/12 Dep. at 120-21.)  The timing of this process, which began around 6 a.m., permitted

Olorode and other Systems Support Analysts to solve any network issues before the traders arrived

around 7 a.m.  (See page 6 above.)  Olorode described this daily task as "critical to the operation of

Streamingedge."  (Olorode 11/12 Dep. at 120.)  In addition to this daily routine, Olorode testified

that his "typical day not only involved . . . troubleshooting problems, virtually from [his] computer[

but also] sometimes physically . . . observ[ing] the broker . . . or sometimes . . . physical[ly]

inspect[ing] . . . their machine, the connection, depending on what nature of the problem they're

having ."  (Ex. N: Olorode 1/13 Dep. at 295.)  Olorode serviced a trading desk of approximately fifty

individuals.  (Olorode 11/12 Dep. at 51.)  Olorode was responsible for creating new user accounts

and giving those new users access to certain products to facilitate their trading functions.  (Olorode

11/12 Dep. at 56.)  He also, from time to time, was required to test new software for functionality.

(Olorode 11/12 Dep. at 114.)  Because of the financially-intensive nature of Streamingedge's

business, Olorode brushed up on his knowledge of financial systems so that he properly could

perform his system support responsibilities.  (Olorode 11/12 Dep. at 114.)

---

[37/]     Olorode's complaint alleges that the tasks assigned by Nweke that were unrelated to his job
as a Systems Support Analyst increased his weekly workload from forty hours to sixty hours,
indicating that, at most, Olorode spent one third of his time performing allegedly non-
exempt work.  (Am. Compl. ¶¶ 20-25.)

Olorode's description of his training and responsibilities is consistent with Hideki

Okubo's characterization of his role:

> [T]he job functions of a systems support analyst have been to determine why software or an operating system is not working, to report the problem, if necessary, and to find a way to make the system work properly and efficiently . . . .
>
> . . . [S]ystems support analysts have customarily helped brokers tailor the operating system to meet their particular needs . . . [and] if a piece of hardware breaks or malfunctions[,] a systems support analyst is usually required to repair it, or to buy or find another one.

(Dkt. No. 72: Okubo Aff. ¶¶ 15-16.)

The evidence in this case is consistent with the evidence in the few other cases within

the Second Circuit to address the FLSA's computer employee exemption. E.g., Clarke v. JPMorgan

Chase Bank, N.A., 08 Civ. 2400, 2010 WL 1379778 at *17-18 (S.D.N.Y. Mar. 26, 2010) ("In sum,

[plaintiff's] testimony and the other evidence before the Court show that [plaintiff] spent the

majority of his time at [defendant company] performing a combination of the functions specified

in [29 U.S.C.] § 213(a)(17).   Thus, he is exempt from the FLSA's overtime requirements.");

Bobadilla v. MDRC, 03 Civ. 9217, 2005 WL 2044938 at *6-9 (S.D.N.Y. Aug. 24, 2005) ("In view

of all the evidence, [plaintiff] performed highly-skilled work on MDRC computer systems and is

an exempt computer employee . . . .").  Although part of Olorode's job entailed work similar to that

of the non-exempt Help Desk employees in Bobadilla (i.e., basic computer maintenance), it is clear

that the primary purpose of Olorode's role was to provide critical network and software support to

their client's brokers, and these duties are consonant with those of exempt computer employees

described in § 213(a)(17).  See, e.g., Bobadilla v. MDRC, 2005 WL 2044938 at *8-9.

Here, Olorode has multiple technical certifications that equipped him with valuable

training and skills.  (See page 2 above.)  In both Bobadilla and Clarke, the court gave weight to the

employee's technical certifications in holding the employee exempt. See Clarke v. JPMorgan Chase Bank N.A., 2010 WL 1379778 at *17-18 ("Before being hired . . . , [Plaintiff] earned two technical certifications . . . which enables its holders to solve advanced company-wide support problems and high-level network problems." (quotations omitted)); Bobadilla v. MDRC, 2005 WL 2044938 at *7 ("The plaintiff had experience related to network management and held a valuable Cisco CCNA credential that would allow him to develop computer systems based on user specifications.").   The job descriptions in both Clarke and Bobadilla are comparable to Olorode's.   Compare Clarke v. JPMorgan Chase Bank N.A., 2010 WL 1379778 at *4 (plaintiff's job duties included "capacity management; . . . resolution of escalated server-related issues; special projects; and the creation and updating of technical manuals") and Bobadilla v. MDRC, 2005 WL 2044938 at *7 ("The record also demonstrates that the plaintiff['s job responsibilities included] . . . the configuration of the new network, and the testing and modification of hardware and software."), with Ex. D: Olorode 3/08 Contract ¶ 3 ("Duties include but not limited to systems analysis, software research and development, support, maintenance and testing, networking, and assistance with site installations."). Moreover, Olorode testified that his role was critical to Streamingedge's functionality and that he often engaged in sophisticated tasks in aid of his brokers.  (See page 46 above.)  These are all types of duties and responsibilities that characterize the computer employees exempted under § 213(a)(17).  See, e.g., Clarke v. JPMorgan Chase Bank N.A., 2010 WL 1379778 at *19 ("Thus, in Bobadilla, as here, 'plaintiffs primary duties included a combination of the duties covered in 29 U.S.C. § 213(a)(17).'" (quoting Bobadilla v. MDRC, 2005 WL 2044938 at *7)).[38]

---

[38]   Because Olorode is an exempt employee under the computer exception, the Court does not reach the issue of whether he also is exempt under the administrative or combination exceptions.

Thus, as an exempt employee, Olorode was paid an annual salary and was not entitled to overtime pay.

## V.   STREAMINGEDGE'S SUMMARY JUDGMENT MOTION SHOULD BE GRANTED AS TO OLORODE'S BREACH OF CONTRACT CLAIMS

Olorode asserts that Streamingedge breached the terms of his employment agreement when they failed to provide (1) three months notice or three months salary in lieu of notice; (2) a pro rated bonus for his year of termination; and (3) payment for accrued but unused sick and vacation days.  (Dkt. No. 6: Am. Compl. ¶ 56; see also Dkt. No. 88: Olorode Opp. Br. at 15.)  Streamingedge defends on the ground that Olorode never executed the March 2008 contract and that the properly executed November 2007 contract did not provide these benefits.  (Dkt. No. 75: Streamingedge Br. at 27-28.)  Olorode responds that he did execute the 2008 contract.  (Olorode Opp. Br. at 15.)  The Court need not decide which contract controls or what benefits are owed because, under either contract, Olorode was required to execute a general release as a condition precedent to receiving termination benefits, and it is undisputed that he failed to do so.

### A.   Legal Standard

Under New York law, a plaintiff alleging a breach of contract claim must establish the following elements: (i) the existence of a contract; (ii) adequate performance of the contract by the plaintiff; (iii) breach by the other party; and (iv) damages suffered as a result of the breach.  See, e.g., Hudson & Broad, Inc. v. J.C. Penney Corp., Inc., No. 13-2720-cv, --- F. App'x ----, 2014 WL 292192 at *1 (2d Cir. Jan. 28, 2014) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)); Dumont v. Litton Loan Servs., LP, 12 Civ. 2677, 2014 WL 815244 at *6 (S.D.N.Y. Mar. 3, 2014).  "When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language

employed and the parties' reasonable expectations." <u>131 Heartland Blvd. Corp.</u> v. <u>C.J. Jon Corp.</u>,

82 A.D.3d 1188, 1189, 921 N.Y.S.2d 94, 96 (2d Dep't 2011).  "If the contract is unambiguous, its

meaning is . . . a question of law for the court to decide." <u>JA Apparel Corp.</u> v. <u>Abboud</u>, 568 F.3d

390, 397 (2d Cir. 2009).  "In interpreting an unambiguous contract, the court is to consider its

[p]articular words not in isolation but in the light of the obligation as a whole and the intention of

the parties as manifested thereby, but the court is not to consider any extrinsic evidence as to the

parties' intentions." <u>JA Apparel Corp.</u> v. <u>Abboud</u>, 568 F.3d at 397 (citations & quotations omitted);

<u>see also</u>, <u>e.g.</u>, <u>In re</u> <u>AMR Corp.</u>, 730 F.3d 88, 98 (2d Cir. 2013) ("[C]ourts applying New York law

construe a contract 'so as to give full meaning and effect to all of its provisions.'" (quoting

<u>PaineWebber Inc.</u> v. <u>Bybyk</u>, 81 F.3d 1193, 1199 (2d Cir. 1996))), <u>cert. denied</u>, No. 13-971, --- S.

Ct. ----, 2014 WL 583570 (Apr. 21, 2014).

>    **B.      Application to Olorode's Claim**

>    Section 11 of both contracts reads as follows:

>    11.      General Release by Employee

>>    At the time of the Termination of Employment, notwithstanding any provision of this Agreement, <u>the Employee acknowledges and agrees that the obligation of the Company to pay any compensation and benefits under this Section 11 is expressly conditioned upon the Employee's timely execution of and concurrence to be bound by a general release of any and all claims</u> (other than claims for compensation and benefits payable under this Section 11 and claims under this Agreement) arising out of or relating to the Employee's employment and termination of employment.

(Exs. C & D: Olorode Contracts ¶ 11 (emphasis added); <u>see</u> page 6 above.)  The contractual

language unambiguously requires a signed release before any termination benefits are paid.  Olorode

testified that he was presented with a separation agreement and release form at the time of his

termination but did not sign it.  (<u>See</u> page 14 above.)  Olorode's testimony is corroborated by

documents in his personnel file, which indicate that he "did not sign or return [the] separation agreement." (Ex. E: Olorode Personnel File at 1.)  Accordingly, Olorode cannot satisfy the second element of his breach of contract claim and summary judgment in favor in Streamingedge should be granted.  See, e.g., Matya v. Dexter Corp., No. 97-CV-763, 2006 WL 931870 at *15 (W.D.N.Y. Apr. 11, 2006) (granting summary judgment in favor of defendant where "the payment of severance pay . . . was contingent on plaintiff's agreement to sign a release of claims, [and] plaintiff refused to sign"), aff'd, 250 F. App'x 408 (2d Cir. 2007); Cronin v. ITT Corp, 737 F. Supp. 224, 231 (S.D.N.Y. 1990) (Plaintiff "did not fulfill the conditions necessary for him to become eligible to receive the award [of 3-months salary at the time of his discharge].  As part of both the Voluntary and Involuntary Separation Plan, departing employees were offered an option to elect a cash award in addition to their notice and severance pay by signing a Separation Agreement that contained a release clause. . . . Plaintiff did not receive the special award simply because he did not sign the Separation Agreement."), aff'd, 916 F.2d 709 (2d Cir. 1990).

## CONCLUSION

For the reasons set forth above, Streamingedge's summary judgment motion (Dkt. No. 70) should be GRANTED.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels, 500 Pearl Street, Room 1310, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Daniels (with

52

a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those

objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v.

Herrick, 475 F. App'x 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d

1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984

F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992), cert. denied, 506

U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d

Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714

F.2d 234, 237-38 (2d Cir. 1983).


Dated:          New York, New York
                April 29, 2014

                                              _____
                                              **Andrew J. Peck**
                                              United States Magistrate Judge


Copies ECF to:          All Counsel
                        Judge George B. Daniels